UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SCORPION FITNESS INC. | Case No.: 1:19-11231-MEW |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| SCORPION CLUB VENTURES, LLC | Case No.: 1:19-11232-MEW |
| Debtor. | |

**LANDLORD'S DECLARATION IN OPPOSITION TO MOTION TO DEPOSIT POST-PETITION RENT INTO ESCROW, AND IN SUPPORT OF CROSS-MOTION FOR STAY RELIEF AND/OR PAYMENT OF POST-PETITION RENT, DISCHARGE OR BOND OF MECHANIC'S LIENS AND CORRECTING VIOLATIONS**

Pawan Melgiri, hereby declares as follows under the penalties of perjury:

1. I am an asset manager for Stellar Management, the managing agent for 220 Fifth Realty, LLC ("Landlord"), the landlord and net lessor of the building located at 220 Fifth Avenue, New York, New York ("Building"). A copy of the Assignment to Landlord is annexed hereto as **Exhibit A**.

2. Debtors, Scorpion Fitness Inc. and Scorpion Club Ventures LLC (collectively, "Debtors"), are the tenants of record currently in possession of all rooms/areas of a portion of the ground floor, mezzanine, and lower level ("Premises"), pursuant to a written Lease, dated December 19, 2014, by and between Petitioner's predecessor in interest, Dino & Sons Realty Corp., as landlord, and Tenants as tenants, which was modified by a First Lease Modification Agreement

dated June 30, 2017 (collectively, "Lease"). True copies of the Lease and First Lease Modification are annexed hereto respectively as **Exhibits B and C**.

### In Support of Landlord's Cross-Motion

3.     Debtors have failed to pay both pre- and post-petition rent and additional rent and to date owe Landlord $309,236.13, of which $45,082.90 is post-petition – See **Exhibit N.** Another month of rent will have become due by the hearing date of this motion sequence on July 9, 2019.

4.     In addition to failing to remain current with regard to its payment obligations under the Lease, as set forth in the various default notices and termination notice annexed hereto as **Exhibits D through J**, Debtors has committed multiple, material non-monetary defaults under the Lease. Debtors have hired uninsured and unlicensed workers without Landlord's consent, caused Department of Buildings and FDNY violations, liens and Stop-Work-Orders to be issued against the Building, have otherwise breached the lease in numerous ways.

5.     The mechanic's liens Debtors caused to be filed against the Building amount to **$953,305.88** ($375,205.55 of which has been discharged but not removed by Debtors of record – leaving $577,830.33 in active mechanic's liens outstanding), and are particularly material because their existence constitutes a default of Landlord's lease with the Building-Owner. See **Exhibits I and O**, ¶12(d).

6.     Landlord is not adequately protected in this case. Landlord is owed hundreds of thousands of dollars in rent, additional rent and security deposit, and may be defaulted under its own lease because of Debtors' failure to discharge or bond the aforementioned mechanic's liens.

7. Debtors have not been complying with the applicable rule which I am advised requires them to timely perform their obligations under the lease until it's assumed or rejected. For the reasons also stated in the accompanying affirmation, Landlord's motion for stay relief should be granted, however, if the Court denies this application, it is requested that at a minimum, Debtors should be ordered to pay all outstanding post-petition rent to Landlord and clear either by bond or discharge, the mechanic's liens as well as correct the violations of record.

### In Opposition to Debtors' Motion to Pay Rent into Escrow

8. Debtors' motion to pay rent into escrow should be denied. Debtors repeat the same arguments already unsuccessfully made to the State Court regarding water leaks, asbestos, etc., and I am advised that Debtors are precluded from raising in a new forum the same arguments which were presented to, and rejected by, the State Court.

9. Nevertheless, Debtors' arguments are without merit and their litany of complaints are nothing more than attempts to shift the blame to Landlord for their total inability to complete their build-out and open for business, which was supposed to occur on or before **December 31, 2017**. See **Exhibit C**, ¶4.

10. Debtors are certainly not entitled to any rent abatement which is clearly set forth in the Lease Modification dated June 30, 2017 ("Modification"), where Debtors agreed to pay the rent without any condition or abatement. See **Exhibit C**. Said Modification also provides Debtors' agreement they've defaulted in the payment of rent, and the **unconditional and irrevocable waiver and release a rent abatement** as set forth in Lease ¶41(D)(See ¶5[b]).

11. Further, Article 5(c) of the Modification states as follows Debtors agreed they are obligated to timely and fully pay rent going forward.

12. It states:

> "Except as otherwise expressly provided above in this Paragraph (5), this Tenant shall continue to be obligated to timely and fully pay all Base Rent and additional rent and other sums due or payable in accordance with and subject to the terms and conditions of the Lease."

See **Exhibit C**, ¶5(c).

13. While the Article 6 of the Modification provides for certain work to be done by Landlord, payment of the rent and additional rent is *not* conditioned on said work and Debtors' motion presents nothing to the contrary.

*Debtors' claim of water infiltration*

14. First, the claim of leaks and mold in the Premises was presented to and rejected by the State Court when Debtors were, despite protesting the alleged existence of water, ordered to pay rent to Landlord in the February 4, 2019 State Court Order. See **Exhibit L**.

15. There are no leaks that prevent Debtors from opening for business and Debtors specifically acknowledged the same in the Lease Modification (**Exhibit C**), where they agreed in 2017:

> "Tenant hereby confirms that Landlord is not in default under any provisions of the Lease, that there are no claims, off-sets, counterclaims, or defenses with respect to the Lease, and, to the extent any such claims, off-sets, counterclaims, and/or defenses may exist, have existed or shall exist, Tenant hereby agrees to, and does hereby forever waive, and release same, if any."

See **Exhibit C**, ¶11(a)

16. Regardless, Debtors' claims regarding alleged water leaks and mold fail to set forth a basis to escrow rent because they are ultimately not entitled to a rent abatement which is clearly barred by the express terms of the Lease.

4

17. Paragraph 4 ("Repairs") of the Lease states in relevant part:

> Except as specifically provided in Article 9 or elsewhere in this Lease, **there shall be no allowance to the Tenant for the diminution of rental value and no liability on the part of Owner by reason of inconvenience, annoyance or injury to business arising from Owner, Tenant or others, making or failing to make any repairs, alterations, additions or improvements** in or to any portion of the building, including the erection or operation of any crane, derrick or sidewalk shed, or in or to the demised premises or the fixtures, appurtenances or equipment thereof. It is specifically agreed that Tenant shall be not entitled to any set off or reduction of rent by reason of any failure of Owner to comply with the covenants of this or any other article of this lease. Tenant agrees that Tenant's sole remedy at law in such instance will be by way of an action for damages for breach of contract.

18. Paragraph 67 of the Lease states in relevant part:

> The work [repairs alterations, etc.], entry and access described herein **shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord and Tenant hereby agrees to release Landlord of and from any claims (including without limitation, claims arising by reason of loss or interruption of business)** provided that Landlord shall use commercially reasonable good faith efforts to lessen adverse effects on Tenant's use and property in connection with the work described in this paragraph without an obligation to incur overtime or premium pay rates.

19. Similarly, paragraph 50(B) of the Lease provides that the Landlord shall not be liable for "…damage to Tenant's property on the demised premises caused by or resulting from any cause whatsoever, including … flood, … or water, … which may be upon, or leak or flow from, any street, road, parking lot, sewer, gas main or subsurface area, or from any part of the Building, or leakage of gasoline, oil or other substances from pipes, pipelines, appliances, storage ,tanks, sewers or plumbing works in or at the Building,…"

5

20. Thus, Debtors' oft-repeated claim of leaks as an excuse for their failure to complete their build-out and open for business, or as a basis to escrow -and not pay to Landlord- the rent, is ultimately without merit.

21. When Landlord subleased the Building in 2017, we hired a waterproofing consultant and spent nearly $100,000 in sidewalk replacement and waterproofing. Debtors have thwarted additional waterproofing attempts by Landlord, instead stating that their consultant, Rand Engineering, would undertake same. See **Exhibit S**. Debtors never provided access and advised of their proposed solution and Rand ultimately wound up filing a mechanic's lien against the Building. See **Exhibit T**.

22. Also without merit is Debtors' claim regarding mold. Even if mold is present in the Premises, it is Debtors responsibility and obligation to cure that condition and it has no effect on their obligation to pay rent. Debtors present to the Court an "Assessment Report" dated February 1, 2019, which pre-dates the State Court's February 4, 2019 Order, and a "Mold Investigation" dated April 19, 2019. The latter concludes the only mold found in the Premises was located in a single portion of the space called the "East Exercise Room." As set forth in the Lease, it is Debtors' obligation to make repairs not explicitly assigned to Landlord and would nevertheless, not constitute grounds for a rent abatement.

*Alleged Asbestos.*

23. Debtors' claims of asbestos were presented to, and rejected by, the State Court. Regardless, Debtors' claims regarding Asbestos are equally unavailing and do not warrant payment of the rent into escrow.

24. Debtors rely on a 2017 letter from "AnCor" their previous general contractor, which does not establish the presence of asbestos in the Premises, merely that "potential" asbestos was "*suspected*." Upon being advised of suspected asbestos *nearly three months after* the AnCor letter, Landlord immediately hired Pennoni Associates, an engineering consulting firm, to inspect the Premises based on Debtors' scope of work and the results came back clean. See **Exhibit R**. Landlord delivered a clean ACP-5 report to Debtors as required by the Lease. In addition, in March 2018, Landlord had Pennoni test additional areas in the Premises, which also came back "NAD" (No Asbestos Detected). See **Exhibit S**.

25. There is no asbestos in the Premises that would adversely affect safety of any occupants. If there was, Landlord has always been willing to abate same. Debtors are simply attempting to shift blame to Landlord for anything and everything.

*Debtors' "Other Deficiencies"*

26. Notwithstanding that the State Court already rejected the enumeration of Debtors' so-called "other deficiencies," Debtors motion further goes on to list various other "deficiencies" allegedly the fault of Landlord, where each alleged instance has been exacerbated, delayed, or caused by Debtors.

27. For example, Debtors delayed their buildout by unilaterally changing the HVAC scope of work multiple times. See **Exhibit T**. Debtors have had multiple contractors and vendors quit for non-payment and Debtors hired unlicensed workers without Landlord's permission to work in the Premises (a lease violation itself), which also violated a Stop-Work-Order issued by the Department of Buildings.

7

28. Moreover, Debtors' motion presents *nothing* (except a 2016 letter from one of their contractors – a contractor who filed a mechanic's lien against the Building for nonpayment by Debtors), to support the myriad of allegations in its supporting declaration.

29. Nevertheless, each so-called "deficiency" is without merit.

30. Regarding the "exclusive and private 'ADA approved elevator,'" Debtors took six weeks to review the submittals sent by IDDC (one of their former general contractors and now a mechanic's-lienor), who then withdrew their elevator permits due to lack of payment.

31. IDDC was further delayed when Debtors' architect withdrew for non-payment. See **Exhibit U**. Eventually, IDDC terminated Debtors' contract based on their non-payment and filed a mechanic's lien for over $350,000. See **Exhibit I**.

32. At no time did Landlord ever direct IDDC to stop performing work for Debtors, allow permits to lapse or have any vendor file a mechanic's lien (which would constitute a default against Landlord).

*A claimed rent-abatement*

33. As stated above, Debtors are in no event entitled to any rent abatement. The parties agreed to same in the First Lease Modification, a negotiated agreement which supersedes the Lease, excludes a rent abatement, and specifically agrees that the rent commencement date occurred in 2016. See **Exhibit C**, ¶5(a) and ¶5(c).

34. With regard to a pipe burst in February, such an event is not the type that is contemplated by the Lease provision cited by Debtors, which requires the Premises to become "totally damaged" or "rendered wholly unusable" by fire or other casualty.

35. Debtors present no evidence whatsoever that the Premises has been rendered unusable or damaged

36. I hereby certify that the information provided herein and any exhibits attached hereto is/are derived from records that were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; that the records were kept in the course of regularly conducted activity; that the records were made in the course of the regularly conducted activity as a regular practice; and that the information provided herein is true and correct based on personal knowledge of Landlord's books and business records.

37. I hereby declare, pursuant to 28 U.S.C. §1746 and under penalties of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 24, 2019

Pawan Melgiri

ERIC PITTER
Notary Public, State of New York
No. 02PI6211505
Qualified in Queens County
Commission Expires Sept. 21, 2021