# SUBLEASE AGREEMENT

Between

## CROISIC BUILDING, LLC

a Delaware limited liability company

### "Sublandlord"

and

## 220 5TH REALTY LLC

a Delaware limited liability company

### "Subtenant"

| | |
|---|---|
| Block: | 828 |
| Lot: | 35 |
| Address: | 218-220 Fifth Avenue, New York, New York 10001 |
| County: | New York |
| State: | New York |

# <u>SUBLEASE AGREEMENT</u>

## <u>INDEX</u>

### Table of Contents

|  |  | **Page** |
|---|---|---|
| 1. | Premises and Term. | 1 |
| 2. | Assignment of Existing Occupancy | 3 |
| 3. | Acceptance of Premises in "As-Is" Condition. | 4 |
| 4. | Rent. | 4 |
| 5. | Net Lease. | 6 |
| 6. | Use(1) . | 6 |
| 7. | Utility Charges. | 6 |
| 8. | Taxes. | 7 |
| 9. | Insurance. | 8 |
| 10. | Title Encumbrances Affecting the Premises. | 12 |
| 11. | Maintenance and Repairs. | 13 |
| 12. | Tenant Improvements and Alterations. | 13 |
| 13. | Equipment, Fixtures and Signs. | 14 |
| 14. | Hazardous Materials. | 14 |
| 15. | Damage by Fire or Other Casualty. | 16 |
| 16. | Condemnation. | 17 |
| 17. | Liability and Indemnification. | 19 |
| 18. | Assignment and Subletting(a) . | 21 |
| 19. | Default. | 22 |
| 20. | Subtenant's Insolvency. | 23 |
| 21. | Remedies and Damages. | 27 |
| 22. | Sublandlord's Expenses and Late Charges. | 30 |
| 23. | Access. | 31 |
| 24. | Covenant of Quiet Enjoyment. | 31 |
| 25. | Subordination and Non-Disturbance. | 31 |
| 26. | Holding Over by Subtenant. | 34 |
| 27. | Notices and Payments. | 35 |
| 28. | Force Majeure. | 35 |

29.    Waiver of Subrogation...........................................................................................35

30.    Recording..............................................................................................................36

31.    Waiver of Sublandlord's Lien. ..............................................................................36

32.    Mortgage by Subtenant(i) .....................................................................................36

33.    Sublandlord's Liability Limited to Sublandlord's Interest....................................44

34.    Excavations and Shoring. ......................................................................................44

35.    Miscellaneous. .......................................................................................................45

36.    Definitions. ............................................................................................................47


Exhibit A -    Description of the Premises
Exhibit B -    Base Rent Schedule
Exhibit C -    Memorandum of Lease
Exhibit D -    Form of Estoppel Certificate
Exhibit E -    Form of Fee Owner Recognition Agreement
Exhibit F -    Rights, Recognition, Non-Disturbance and Attornment Agreement
Exhibit G -    Minimum Scope of Capital Improvements

## SUBLEASE AGREEMENT

THIS **SUBLEASE AGREEMENT** (this "**Lease**") is made and entered into effective as of March 2 2, 2017 (the "**Effective Date**"), by and between **CROISIC BUILDING, LLC**, a Delaware limited liability company ("**Sublandlord**"), and **220 5TH REALTY LLC**, a Delaware limited liability company ("**Subtenant**").

In consideration of the agreements hereinafter set forth to be kept and performed by the parties hereto, Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, the premises hereinafter described, for the term, at the rental and subject to and upon the following terms, conditions and agreements:

1.          **Premises and Term.**

(a)          The premises leased herein consists of that certain improved parcel of land more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes, together with all rights, privileges, easements and appurtenances belonging or in any way pertaining thereto (such land and additional rights being hereinafter collectively referred to as the "**Land**"), together with the building and other improvements and appurtenances that are located on the Land (such building and improvements being hereinafter collectively referred to as the "**Improvements**") and the machinery, equipment and systems necessary for the operation of the Improvements that are "fixtures" pursuant to applicable law (hereinafter collectively referred to as the "**Fixtures**"); provided, however, that the Improvements and Fixtures as referenced herein shall specifically exclude any and all of Subtenant's personal property, business equipment, trade fixtures located within the Premises (as hereinafter defined) that are used primarily for the operation of Subtenant's business and any replacements thereof (hereinafter collectively referred to as **"Subtenant's Business Property**"), TO HAVE AND TO HOLD the same from even date herewith and for a term (hereinafter referred to as the "**Term**") commencing on the Effective Date and expiring on the last day of the calendar month in which the ninth (9th) year anniversary of the Effective Date occurs.  The Land, together with the Improvements and Fixtures thereon, shall hereinafter collectively be referred to as the "**Premises**".  If the holder of the option to purchase the membership interests in Sublandlord, granted pursuant to that certain Option Agreement dated March 22, 2017 (the "**Membership Interests Option**") between Dino & Sons Realty Corp. and Dino Tomassetti, Jr. (collectively, the "**Sublandlord's Members**"), and 220 Fifth Avenue Member LLC (the "**Option Holder**"), terminates the Membership Interest Option as a result of the default by Sublandlord's Members under either the Membership Interests Option or under that certain Membership Interest Purchase Agreement to be entered into by Sublandlord's Members and Option Holder pursuant to the Membership Interests Option, which default results in Option Holder being unable to realize Option Holder's rights under the Membership Interest Option or the Membership Interest Purchase Agreement, then Subtenant shall have the right to terminate this Sublease simultaneously with such termination of the Membership Interests Option and the termination of the Membership Interest Purchase Agreement, and in such event neither party shall have further obligations to the other under this Sublease except with respect to those obligations under this Sublease which have accrued prior to such termination or which expressly survival termination.

(b)    Notwithstanding any present or future law to the contrary: (i) this Sublease shall not be terminated by Subtenant for any failure of Sublandlord to perform its obligations pursuant to the terms and conditions of this Sublease; and (ii) this Sublease is a "net" lease and shall not terminate except as otherwise expressly provided herein, nor shall Subtenant be entitled to any abatement, reduction, diminution, set-off, counterclaim, defense or deduction with respect to any Base Rent, additional rent or other sums payable hereunder (except as otherwise provided herein), nor shall the obligations of Subtenant hereunder be affected (except as otherwise provided herein), by reason of: (A) any damage to or destruction of the Premises or any portion thereof; or (B) any defect in the condition, design, operation or fitness for use of the Premises or any portion thereof; or (C) any taking of the Premises or any part thereof by condemnation or otherwise; or (D) any prohibition, limitation, interruption, cessation, restriction or prevention of Subtenant's use, occupancy or enjoyment of the Premises, or any interference with such use, occupancy or enjoyment by any Person; or (E) any eviction by paramount title or otherwise; construction on or renovation of the Premises; or (F) any failure of the Premises to comply with all Applicable Laws (as defined in <u>Section 36</u> hereof); or (G) any other cause whether similar or dissimilar to the foregoing.

(c)    If on that date which is one hundred eighty (180) days prior to the expiration of the initial Term, or prior to the then current Sublease Extension Term (as hereinafter defined), as applicable, the Membership Interest Option Period (as defined in <u>Section 36</u> hereof) shall not have expired then, until the Membership Interest Option Period expires, Tenant shall have the option to extend (each, an "**Option to Extend**") the term of this Sublease for separate consecutive extension periods (collectively as the "**Sublease Extension Periods**" and individually as an "**Sublease Extension Period**") upon and subject to the terms set forth in this <u>Section 1(c)</u>. Each Sublease Extension Period shall continue for a period of one (1) year from the commencement date of such Sublease Extension Period.  Provided that as of the date such Sublease Extension Period is scheduled to commence, this Sublease has not been terminated and provided that the Membership Interest Option Period shall not have expired, Tenant shall be deemed to have automatically exercised its option to extend the Term for the next Sublease Extension Period, unless Tenant shall deliver to Landlord written notice of Tenant's election not to extend for the next Sublease Extension Period not later than one hundred eighty (180) days prior to the expiration of the then-existing Term. Except as otherwise expressly provided herein, all of the terms and conditions of this Sublease applicable to the Term shall continue to apply during each Sublease Extension Period.  The initial Term and any Sublease Extension Period for which an option has been exercised shall hereinafter collectively be referred to as the "**Term**".  Without limitation to the foregoing, unless otherwise elected by Subtenant in writing, the Sublease and the Term hereof shall continue to be automatically extended until such time as the "Closing" under the Membership Interest Purchase Agreement shall have occurred.

(d)    It is agreed that this Sublease is subject and subordinate to the Lease Agreement dated as of March 22, 2017 between Dino & Sons Realty Corp., as fee owner/landlord (the "**Landlord**" and Sublandlord, as Tenant (the "**Lease**") and that no right, power or privilege granted to Subtenant hereunder may be exercised or enjoyed by Subtenant if and to the extent that such exercise, enjoyment, or operation would violate or conflict with any terms, conditions or covenant of the Lease.  Subtenant shall comply with all of the obligations of Sublandlord, as tenant, under the Lease, other than the payment of Base Rent thereunder or any sums payable by reason of a default of the Sublandlord thereunder.  Subtenant covenants and agrees that it will not

2

do or permit anything that would violate, breach, or be contrary to any of the terms, conditions or covenants of the Lease. Notwithstanding the foregoing, Sublandlord hereby agrees that in no event shall it exercise a right to terminate the Lease prior to the termination of this Sublease, it shall not default thereunder and it shall not amend, extend, modify or terminate the Lease or suffer a default thereunder. Unless Sublandlord acquires the landlord's interest in the Lease, nothing contained in this Sublease shall make Sublandlord responsible to perform any obligations of Landlord under the Lease, and Sublandlord shall not be liable to Subtenant for any default, failure, or delay by Landlord in the performance of any of its obligations under the Lease, nor shall such default of Landlord affect this Sublease, or waive or defer the performance by Subtenant of its obligations hereunder; provided, nevertheless, that in the event of any such default or failure of performance by Landlord, Sublandlord agrees, upon notice from Subtenant, to as directed by Subtenant;

        (1)     make demand upon Landlord to perform its obligations under the Lease; and/or

        (2)     exercise any and all rights available to Sublandlord, as tenant under the Lease, in the event of a default of the Landlord; and/or

        (3)     institute litigation against Landlord, in order to enforce its rights under the Lease; and/or

        (4)     permit Subtenant to institute litigation against Landlord in the name of Sublandlord (all of the foregoing being hereinafter called the "Enforcement Procedures").

Subtenant shall reimburse Sublandlord for all of Sublandlord's actual reasonable necessary third-party and out-of-pocket costs and expenses with respect to the Enforcement Procedures. Sublandlord shall promptly deliver to Subtenant a copy of any notice of default served on Sublandlord, as tenant under the Lease. Notwithstanding anything to the contrary in this Sublease, Subtenant shall have the right to cure any default by Sublandlord under the Lease for and on behalf of Sublandlord and recover the cost thereof from Sublandlord and/or offset such costs against the Rent.

        2.     **<u>Assignment of Existing Occupancy Agreement.</u>** Sublandlord hereby assigns to Subtenant all of Sublandlord's right, title and interest as landlord under the Existing Leases (as defined in <u>Section 36</u> hereof), which Existing Leases shall be subleases of the Premises on the terms and conditions set forth in the Existing Leases. As of the Effective Date, Sublandlord shall adjust with Subtenant, all rents payable with respect to the Existing Leases, with rents payable for the Effective Date being credited to the Subtenant. Concurrently with entry herein Sublandlord shall transfer to Subtenant all security deposits under the Existing Leases. From and after the Effective Date, Subtenant shall be entitled to receive all rent payable under the Existing Leases. Subtenant shall fulfill, perform and observe in all respects, at no cost or expense to Sublandlord, each and every obligation, condition and covenant of the landlord in each Existing Lease first arising and first accruing from and after the Effective Date and shall indemnify, defend and hold harmless each of the Sublandlord Indemnitees (as defined in <u>Section 17</u> hereof) for, from and against any and all damages, injury, losses, compensation or claims relating to obligations under

the Existing Leases first arising and first accruing from and after the Effective Date. Sublandlord shall indemnify defend and hold harmless each of the Subtenant Indemnitees (as defined in Section 36 hereof) from and against any and all damages, injury, losses, compensation or claims relating to obligations under the Existing Leases that first arose or first accrued prior to the Effective Date. Sublandlord represents, warrants and covenants to and with Subtenant that (i) a true, correct, complete and accurate rent roll for the Premises, setting forth all of the Existing Leases is annexed hereto as <u>Schedule</u> 2, (ii) that except as set forth on Schedule 2, all Existing Leases are in full force and effect and to Sublandlord's actual knowledge, without default by any party thereunder, (iii) that no notice of default under any of the Existing Leases has been given by any party thereto which remains uncured, except as set forth on Schedule 2, (iv) that all rents as set forth on Schedule 2 are actually billed and collected on a current basis, except as set forth thereon, (v) that there are no options to purchase, rights of first offer to purchase or rights of first refusal to purchase pursuant to the Existing Leases, (vi) there are no offsets, claims, counterclaims or defenses under the Existing Leases, and (vii) all tenant improvement work, tenant improvement allowances, other reimbursements to tenants and/or landlord's work under the Existing Leases has been fully paid and/or performed, as applicable. Sublandlord further represents, warrants and covenants to and with Subtenant that true, correct, complete and accurate copies of all Existing Leases have been provided to Subtenant. In furtherance of the terms and provisions of this Section 2, Sublandlord shall, promptly upon demand, execute, acknowledge and deliver all further instruments, agreements and documents as Subtenant shall reasonably request to effectuate the terms and provisions of this Section 2.

      3.      **<u>Acceptance of Premises & Condition</u>**.

      (a)      **EXCEPT AS OTHERWISE PROVIDED IN THIS SUBLEASE, SUBTENANT ACKNOWLEDGES THAT SUBTENANT ACCEPTS POSSESSION OF THE PREMISES IN ITS "AS IS" PHYSICAL CONDITION AS OF THE EFFECTIVE DATE. EXCEPT AS OTHERWISE PROVIDED IN THIS SUBLEASE, SUBLANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PREMISES, EITHER AS TO ITS FITNESS FOR USE, ITS DESIGN OR CONDITION, OR ANY PARTICULAR USE OR PURPOSE TO WHICH THE PREMISES MAY BE FIT, OR OTHERWISE, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, OR THE EXISTENCE OF ANY DEFECTS, LATENT OR PATENT, IT BEING AGREED THAT ALL SUCH RISKS ARE BORNE BY SUBTENANT.**

      (b)      Sublandlord represents, warrants and covenants to and with Subtenant that except as set forth on <u>Schedule 3(b)</u>, there are no service contracts, maintenance agreements, commission agreements, brokerage agreements, leasing agreements, union contracts, employees or other agreements affecting the Premises and/or which shall be binding upon the Subtenant and Schedule 3(c) is true, correct, complete and accurate and there are no defaults by any party to the agreements set forth thereon and all sums payable thereunder have been paid to date and true, correct, complete and accurate copies of all such agreements have been provided to Subtenant.

      (c)      Sublandlord represents, warrants and covenants to and with Subtenant that except as set forth on Schedule 3(c), there are no employees at or of the Premises and that Schedule 3(c) is true, correct, complete and accurate and all such employees have been paid through the date hereof

and have not asserted any claims against Sublandlord, Landlord and/or otherwise with respect to their employment.

(d)    Notwithstanding anything to the contrary in this Sublease, Subtenant shall not be liable for the payment of any fines, penalties and/or interest with respect to any violations or notes or notices of violation issued or noted against the Premises, Land and/or Building as of the Effective Date and Sublandlord shall cause such to be paid at Sublandlord's sole cost and expense and Subtenant shall not be in default of this Sublease by reason of the existence of such fines, penalties and/or interest.

4.    **Rent**.

(a)    Subtenant shall pay to Sublandlord base rent (hereinafter referred to as the "**Base Rent**") during the Term in the amount specified on Exhibit B attached hereto and made a part hereof for all purposes, in equal monthly installments, in advance, without notice, demand, set-off or abatement (except as otherwise provided in this Sublease), with the first such monthly installment to be due and payable on the Effective Date, and thereafter each monthly installment to be due and payable on or before the first (1st) day of each succeeding calendar month during the Term. Rent for any fractional month at the beginning or the end of the Term shall be prorated on a per diem basis.

(b)    Except as otherwise provided in this Sublease, any sum owed by Subtenant to Sublandlord under this Sublease (other than Base Rent), and any cost, expense, damage or liability incurred by Sublandlord for which Subtenant is liable, shall be considered "additional rent," and shall be paid by Subtenant to Sublandlord no later than thirty (30) days after the date Sublandlord notifies Subtenant of the amount thereof and provides reasonable documentation evidencing the amount to be paid. Base Rent and any additional rent are hereinafter collectively referred to as "rent". Sublandlord shall have the same remedies which are provided to Sublandlord in this Sublease, at law or in equity for the non-payment of additional rent as Sublandlord would have for the non-payment of Base Rent.

(c)    All payments of rent shall be made to Sublandlord as the same shall become due, by wire transfer of immediately available funds to an account designated from time to time by Sublandlord, or by check or cashier's check, at the address specified in Section 27 hereof, or to such other party or at such other address as may hereafter be designated by Sublandlord by written notice delivered to Subtenant at least fifteen (15) days prior to the next ensuing monthly rental payment date. In the event Sublandlord does not receive payment of any installment of the Base Rent or additional rent then due and payable within five (5) Business Days (as defined in Section 36 hereof) of the date the same is due and payable, Subtenant shall pay to Sublandlord as a "late charge" for additional costs incurred by Sublandlord for administration, an amount equal to Six and 00/100 ($6.00) Dollars for each One Hundred and 00/100 ($100.00) Dollars of Base Rent and/or additional rent so overdue, and such "late charge" shall be collectible as additional rent by Sublandlord. In the event any of Subtenant's checks are returned for insufficient funds or for any other reason, or if said checks are unable to be deposited or cashed by Sublandlord, Subtenant shall pay to Sublandlord, as additional rent, a "service charge" of Fifty and 00/100 ($50.00) Dollars in each instance, for additional costs incurred by Sublandlord for administration, and Sublandlord

shall have the right to thereafter request that any amounts due and payable by Subtenant to Sublandlord hereunder be paid by certified or bank check.

5.      **Net Lease.**  Except as otherwise expressly provided in this Sublease, this Sublease shall be an absolute "net" lease, so that this Sublease shall yield all Base Rent payable hereunder as an absolutely net return to Sublandlord.  Accordingly, with the sole exception of Excluded Amounts (as defined in Section 8(b) hereof) and except as otherwise expressly provided herein, Subtenant shall pay all taxes, assessments, insurance, ground rents, repair costs, easement charges, association fees, and other costs, expenses and obligations of every kind and nature whatsoever relating to the Premises, including, without limitation, costs with respect to the ownership and operation, and all repairs, maintenance and replacements thereof, which accrue prior to the expiration of the Term and are applicable to periods of time prior to the expiration of the Term. Subtenant's obligation to pay all amounts described in this Section 5 shall survive the expiration or earlier termination of the Term.

6.      **Use.**  Throughout the Term and provided this Sublease has not been terminated, Subtenant shall use the Premises as an office building and ancillary uses incidental thereto or for any other legally permitted use.  Subtenant will not permit any unlawful occupation, business or trade to be conducted on the Premises, or any use to be made thereof contrary to Applicable Laws or the terms of each insurance policy required to be carried by Subtenant under this Sublease or the requirements of the issuer of such policy. Subtenant will not use, occupy or permit any of the Premises to be used or occupied, nor do or permit anything to be done in or on any of the Premises, in a manner which would: (i) violate any certificate of occupancy, zoning compliance certificate, or equivalent certificate affecting the Premises; or (ii) make void or voidable any insurance which Subtenant is required hereunder to maintain then in force with respect to any of the Premises; or (iii) adversely affect in any material manner the ability of Subtenant to obtain any insurance which Subtenant is required to furnish hereunder; or (iv) cause any injury or damage to any of the Improvements (other than for Alterations (as defined in Section 12 hereof) permitted under this Sublease); or (v) constitute a public or private nuisance or waste.  Except as otherwise provided in this Sublease, Subtenant covenants and agrees that Subtenant will obtain and maintain, at Subtenant's sole cost and expense, all licenses and permits from any and all governmental or quasi-governmental agencies, authorities, departments, bureaus, bodies or officials having jurisdiction of the demised premises which may be necessary for the conduct of Subtenant's business therein.

7.      **Utility Charges.**  Subtenant, at its own expense and risk, shall arrange with the appropriate utility companies and service providers for the provision to the Premises of water, sewer, trash collection, electricity, gas, heating, ventilation and air-conditioning, telephone, window washing, extermination, and all other utilities and services desired by Subtenant. Subtenant shall pay directly to the appropriate utility companies and service providers all "hook-up" or connection charges, charges for improvements and charges for all utilities consumed in and services performed for the Premises, as and when such charges become due and payable. To the extent the invoices for any such utilities and services are received by Sublandlord, Sublandlord shall forward such invoices to Subtenant and Subtenant shall pay the charge for such utilities and services directly to the utility or service provider.  If Subtenant does not promptly pay for any such utilities and services, then Sublandlord may pay for such utilities and services directly and Subtenant shall reimburse Sublandlord for such charges, as additional rent, within fifteen (15)

6

days after Subtenant's receipt from Sublandlord of written demand therefor..  Sublandlord shall remain liable for the payment of any utility charges with respect to any period prior to the Effective Date.

     8.    **Taxes**.

     (a)    Subtenant shall pay all Impositions (as hereinafter defined) before they become delinquent.  Subtenant shall deliver to Sublandlord receipts or other reasonably satisfactory evidence of timely payment of all Impositions so paid by Subtenant.  To the extent that any such Impositions are imposed upon Sublandlord, Subtenant shall pay such Impositions directly to the taxing authority.  If the Term expires on a day other than the last day of a calendar year or tax fiscal year, then Subtenant's liability for Impositions for such calendar year or tax fiscal year shall be apportioned by multiplying the amount of Impositions for the full calendar year or tax fiscal year, as the case may be, by a fraction, the numerator of which is the number of days during such calendar year or tax fiscal year falling within the Term, and the denominator of which is three hundred sixty-five (365).

     (b)    The term "**Impositions**" shall mean, collectively, taxes assessed, levied or imposed upon the Premises, including, without limitation, any present or future real estate taxes, all taxes or other impositions that are in the nature of or in substitution for real estate taxes, vault and/or public space rentals, business improvement district or arena taxes, water charges, sewer rents, gross receipts or rent taxes (including commercial rent tax) with respect to the rent paid by Subtenant under this Sublease (including on any sum or consideration classified as rent by the IRS), as well as special user fees, license fees, permits, improvement bonds, levies, improvement district charges, governmental charges, rates and assessments, general, special, ordinary or extraordinary, foreseen and unforeseen, that are imposed upon Sublandlord, Subtenant or the Premises, fixtures, machinery, equipment or systems used in connection with the Premises (including any Subtenant's Business Property) or the business being operated on the Premises, and specifically including any assessments, charges, fees or expenses payable by Sublandlord or with respect to the Premises pursuant to any Title Encumbrance (as defined in <u>Section 10(a)</u> hereof). Notwithstanding the foregoing, in no event shall Subtenant be liable hereunder for or be required to pay the following (hereinafter collectively referred to as the "**Excluded Amounts**"): (i) income, profit, excise, estate, gift, inheritance or franchise taxes levied, assessed or imposed upon Sublandlord; (ii) financing costs for any fee mortgages granted by Sublandlord with respect to the Premises; (iii) any transfer taxes imposed by reason of a transfer of all or a portion of Sublandlord's interest in the Premises, this Sublease or the Lease; (iv) any transfer taxes imposed by reason of Landlord's transfer of all or a portion of Landlord's interest in the Premises or the Lease; or (iv) any transfer taxes imposed by reason of this Sublease or the Lease.

     (c)    Subtenant, at its sole cost and expense, without notice to Sublandlord or any requirement to obtain Sublandlord's consent, shall have the right to contest the amount or validity of any Imposition with the applicable taxing authority, provided that the following conditions are met: (i) the Premises shall not, by reason of any postponement of payment, or the initiation of such proceeding, be subject to imminent forfeiture, sale, or loss; (ii) such proceedings shall not affect or interfere with Subtenant's continued payment of Base Rent or other additional rent hereunder; and (iii) pursuing the contest of Impositions shall not in any way expose Sublandlord to any criminal or civil liability, penalty or sanction which Subtenant does not pay.  Subtenant shall pay all

judgments, decrees and costs incurred by Subtenant in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied. Subtenant shall be entitled to any refund received with respect to Impositions paid by Subtenant.

(d)    Subtenant shall pay at least fifteen (15) days before delinquency any business, rent, commercial rent tax, sales, franchise or other taxes or fees that are now or hereafter levied, assessed or imposed upon Subtenant's use, operation, or occupancy of the Premises, the conduct of Subtenant's business at the Premises, or Subtenant's equipment, fixtures, furnishings, inventory or personal property. If any such tax or fee is enacted or altered so that such tax or fee is levied against Sublandlord or so that Sublandlord is responsible for collection or payment thereof, then, at least fifteen (15) days prior to the due date thereof, Subtenant shall pay to Sublandlord, as additional rent, the amount of such tax or fee.

(e)    During the term of this Sublease, unless requested by Subtenant, Sublandlord shall be responsible for the timely preparation and filing of the Real Property Income and Expense Statement ("**RPIE**") with the applicable governmental authorities. If Subtenant timely elects, Subtenant shall be responsible for filing the RPIE. The party responsible shall provide the other party hereto with a copy of the proposed RPIE filing at least fifteen (15) Business Days prior to the date upon which the same must be filed with the applicable governmental authority. The party responsible shall electronically file the RPIE and provide the other party hereto with a copy thereof and the electronic receipt therefore at least ten (10) Business Days prior to the deadline for filing of the same with the applicable governmental authorities. In the event of the failure of the party responsible to provide proof of filing at least ten (10) Business Days prior to the applicable filing deadline, the other party hereto, as its sole remedy with respect to such failure, shall have the option, at its discretion, to make such filing either on its own behalf or on behalf of the party responsible for filing as set forth herein.

9.    **Insurance**.

(a)    Subtenant shall procure and at all times during the Term maintain at Subtenant's sole cost and expense:

(1)    property insurance against loss or damage by fire, wind (including named storms), lightning and such other perils as are included in a standard "all risk" or "special form" policy, including riot and civil commotion, vandalism, terrorist acts, malicious mischief, burglary and theft, in each case (i) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost" of the Premises, which for purposes of this Sublease shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) waiving depreciation. The Full Replacement Cost must be adjusted annually to reflect increased value due to inflation. If this is not provided, Inflation Guard Coverage shall be required, (ii) written on a no co-insurance form or containing an agreed amount endorsement with respect to the Improvements and, if applicable, personal property at the Premises waiving all co-insurance provisions, (iii) providing for no deductible in excess of $25,000.00 (except for deductibles for windstorm and earthquake coverage, which deductibles may be up to five percent (5%) of the total insurable value of the Premises set forth in the policy), and

(iv) containing "Ordinance or Law Coverage" if any of the Improvements or the use of the Premises shall at any time during the Term constitute legal non-conforming structures or uses, including coverage for Loss to the Undamaged Portion, Demolition Costs and Increased Cost of Construction, all in amounts acceptable to Sublandlord.  In addition, Subtenant shall obtain if any portion of the Improvements is currently or at any time in the future located in a federally-designated "special flood hazard area," flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or such greater amount as Sublandlord shall require, provided that such insurance shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (1);

(2)    commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverages against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Premises, such insurance (i) to be on the so-called "occurrence" form and containing minimum limits per occurrence of Two Million Dollars ($2,000,000), with a combined limit per policy year, excluding umbrella coverage, of not less than Five Million Dollars ($5,000,000) applying "per location" if the policy covers more than one location; (ii) to continue at not less than the aforesaid limit until required to be changed by Sublandlord by reason of changed economic conditions making such protection inadequate; and (iii) to cover at least the following hazards:  (A) premises and operations; (B) products and completed operations on an "if any" basis; (C) independent contractors; (D) contractual liability for all insured contracts; and (E) contractual liability covering the indemnities contained in Section 17 hereof to the extent the same is available;

(3)    at all times during which construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability insurance coverage forms do not otherwise apply, coverage all in form and substance and with limits, terms and conditions acceptable to Sublandlord including (i) commercial general liability and umbrella insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policies required in this Section 9(a)(1); and (ii) the insurance provided for in Section 9(a)(1) hereof written in a so-called builder's risk completed value form, including coverage for one hundred percent (100%) of the total insurable costs of construction (A) on a non-reporting basis, (B) against all risks insured against pursuant to Section 9(a)(1), (5), (8) and (9), (C) including permission to occupy the Premises, and (D) with an agreed amount endorsement waiving co-insurance provisions;

(4)    workers' compensation, subject to the statutory limits of the State of New York, and employer's liability insurance with limits which are required from time to time by Sublandlord in respect of any work or operations on or about the Premises, or in connection with the Premises or its operation (if applicable);

(5)    boiler and machinery/equipment breakdown insurance in amounts as shall be reasonably required by Sublandlord on terms consistent with the commercial

property insurance Policy (as hereinafter defined) required under Section 9(a)(1) hereof (if applicable);

(6)     umbrella liability insurance in addition to primary coverage in an amount not less than Five Million and No/100 Dollars ($5,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under Section 9(a)(2) hereof and, if applicable, the Policies required in Section 9(a)(4) and (7) hereof;

(7)     commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, with limits which are required from time to time by Sublandlord (if applicable);

(8)     upon thirty (30) days' notice, such other insurance and in such amounts as Sublandlord from time to time may request against such other insurable hazards which at the time are commonly insured against for properties similar to the Premises located in or around the region in which the Premises are located; and

(9)     if any of the "all risk"/"special form" property or the commercial general liability or umbrella Policies include any exclusions for loss, cost, damage or liability caused by "terrorism" or "terrorist acts", Subtenant shall obtain and maintain terrorism coverage to cover such exclusion(s) from a carrier which otherwise satisfies the rating criteria specified herein (hereinafter referred to as a "**Qualified Carrier**") or, in the event that such terrorism coverage is not available from a Qualified Carrier, Subtenant shall obtain such terrorism coverage from the highest rated insurance company providing such terrorism coverage.

(b)     Subtenant shall bear the risk of loss to its personal property, including all of Subtenant's Business Property.  Subtenant shall either obtain insurance to cover such losses or self-insure a portion of or all of such losses with respect to Subtenant's Personal Property.  In the event Subtenant maintains insurance to cover such losses, then all insurance proceeds from such coverage shall be paid to and become the property of Subtenant (except to the extent Sublandlord performs the restoration or repair of any such property pursuant to Section 21(i) hereof, in which event such proceeds shall be paid to Sublandlord in respect thereof).

(c)     All insurance provided for in Section 9(a) hereof shall be obtained under valid and enforceable policies (hereinafter collectively referred to as the "**Policies**" or in the singular, the "**Policy**") and shall be subject to the approval of Landlord and Sublandlord as to form and substance including deductibles, loss payees and insureds.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Landlord and Sublandlord, certificates of insurance and, if requested by Landlord or Sublandlord, other documentation, in each case acceptable to Landlord and Sublandlord evidencing the Policies, accompanied by evidence reasonably satisfactory to Sublandlord of payment of the premiums then due thereunder (the "**Insurance Premiums**"), shall be delivered by Subtenant to Landlord and Sublandlord.

(d)     All Policies of insurance provided for or contemplated by <u>Section 9(a)</u> hereof shall name Landlord and Sublandlord as a named insured and, in the case of liability coverages (except for the Policies referenced in <u>Sections 9(a)(4)</u> and <u>(7)</u> hereof) shall name Landlord's lender and Sublandlord's lender and its successors and/or assigns as an additional insured, as its interests may appear, and in the case of property insurance coverages, including, but not limited to, boiler and machinery, terrorism, flood and earthquake insurance, shall contain a standard non-contributing mortgagee/lender's loss payable clause in favor of Landlord's lender providing that the loss thereunder shall be payable to an insurance trustee reasonably acceptable to Sublandlord and Subtenant and Sublandlord's lender to be applied in accordance with this Lease. Additionally, if Subtenant obtains property insurance coverage in addition to or in excess of that required by <u>Section 9(a)(1)</u> hereof, then such insurance policies shall also contain a standard non-contributing mortgagee/lender's loss payable clause in favor of Landlord's lender providing that the loss thereunder shall be payable to Sublandlord and Subtenant and Sublandlord's lender to be applied in accordance with this Lease.

(e)     All property insurance Policies provided for in <u>Section 9(a)</u> hereof shall:

(1)     provide that no act or negligence of Subtenant or any other insured under the Policy, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Sublandlord is concerned;

(2)     provide that the Policy shall not be canceled without at least thirty (30) days' prior written notice to Landlord and Sublandlord and its lender, except ten (10) days' notice for non-payment of premiums and, if obtainable by Subtenant using commercially reasonable efforts, shall not be materially changed (other than to increase the coverage provided thereby) without such a thirty (30) day notice; and

(3)     not contain any provision that would make Landlord or Sublandlord or their respective lender liable for any premiums thereon or subject to any assessments thereunder, except that Landlord and Sublandlord shall be permitted to make payments to effect the contribution of such Policy upon notice of cancellation due to non-payment of insurance premiums.

(f)     All insurance policies required to be maintained by Subtenant hereunder shall:

(1)     provide for a waiver of subrogation by the insurer as to claims against Landlord and Sublandlord and their respective employees and agents;

(2)     with respect to any general liability policy maintained by Subtenant, provide that no "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Landlord or Sublandlord and that the insurance policy shall not be brought into contribution with insurance maintained by Landlord or Sublandlord; and

(3)      with respect to any liability policy maintained by Subtenant, provide that such coverage is primary and non-contributory with any liability insurance maintained by Landlord or Sublandlord.

(g)      If Subtenant fails to maintain any of the insurance coverages required to be maintained pursuant to this <u>Section 9</u>, then Sublandlord shall have the right (but not the obligation), following no less than ten (10) Business Days prior written notice (or such shorter notice as is reasonable in the circumstances should coverage have lapsed) to Subtenant, to procure such insurance coverages that Subtenant has failed to maintain, and if such coverage is not in place prior the end of such notice period, Subtenant shall reimburse Sublandlord, as additional rent, within thirty (30) days after Sublandlord's written demand, for all premiums reasonably incurred by Sublandlord by reason of Subtenant's failure to insure, which shall include reasonably detailed backup for the premiums incurred.

10.      <u>**Title Encumbrances Affecting the Premises**</u>.

(a)      Except as otherwise provided in this Sublease, Subtenant agrees to comply with all obligations imposed upon Sublandlord or the Premises under any title encumbrances affecting the Premises as of the date hereof as set forth on Schedule 10(a) annexed hereto (the "Permitted Exceptions"), excluding, without limitation, the current fee mortgage (hereinafter collectively referred to as the "**Title Encumbrances**"), at Subtenant's sole cost and expense.  Any title encumbrance which is not a Permitted Exception shall be discharged of record at Sublandlord's sole cost and expense.

(b)      So long as this Lease has not been terminated, Sublandlord hereby agrees to fully cooperate with the following actions by Subtenant, at Subtenant's sole cost and expense, and at no out-of-pocket expenses to Sublandlord:  (i) the granting of easements, licenses, rights-of-way and other rights and privileges reasonably necessary or desirable for the operation, restoration, use, repair, renovation, improvement, alteration, addition to or maintenance of the Premises as herein provided (including without limitation, with respect to transactions involving the acquisition of (but in no event the disposal of) air rights); (ii) Subtenant's obtaining all necessary government or third-party actions, consents or agreements necessary for the performance and completion of any alteration; and (iii) any other matters which Subtenant shall reasonably request with respect to the alteration, improvement, maintenance, operation, construction and/or other matter or thing related to the Premises (any of the foregoing a "**Property Action**"); provided, however, that in each case Subtenant shall have delivered to Sublandlord a certificate stating that: (A) in Subtenant's opinion, such grant, release, dedication, transfer, amendment or government action, or other action or agreement (any of the foregoing, a "**Property Action**") does not permanently and materially impair the value, utility or remaining useful life of the Premises or have a permanent material adverse effect on the value of Sublandlord's interest in the Premises; (B) such Property Action is reasonably necessary or desirable in connection with the use, maintenance, alteration, renovation, operation, restoration, repair or improvement of the Premises; (C) Subtenant shall remain obligated under this Sublease notwithstanding such Property Action; and (D) Subtenant shall pay any reasonable, out-of-pocket costs of Sublandlord under such Property Action.  Without limiting the effectiveness of the foregoing, Sublandlord shall use good faith efforts to respond within ten (10) Business Days after Sublandlord's receipt of Subtenant's written request for approval or consent, and, at Subtenant's sole cost and expense for the actual, reasonable and out-of-pocket cost

12

thereof (including reasonable fees and disbursements of counsel to Sublandlord and its lender to review such Property Action), review and either approve or disapprove in writing the proposed Property Action and, if approved, execute and deliver any instruments and take any other action reasonably necessary or appropriate to confirm any such Property Action to any Person (as defined in Section 36 hereof) permitted under this Section 10(b) or to implement any such Property Action. Any request by Subtenant hereunder with respect to a Property Action shall contain a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters stating "**FIRST NOTICE: THIS IS A REQUEST FOR CONSENT UNDER SECTION 10 OF THAT CERTAIN SUBLEASE DATED MARCH 22, 2017. FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) BUSINESS DAYS MAY RESULT IN THE REQUEST BEING DEEMED APPROVED**". If Sublandlord fails to respond to such request within ten (10) Business Days, and Subtenant sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters stating "**SECOND AND FINAL NOTICE: THIS IS A REQUEST FOR CONSENT UNDER SECTION 10 OF THAT CERTAIN SUBLEASE DATED MARCH 22, 2017. IF YOU FAIL TO PROVIDE A SUBSTANTIVE RESPONSE (E.G., APPROVAL, DENIAL OR REQUEST FOR CLARIFICATION OR MORE INFORMATION) TO THIS REQUEST FOR APPROVAL IN WRITING WITHIN FIVE (5) BUSINESS DAYS, YOUR APPROVAL SHALL BE DEEMED GRANTED**", Sublandlord shall be deemed to have approved or consented to such Property Action if Sublandlord fails to respond to such second written request before the expiration of such second five (5) Business Day period. In the event of any disapproval of a Property Action by Sublandlord, concurrently with the delivery thereof, Sublandlord shall provide a written explanation of the basis for such disapproval, sufficient in scope and detail to allow Subtenant the ability to resubmit a modified request for approval of a Property Action. In the event that Sublandlord fails to provide a description as aforesaid, the disapproval shall be invalid and the request for approval shall be subject, inter alia, to deemed approval as provided above.

11.    **Maintenance and Repairs.**    Subtenant shall maintain the Premises, including the Improvements, in good operating condition during the Term, including repairs and replacements (when necessary as a result of damage to any part of the Premises or as a result of a portion of the Premises reaching the end of its useful life) to the interior, exterior and structure (including, without limitation, the roof and foundation). Except as otherwise provided in this Sublease, Subtenant shall, at its sole cost and expense, comply with all Applicable Laws (as defined in Section 36 hereof) affecting the Premises during the Term. Except as otherwise provided in this Sublease, Sublandlord shall not be required to maintain or make any repairs to the Premises, including the Improvements, during the Term. At the expiration or earlier termination of this Sublease, Subtenant shall deliver up the Premises in the same condition as of the Effective Date, except for and subject to any Alterations (as defined in Section 12 hereof) permitted under this Sublease, loss by fire or other casualty (which shall be governed by the terms of Section 15 hereof) and condemnation (which shall be governed by the terms of Section 16 hereof).

12.    **Tenant Improvements and Alterations**.

(a)    Title to all of the Improvements located on the Land as of the Effective Date shall remain vested in Sublandlord. All of the Improvements constructed or placed on the Premises following the Effective Date and during the Term (hereinafter referred to as the "**New**

**Improvements**") are and shall become the property of Sublandlord. On the expiration or earlier termination of this Sublease, all Improvements then situated on the Premises shall be delivered to Sublandlord free from any monetary liens whatsoever created by Subtenant, without compensation therefor by Sublandlord to Subtenant.

　　　　　(b)　　　Subtenant shall, at its own cost and expense, at a minimum, make certain capital improvements to the Premises as outlined in the "Scope of Work" attached hereto as <u>Exhibit G</u>. All such work shall be performed within the time frames set forth in <u>Exhibit G</u> and shall be performed in a workmanlike and professional manner and in accordance with all Applicable Laws.

　　　　　(c)　　　Subtenant shall have the right at any time and from time to time during the Term to make all alterations, additions and improvements to the Improvements, or any portion thereof, as Subtenant deems necessary or desirable (each being hereinafter referred to as, an "**Alteration**"), without the necessity of obtaining the prior consent of Sublandlord and without the payment of any additional rent; provided, however, that Subtenant shall not have the right, without Sublandlord's prior written consent, to: (i) make any Alteration that materially increases the envelope of the Building, which consent shall not be unreasonably withheld, conditioned or delayed nor a fee therefore charged, or (ii) demolish the Building, (iii) demolish the Improvements (other than in the course of making interior alterations to the Building consistent with the same class of office building as the Building within the same submarket in which the Building is located), or (iv) make any Alteration that reduces (other than to a *de minimis* extent) floor area ratio of the Improvements, or impairs the structural integrity of the Improvements. In the event that Sublandlord denies its consent, it shall provide a detailed written explanation for the basis thereof. Sublandlord agrees that Subtenant may add, replace or remove any of Subtenant's Business Property from time to time in its sole discretion. All alterations, additions, construction or reconstruction shall be accomplished at Subtenant's sole cost and expense, and in a good and workmanlike manner and in accordance with all Applicable Laws; provided, however, that in no event shall Subtenant be entitled to an abatement of the Base Rent or additional rent as a result of such alterations. Any request by Subtenant hereunder with respect to an Alteration shall contain a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters stating "**<u>FIRST NOTICE</u>: THIS IS A REQUEST FOR CONSENT UNDER SECTION 12 OF THAT CERTAIN SUBLEASE DATED MARCH 22, 2017. FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) BUSINESS DAYS MAY RESULT IN THE REQUEST BEING DEEMED APPROVED**". If Sublandlord fails to respond to such request within ten (10) Business Days, and Subtenant sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters stating "**<u>SECOND AND FINAL NOTICE</u>: THIS IS A REQUEST FOR CONSENT UNDER SECTION 12 OF THAT CERTAIN SUBLEASE DATED MARCH 22, 2017. IF YOU FAIL TO PROVIDE A SUBSTANTIVE RESPONSE (E.G., APPROVAL, DENIAL OR REQUEST FOR CLARIFICATION OR MORE INFORMATION) TO THIS REQUEST FOR APPROVAL IN WRITING WITHIN FIVE (5) BUSINESS DAYS, YOUR APPROVAL SHALL BE DEEMED GRANTED**", Sublandlord shall be deemed to have approved or consented to such Alteration if Sublandlord fails to respond to such second written request before the expiration of such second five (5) Business Day period. In the event of any disapproval of an Alteration by Sublandlord, concurrently with the delivery thereof, Sublandlord shall provide a written explanation of the basis for such disapproval, sufficient in scope and detail

14

to allow Subtenant the ability to resubmit a modified request for approval of an Alteration. In the event that Sublandlord fails to provide a description as aforesaid, the disapproval shall be invalid and the request for approval shall be subject, inter alia, to deemed approval as provided above.

(d)    Subtenant shall have no right or authority to cause or allow any mechanics' lien or other monetary lien or claim to encumber Sublandlord's interest, or the fee estate, in the Premises, and in the event any such lien or claim arises by reason of Subtenant or anyone claiming by, through or under Subtenant, Subtenant shall cure and remove same, by payment, discharge or "bonding-off", within sixty (60) days after notice from Sublandlord. Sublandlord shall have no responsibility to Subtenant or to any contractor, subcontractor, supplier, materialman, workman or other Person, firm or corporation who shall engage in or participate in any additions, alterations, changes or replacements thereof on behalf of Subtenant or anyone claiming by through or under Subtenant, unless Sublandlord shall expressly undertake such obligation in a written contract or has authorized in writing the purchase of materials and/or the employment of workmen in connection therewith.

13.    **Equipment, Fixtures and Signs.**    Subtenant shall have the right to erect, install, maintain and operate on the Premises such equipment, trade and business fixtures, signs and other personal property as Subtenant may deem necessary or desirable, and such items of personal property shall not be deemed to be Improvements or part of the Premises, but shall remain the property of Subtenant. Any such installations shall be in accordance with Applicable Laws. At any time during the Term, Subtenant may, and at the expiration or earlier termination of the Term Subtenant shall, remove all of Subtenant's Business Equipment, Subtenant's equipment, removable fixtures, signs and other personal property from the Premises, at Subtenant's sole cost and expense. Any such personal property of Subtenant remaining at the Premises after such date shall, at the election of Sublandlord, either be removed by Sublandlord and stored at Sublandlord's cost or expense, or shall be deemed to have been abandoned by Subtenant and shall automatically become the property and responsibility of Sublandlord.

14.    **Hazardous Materials**.

(a)    Subtenant shall not cause or permit any Hazardous Materials (as hereinafter defined) to be generated, used, released, stored or disposed of in or about the Premises, provided that Subtenant may use, store and dispose of reasonable quantities of Hazardous Materials commonly used in the ordinary course of Subtenant's business and as may be reasonably necessary for Subtenant to conduct such business, provided such Hazardous Materials are used, stored and disposed of in accordance in all material respects with all Environmental Laws (as hereinafter defined). At the expiration or earlier termination of this Sublease, Subtenant shall surrender the Premises to Sublandlord: (i) free of all Hazardous Materials; and (ii) in compliance with all Environmental Laws in all respects, without regard to whether any Hazardous Materials or violations of Environmental Laws existed at the Premises as of the Effective Date. "**Hazardous Materials**" shall mean (A) petroleum or petroleum products, natural or synthetic gas, mold, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, and radon gas; and (B) any substances that are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances", "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law.

15

"**Environmental Law**" shall mean any and all federal, state and local laws, regulations, ordinances, codes and policies, and any and all judicial or administrative interpretations thereof by Governmental Authorities (as defined in <u>Section 36</u> hereof), as now in effect or hereinafter amended or enacted, relating to: (1) pollution or protection of the environment, natural resources or health and safety, including, without limitation, those regulating, relating to, or imposing liability for emissions, discharges, releases or threatened releases of Hazardous Materials into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, release, transport or handling of Hazardous Materials; or (2) the use of chemical, electrical, radiological or nuclear processes, radiation, sophisticated electrical and/or mechanical equipment, sonar and sound equipment, lasers and laboratory analysis and materials including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 <u>et seq.</u>; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 9601 <u>et seq.</u>; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 <u>et seq.</u>; the Clean Water Act, 33 U.S.C. §§ 1251 <u>et seq.</u>; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 <u>et seq.</u>; the Clean Air Act, 42 U.S.C. §§ 7401 <u>et seq.</u>; the Safe Drinking Water Act, 42 U.S.C. §§ 300f <u>et seq.</u>; the Atomic Energy Act, 42 U.S.C. §§ 2011 <u>et seq.</u>; and the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136 <u>et seq.</u>.

(b)    Subtenant shall give Sublandlord a written notice of any actual or threatened in writing Environmental Event (as hereinafter defined) or of any notice of or claim with respect to an actual or alleged Environmental Event. An "**Environmental Event**" means: (i) a violation of an Environmental Law; or (ii) a release, spill, discharge or detection of a Hazardous Material (in all cases in violation of Environmental Law) in, on or from the Premises (regardless of whether or not a reporting requirement exists); or (iii) an environmental condition requiring responsive action under Environmental Law. Upon any Environmental Event, in addition to all other rights available to Sublandlord under this Sublease, at law or in equity, Subtenant shall, at Subtenant's sole cost and expense, promptly cure such Environmental Event, in accordance with all Environmental Laws. In the event that Subtenant fails to promptly cure the Environmental Event as required by Environmental Laws within the applicable notice and cure periods set forth in Section 19(a) hereof, Sublandlord may perform, at Subtenant's sole cost and expense for the actual out-of-pocket reasonable third-party and necessary cost thereof, any action required pursuant to Environmental Laws to address the same, in which event Subtenant shall pay the costs thereof to Sublandlord, as additional rent, within thirty (30) days after demand therefor in writing.

(c)    As a material consideration for Sublandlord's willingness to enter into this Sublease, Subtenant hereby waives and releases Sublandlord from any and all claims for damage, injury or loss (including, without limitation, claims for the interruption of or loss to business) which relate to any Environmental Event, whether occurring prior or subsequent to the Effective Date. Promptly upon Sublandlord's request, given not more than once in any twelve (12) month period, Subtenant shall execute from time to time, affidavits, representations and similar documents concerning Subtenant's knowledge and belief regarding the presence of Hazardous Materials and compliance with Environmental Laws at the Premises.

(d)    Sublandlord's rights and Subtenant's obligations pursuant to this <u>Section 14</u> shall survive the expiration or earlier termination of this Sublease.

15.    **Damage by Fire or Other Casualty**.

16

(a)      If the Improvements, or any material part thereof, located on any of the Premises are destroyed or damaged by fire or other casualty, Subtenant shall promptly deliver written notice thereof to Sublandlord.

(b)      If, within the last twenty-four (24) months of the Term, more than thirty percent (30%) of the rentable area of the Improvements is substantially destroyed by fire or other casualty, then Subtenant shall have the option to terminate this Sublease, in its sole and absolute discretion, by delivering written notice of termination to Sublandlord, with such termination to be effective as of the date of such notice.  Thereafter, subject to Section 15(d) hereof, Sublandlord and Subtenant shall be released from any further liability or obligation under this Sublease with respect to the Premises.

(c)      If the Improvements are damaged by fire or other casualty but Subtenant does not have the right to terminate this Sublease pursuant to subsection (b) hereof, or if Subtenant shall not have elected to terminate this Sublease pursuant to subsection (b) hereof, then this Sublease shall not terminate and Subtenant shall proceed with commercially reasonable diligence to rebuild and repair the Improvements to not less than a substantially equivalent condition in which they existed prior to such damage (taking into account Applicable Laws and the commercial reasonableness of doing so).  Subtenant shall have no right to any abatement of Base Rent or any additional rent as a result of any casualty, whether insured or uninsured.

(d)      All insurance proceeds payable under insurance policies maintained by Sublandlord or Subtenant by reason of the occurrence of such fire or other casualty to the Improvements shall be paid to a third party insurance trustee reasonably acceptable to Sublandlord, Subtenant and their respective lenders (if applicable), and made available to Subtenant on an advance requisition basis no less frequently than monthly, to be applied to the cost of repair and restoration or the Improvements with the balance, if any, released to Subtenant; provided, however, that notwithstanding the foregoing, if this Sublease is terminated pursuant to Section 15(b) hereof, then the insurance proceeds payable with respect to the affected Improvements (which shall be deemed to include any deductibles and the amount which would have been payable had Subtenant maintained the insurance required in Section 9(a) hereof) (but not with respect to any personal property or trade fixtures owned by Subtenant) shall be paid to Sublandlord or Sublandlord's lender.

(e)      Except as expressly set forth herein, this Sublease shall not terminate or be forfeited or be affected in any manner, by reason of damage to or total, substantial or partial destruction of the Improvements or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any reason or cause whatsoever, and Subtenant, notwithstanding any law or statute present or future, waives any and all rights to quit or surrender the Premises or any part thereof, and Sublandlord and Subtenant's obligations hereunder, shall continue as though the Improvements had not been damaged or destroyed and without abatement, suspension, diminution or reduction of any kind. It is the intention of Sublandlord and Subtenant that the foregoing is an "express agreement to the contrary" as provided in Section 227 of the Real Property Law of the State of New York.

16.    **Condemnation**.

17

(a)    (1)    If at any time during the Term, the whole or any "significant portion" (as hereinafter defined) of the Land and/or the Improvements shall be taken (including a taking of the fee interest in the Land) for any public or quasi-public purpose by any lawful power or authority by the exercise of the right of condemnation or eminent domain or by agreement in lieu thereof among Sublandlord, Subtenant and those authorized to exercise such right, then this Sublease and the Term shall terminate and expire on the date of such taking and the rent payable by Subtenant hereunder shall be apportioned as of the date of such taking.

(2)    If the whole or any "significant portion" of the Land shall be taken or condemned during the Term, and this Sublease is terminated as provided for in Section 16(a)(i) hereof, the condemnation proceeds shall be paid as follows:

        a.    First, to the repayment of all sums paid by Subtenant under the Membership Interests Option; then

        b.    Then, to Landlord, Sublandlord and Subtenant for their reasonable out-of-pocket costs incurred in collecting the award; then

        c.    Then, to Subtenant the Appraised Value of the Leasehold Estate (as hereinafter defined); then

        d.    To Landlord, the balance.

(3)    Each of the parties shall execute and deliver any and all documents that may be reasonably required in order to facilitate collection by them of such awards in accordance with the provisions of this Section 16.

(4)    For purposes of this Section 16, the "date of taking" shall be deemed to be the earlier of (i) the date on which actual possession of the whole or substantially all of the Land, or a part thereof, as the case may be, is acquired by any lawful power or authority pursuant to the provisions of the applicable federal or New York state law, or (ii) the date on which title to the Premises or the aforesaid portion thereof shall have vested in any lawful power or authority pursuant to the provisions of the applicable federal or New York state law.

(5)    For purposes of this Section 16, a "significant portion" of the Land shall be deemed to mean such portion of the Land and/or the Improvements as, when so taken or condemned, would leave remaining a balance of the Land and/or the Improvements which, due either to the area so taken or condemned or the location of the part so taken or condemned in relation to the part not so taken or condemned, would not allow Subtenant the use of the remaining portion of the Land and the Improvements for the purposes for which the Improvements were being used by Subtenant prior to the date of such taking or condemnation, as reasonably determined by Subtenant.

(b)    If this Sublease is not cancelled pursuant to Section 16(a) hereof or if less than a "significant portion" of the Premises are so taken, then this Sublease and the Term shall continue without abatement of the rent or diminution of any of Subtenant's obligations hereunder,

18

except that the Base Rent shall be reduced in proportion to the percentage reduction of the useable square footage of the Improvements and the award shall be made available to Subtenant for the restoration of the Improvements and any balance shall be disbursed as provided for in Section(16)(a)(2) hereof.

(c)    In case of any governmental action, not resulting in the taking or condemnation of any portion of the Premises but creating a right to compensation therefor, such as the changing of the grade of any street upon which the Premises abut, then this Sublease shall continue in full force and effect without reduction or abatement of rent and the award shall be equitable divided between Sublandlord and Subtenant.

(d)    Sublandlord and Subtenant shall not enter into, settle or compromise any taking or other governmental action creating a right to compensation in Subtenant as provided in this <u>Section 16</u> except upon the mutual reasonable approval of both parties.

17.    **<u>Liability and Indemnification</u>**.

(a)    Except as otherwise provided in this Lease and except to the extent arising out of the negligence, willful misconduct or bad faith of any Sublandlord Indemnitee, Sublandlord, its partners, officers, directors, members, managers, trustees, employees, agents and lenders and their respective heirs, successors and assigns (hereinafter collectively referred to as the "**Sublandlord Indemnitees**") shall have no liability for and shall not assume any liability or responsibility to Subtenant, its employees, agents, invitees, licensees, assignees, subtenants, customers, clients, contractors or guests (hereinafter collectively referred to as the "**Subtenant Parties**") for any damage, injury, loss, compensation or claim based on, arising out of or resulting from any cause whatsoever, including, but not limited to, claim of loss of business or interruption of operations, or any consequential damages or indirect losses whatsoever. Any inventory, goods, furnishings, fixtures, property or personal effects placed or stored in or about the Premises shall be at the sole risk of Subtenant, and none of the Sublandlord Indemnitees shall be responsible or liable for such property, except to the extent of the negligence, willful misconduct or bad faith of any Sublandlord Indemnitee. Subtenant shall indemnify, defend upon request and hold Sublandlord and the Sublandlord Indemnitees harmless from and against any and all unaffiliated third-party demands, causes of action asserted by unaffiliated third-parties, judgments payable to unaffiliated third-parties, actual reasonable necessary out-of-pocket and third party costs, actual damages, unaffiliated third-party claims, unaffiliated third-party liabilities, actual reasonable necessary out-of-pocket and third party expenses, actual losses, actual penalties payable to unaffiliated third-parties and court costs suffered by or claimed against any of them (solely to the extent arising from events from the Effective Date to the expiration or earlier termination of this Sublease), directly, to the extent based on or arising out of: (i) the use, condition, operation, maintenance, repair, alteration, and occupancy of the Premises or any part thereof or the business conducted therein or therefrom, except to the extent arising out of Sublandlord's obligations under this Sublease, or (ii) any negligence or willful misconduct of Subtenant or any of the Subtenant Parties, or (iii) contamination of the Premises or the ground waters beneath or adjacent thereto, any discharge of toxic or hazardous sewage or waste materials from the Premises into any septic facility or sewer system, or (iv) contamination of the Premises or the ground waters beneath or adjacent thereto by any Hazardous Materials or any violation of Environmental Law, or (v) any breach, violation or nonperformance by Subtenant or any Person claiming under Subtenant of any

19

of the terms, provisions, representations, warranties, covenants or conditions of this Sublease on Subtenant's part to be performed beyond the expiration of applicable notice, grace and cure periods, including, without limitation, the failure to comply with Applicable Laws or with any Title Encumbrances, or (vi) intentionally omitted, or (vii) any accident, injury, death or damage to the Person, property or business of Subtenant, or any other Person that shall happen at, in, upon, or arising out of the Premises, however occurring, provided that in no event shall Subtenant be required to indemnify, defend or hold harmless any Sublandlord Indemnitees to the extent any indemnified claims results from the negligence, willful misconduct or bad faith of any Sublandlord Indemnitee or the breach of this Sublease by Sublandlord.

(b)     Subtenant, upon written notice from Sublandlord, shall defend any claim against a Sublandlord Indemnitee for which indemnification is applicable, at Subtenant's sole expense using legal counsel reasonably satisfactory to Sublandlord (it being agreed that any counsel provided by Subtenant's insurer shall be deemed reasonably acceptable to Sublandlord), and Sublandlord shall and shall cause any applicable Sublandlord Indemnitees to cooperate with Subtenant in such defense.  Provided that this Lease has not been terminated by reason of the Subtenant's default, no Sublandlord Indemnitee shall compromise or settle any claim for which such Sublandlord Indemnitee is seeking indemnification from Subtenant pursuant to this Section 17 unless such settlement or compromise is consented to in writing by Subtenant, which consent shall not be unreasonably withheld, conditioned or delayed.  Subtenant's indemnity obligations under this Section 17 and elsewhere in this Sublease arising prior to the expiration or earlier termination of this Sublease shall survive such expiration or earlier termination of this Sublease.

(c)     Notwithstanding anything to the contrary contained in this Sublease, in no event shall Sublandlord or Subtenant have the right to seek or receive special, punitive or other similar measures of damages against the other nor shall Sublandlord or Subtenant be entitled to receive any consequential, exemplary, indirect or speculative damages, and each party hereby irrevocably waives, for itself and its successors and assigns, its right to seek or receive any such measure of damages or remedy.

18.    **Assignment and Subletting**.

(a)     Except as expressly permitted pursuant to Section 18(b) or (c) or Section 32, neither Subtenant nor Subtenant's legal representatives or successors-in-interest by operation of law or otherwise, shall sell, assign, transfer, hypothecate, encumber, grant concessions or licenses, sublet, or otherwise dispose of all or any interest in this Sublease or the Premises, or permit any person or entity other than Subtenant to occupy any portion of the Premises (each of the foregoing are a "Transfer" to a "Transferee"), without Sublandlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed. Any Transfer undertaken without Sublandlord's prior written consent (other than pursuant to Section 18(b) or (c) or Section 32) shall constitute an Event of Default and shall, at Sublandlord's option, be void and/or terminate this Lease. For purposes of this Sublease, a Transfer shall include, without limitation, any assignment by operation of law, and any merger, consolidation, or asset sale involving Subtenant, any direct or indirect transfer of control of Subtenant, and any transfer of a majority of the ownership interests in Subtenant. Consent by Sublandlord to any one Transfer shall be held to apply only to the specific Transfer authorized, and shall not be construed as a waiver of the duty of Subtenant, or Subtenant's legal representatives or assigns, to obtain from

Sublandlord consent to any other or subsequent Transfers pursuant to the foregoing, or as modifying or limiting the rights of Sublandlord under the foregoing covenant by Subtenant. No assignment or sublease shall affect or reduce any of the obligations of Subtenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made. Subtenant agrees that in the case of an assignment of this Sublease, Subtenant shall, within fifteen (15) days after the execution and delivery of any such assignment, deliver to Sublandlord: (i) a duplicate original of such assignment in recordable form; and (ii) an agreement executed and acknowledged by the assignee in recordable form in favor of Sublandlord wherein the assignee shall assume and agree to observe and perform all of the terms and provisions of this Sublease on the part of the Subtenant to be observed and performed from and after the date of such assignment. In the case of a sublease, Subtenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Sublandlord a copy of such sublease.

(b)     Notwithstanding anything to the contrary in <u>Section 18(a)</u> above, Subtenant may assign its rights in, to and under this Sublease to an Affiliate of Subtenant without the prior written consent of Sublandlord; provided, however, no such assignment shall be effective or binding on Sublandlord until (a) notice thereof has been delivered to Sublandlord, and (b) the assignee executes an assignment and assumption agreement in which the assignee assumes all of Subtenant's rights, duties and obligations under this Agreement and all of Option Holders right and obligations under the Membership Interest Option. No assignment shall release or otherwise relieve Subtenant from any obligations hereunder. "**Affiliate**" shall mean an Entity which: (i) is directly or indirectly, owned twenty-five percent (25%) or more by Lawrence Gluck or a Gluck Family Trust (collectively, "**Gluck**") (which twenty-five percent (25%) may include minority shares held by the following employees: Matthew Lembo, Adam Roman and Ryan Jackson); and (ii) is controlled by or is under common control with Gluck. For the purpose of this definition, "**Entity**" shall mean any limited liability company, corporation, or limited partnership, and "**control**" of an Entity shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise (provided that the granting of major decision rights and/or any consents from other members shall not be construed as not having control). Further, notwithstanding anything to the contrary in <u>Section 18(a)</u> above, Subtenant may, without the prior written consent of Sublandlord, sell or assign direct or indirect interests in the Entity comprising Subtenant, provided that the requirements in the definition of Affiliate, set forth in this Section 18(b) above, remain satisfied with respect to Subtenant at all times during the term of this Sublease.

(c)     Sublandlord's consent shall not be required with respect to any sub-subletting of part of the Premises to occupancy sub-subtenants. Each sub-sublease of the Premises or any part thereof shall be subject and subordinate to the provisions of this Sublease. Notwithstanding anything in this Sublease to the contrary, Sublandlord acknowledges and agrees that Subtenant shall be permitted to grant sub-subleases for a term expiring beyond that of this Sublease, up to and including the forty-nine (49) year anniversary of the Effective Date and in the event of the termination or expiration of this Sublease prior to any such date, any sub-subtenant occupying part of the Premises from Subtenant under the terms of a Qualified Sub-Sublease (as defined below) shall attorn to Sublandlord on the executory terms of such Qualified Sub-Sublease and Sublandlord shall accept such attornment. Notwithstanding anything to the contrary in this

Sublease, Sublandlord expressly acknowledges and agrees that in the event of a termination or expiration of this Sublease, no sub-subtenant occupying part of the Premises from Subtenant under the terms of a Qualified Sub-Sublease shall be dispossessed and shall be permitted to remain in possession pursuant to the terms of their Qualified Sub-Sublease. In confirmation of the foregoing and as otherwise requested by Subtenant, Sublandlord shall execute acknowledge and deliver (and shall cause the Fee Owner to execute, acknowledge and deliver) within ten (10) Business Days of written request, a Fee Owner and Sublandlord Recognition and Non-Disturbance Agreement in favor any sub-subtenant occupying part of the Premises from Subtenant under the terms of a Qualified Sub-Sublease substantially in the form of Exhibit E hereto. For the purposes hereof, the term "Qualified Sub-Sublease shall mean a sub-sublease satisfying the following conditions: (i) the fixed rent payable under the sub-sublease shall be no less than ninety (90%) percent of the then current fair market rental value of similar premises in the applicable submarket where the Premises are located; (ii) the sub-subtenant under such sub-sublease shall not be an affiliate of Stellar or be owned all or in part by Stellar, or an affiliate of Stellar; (iii) the sub-sublease(s) shall not be to a single sub-subtenant or related sub-subtenants of partial floors over multiple floors (unless such sub-sublease(s) contain a right for the sub-sublandlord thereunder to relocate and consolidate such premises; (iv) the sub-sublease shall be entered into for the purposes of the sub-subtenant thereunder physically occupying such premises and performing its business therein, however such shall not limit the further assignment or subletting in accordance with the terms of such sub-sublease; and (v) the sub-sublease shall be a market sub-sublease to an independent third party and not entered into for the purposes of circumventing the terms of this Sublease or the Membership Interest Option. In connection with any Qualified Sub-Sublease, Sublandlord, within ten (10) Business Days of written request, shall use commercially reasonable efforts to cause any Leasehold Mortgagee and any mortgagee of the Land to execute and deliver a subordination non-disturbance and attornment agreement for the benefit of the sub-subtenant under such Qualified Sub-Sublease, which is either for retail space or at least one full office floor, in a form to be reasonably agreed between any Fee Mortgagee and the subtenant under such Qualified Sub-Sublease.

19. **Default**.

(a)    Each of the following events shall be an "**Event of Default**" by Subtenant hereunder:

(1)    if Subtenant shall fail to make any payment of rent required to be paid by Subtenant hereunder for a period of five (5) Business Days after the same was due; or

(2)    if Subtenant shall fail to observe or perform one or more of the other terms, conditions, covenants or agreements of this Sublease and such failure shall continue for a period of sixty (60) days after written notice thereof by Sublandlord to Subtenant specifying such failure (unless such failure requires work to be performed, acts to be done, or conditions to be removed which cannot either by their nature, or by reason of an unavoidable delays (as described in Section 28 hereof) (hereinafter referred to as "**Unavoidable Delays**"), reasonably be performed, done or removed, as the case may be, within such thirty (30) day period, in which case no Event of Default shall be deemed to exist as long as Subtenant shall have commenced curing the same within such thirty (30)

day period and shall continuously prosecute the same to completion with reasonable diligence, subject to Unavoidable Delays); or

(3)    if Subtenant shall file a voluntary petition under Title 11 of the Bankruptcy Code (as defined in Section 20(a)(1) hereof) or if such petition is filed against Subtenant and an order for relief is entered, or if Subtenant shall file any petition or answer seeking, consenting to or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal Bankruptcy Code or any other present or future applicable federal, state or other statute or law, or shall seek or consent to or acquiesce in or suffer the appointment of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of Subtenant, or of all or any substantial part of its properties or of the Premises or any interest therein of Subtenant, or if Subtenant shall take any corporate (or partnership or limited liability company) action in furtherance of any action described in this Section 19(a)(3); or

(4)    if within ninety (90) days after the commencement of any proceeding against Subtenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal Bankruptcy Code or any other present or future applicable federal, state or other statute or law, such proceeding shall not have been dismissed, or if, within ninety (90) days after the appointment, without the consent or acquiescence of Subtenant, of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of Subtenant or of all or any substantial part of its properties or of the Premises or any interest therein of Subtenant, such appointment shall not have been vacated or stayed on appeal or otherwise, or if, within ninety (90) days after the expiration of any such stay, such appointment shall not have been vacated.

(b)    If (i) an Event of Default occurs, and (ii) Sublandlord, at any time thereafter during the continuance of such Event of Default only, at Sublandlord's option, gives a notice to Subtenant stating that this Sublease and the Term shall expire and terminate on the fifth (5th) Business Day after the date that Sublandlord gives Subtenant such notice, then this Sublease and the Term and all rights of Subtenant under this Sublease shall expire and terminate as of the fifth (5th) Business Day after the date that Sublandlord gives Subtenant such notice, and Subtenant immediately shall quit and surrender the Premises, but Subtenant shall nonetheless remain liable for all of its obligations hereunder, as provided in Section 21 hereof and Section 22 hereof. Notwithstanding the foregoing, with respect to an Event of Default under Section 19(a)(1) above, Sublandlord acknowledges and agrees that there shall be no conditional limitation and Sublandlord shall not be permitted to serve a notice of termination unless in the calendar year of such Event of Default Subtenant has failed to make any payment of rent required to be paid by Subtenant hereunder for a period of five (5) Business Days after notice of such failure was delivered to Subtenant on three separate occasions during such calendar year. With respect to the fourth such default in the payment of rent, the Event of Default shall occur if Subtenant fails to make such payment within five (5) Business Days after the due date rather than five (5) Business Days after notice of such failure, which notice shall not be required on the fourth and subsequent occasions during any calendar year.

20.    **Subtenant's Insolvency**.

(a)     Assignments pursuant to the Bankruptcy Code.

(1)     The term "**Bankruptcy Code**" shall mean 11 U.S.C. Section 101 <u>et
seq.</u>, or any statute of similar nature and purpose.

(2)     If    Subtenant,    Subtenant's    trustee    or    Subtenant    as
debtor-in-possession (each being referred to as, an "**Insolvency Party**") proposes to assign
the tenant's interest hereunder pursuant to the provisions of the Bankruptcy Code to any
Person that has made a *bona fide* offer to accept an assignment of the tenant's interest
under this Sublease on terms acceptable to Subtenant, then the Insolvency Party shall give
to Sublandlord notice of such proposed assignment no later than twenty (20) days after the
date that the Insolvency Party receives such offer, but in any event no later than ten (10)
days before the date that the Insolvency Party makes application to a court of competent
jurisdiction for authority and approval to consummate such assignment. Such notice given
by the Insolvency Party to Sublandlord shall (i) set forth the name and address of such
Person that has made such *bona fide* offer; (ii) set forth all of the terms and conditions of
such *bona fide* offer; and (iii) confirm that such Person will provide to Sublandlord
adequate assurance of future performance that conforms with the terms of <u>Section 20(a)(4)</u>
hereof. Sublandlord shall have the right to accept an assignment of this Sublease upon the
same terms and conditions and for the same consideration, if any, as the *bona fide* offer
made by such Person (less any brokerage commissions that would otherwise be payable by
the Insolvency Party out of the consideration to be paid by such Person in connection with
such assignment of the tenant's interest under this Sublease), by giving notice thereof to the
Insolvency Party at any time prior to the effective date of such proposed assignment.

(3)     Subtenant shall pay to Sublandlord an amount equal to the
reasonable out-of-pocket costs that Sublandlord incurs in connection with Subtenant's
assignment of the tenant's interest hereunder pursuant to the provisions of the Bankruptcy
Code, within thirty (30) days after Sublandlord's submission to Subtenant of an invoice
therefor that contains reasonable supporting documentation for the charges described
therein.

(4)     A Person that submits a *bona fide* offer to take by assignment the
tenant's interest under this Sublease as described in <u>Section 20(a)(2)</u> hereof shall be
deemed to have provided Sublandlord with adequate assurance of future performance only
if such Person: (i) deposits with Sublandlord simultaneously with such assignee's taking
by assignment the tenant's interest under this Sublease an amount equal to the then annual
Base Rent, as security for the faithful performance and observance by such assignee of the
tenant's obligations of this Sublease (and such Person gives to Sublandlord, at least five (5)
days prior to the date that the proposed assignment becomes effective, information
reasonably satisfactory to Sublandlord that indicates that such Person has the ability to post
such deposit); (ii) gives to Sublandlord, at least five (5) days prior to the date that the
proposed assignment becomes effective, such Person's financial statements, audited by a
certified public accountant in accordance with generally accepted accounting principles,
consistently applied, for the three (3) fiscal years that immediately precede such
assignment, that indicate that such Person has a tangible net worth of at least ten (10) times
the then annual Base Rent for each of such three (3) years; and (iii) gives to Sublandlord, at

least five (5) days prior to the date that the proposed assignment becomes effective, such other information or takes such action that in either case Sublandlord, in its reasonable judgment, determines is necessary to provide adequate assurance of the performance by such assignee of the obligations of the tenant under this Sublease.

(5)    If Subtenant's interest under this Sublease is assigned to any Person pursuant to the provisions of the Bankruptcy Code, then any such assignee shall: (i) be deemed without further act or deed to have assumed all the obligations of the tenant arising under this Sublease from and after the date of such assignment, and (ii) execute and deliver to Sublandlord promptly upon demand an instrument confirming such assumption in form and substance reasonably acceptable to assignee.

(6)    Nothing contained in this <u>Section 20</u> limits Sublandlord's rights against Subtenant under <u>Section 19</u> hereof.

(b)    If: (i) Subtenant is not the Person that constituted Subtenant initially; and (ii) either (A) this Sublease is disaffirmed or rejected pursuant to the Bankruptcy Code, or (B) this Sublease terminates by reason of occurrence of an Insolvency Event (as defined in <u>Section 20(c)</u> hereof), then, subject to the terms of this <u>Section 20(b)</u>, the Persons that constituted Subtenant hereunder previously, including, without limitation, the Person that constituted Subtenant initially (each such Person that previously constituted Subtenant hereunder (but does not then constitute Subtenant hereunder), and with respect to which Sublandlord exercises Sublandlord's rights under this <u>Section 20(b)</u>, being referred to herein as a "**Predecessor Subtenant**") shall, at Sublandlord's election (1) pay to Sublandlord the aggregate rent that is then due and owing by Subtenant to Sublandlord under this Sublease to and including the date of such disaffirmance, rejection or termination, and (2) enter into a new lease, between Sublandlord, as landlord, and the Predecessor Subtenant, as tenant, for the Premises, and for a term commencing on the effective date of such disaffirmance, rejection or termination and ending on the date this Sublease would otherwise expire but for such rejection or Insolvency Event, at the same Base Rent and upon the then executory terms that are contained in this Sublease, except that (x) the Predecessor Subtenant's rights under the new lease shall be subject to the possessory rights of Subtenant under this Sublease and the possessory rights of any Person claiming by, through or under Subtenant or by virtue of any statute or of any order of any court, and (y) such new lease shall require all continuing defaults existing under this Sublease to be cured by the Predecessor Subtenant with reasonable diligence (except for those defaults which are personal in nature and cannot be cured). Sublandlord shall have the right to require the Predecessor Subtenant to execute and deliver such new lease on the terms set forth in this <u>Section 20(b)</u> only by giving notice thereof to Subtenant and to the Predecessor Subtenant within thirty (30) days after Sublandlord receives notice of any such disaffirmance or rejection (or, if this Sublease terminates by reason of Sublandlord making an election to do so, then Sublandlord may exercise such right only by giving such notice to Subtenant and the Predecessor Subtenant within thirty (30) days after this Sublease so terminates). If the Predecessor Subtenant defaults in its obligation to enter into said new lease for a period of ten (10) days following Sublandlord's request therefor, then, in addition to all other rights and remedies by reason of such default, either at law or in equity, Sublandlord shall have the same rights and remedies against such Predecessor Subtenant as if such Predecessor Subtenant had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reason of such Predecessor Subtenant's default thereunder.

(c)    This Lease shall terminate automatically upon the occurrence of any of the following events:

(1)    Subtenant commences or institutes any case, proceeding or other action (i) seeking relief on its behalf as debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (ii) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

(2)    Subtenant makes a general assignment for the benefit of creditors; or

(3)    any case, proceeding or other action is commenced or instituted against Subtenant (i) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (ii) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, which in either of such cases (A) results in any such entry of an order for relief, adjudication of bankruptcy or insolvency or such an appointment or the issuance or entry of any other order having a similar effect, and (B) remains undismissed for a period of ninety (90) days; or

(4)    any case, proceeding or other action is commenced or instituted against Subtenant seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its property which results in the entry of an order for any such relief which is not vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or

(5)    a trustee, receiver or other custodian is appointed for any substantial part of Subtenant's assets, and such appointment is not vacated or stayed within ninety (90) days (the events described in this Section 20(c) being collectively referred to herein as "**Insolvency Events**".

If this Sublease terminates pursuant to this Section 20(c), then (I) Subtenant immediately shall quit and surrender the Premises, and (II) Subtenant shall nonetheless remain liable for all of its obligations hereunder, as provided in Section 21 hereof and Section 22 hereof.

(d)    Notwithstanding anything to the contrary contained herein, if: (i) Sublandlord's right to terminate this Sublease after the occurrence of an Event of Default, or the termination of this Sublease upon the occurrence of an Insolvency Event, is stayed by order of any court having jurisdiction over an Insolvency Event, or by federal or state statute; (ii) the trustee appointed in connection with an Insolvency Event, or Subtenant or Subtenant as debtor-in-possession, fails to assume Subtenant's obligations under this Sublease on or prior to the

earliest to occur of (A) the last day of the period prescribed therefor by law, (B) the one hundred twentieth (120th) day after entry of the order for relief, or (C) a date that is otherwise designated by the court, or (iii) said trustee, Subtenant or Subtenant as debtor-in-possession fails to provide adequate protection of Sublandlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Subtenant's obligations under this Sublease as provided in Section 20(a)(4) hereof, then Sublandlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Sublease on five (5) Business Days' prior written notice to Subtenant, Subtenant as debtor-in-possession or said trustee, and, upon the expiration of said period of five (5) Business Days, this Sublease shall cease and expire as aforesaid and Subtenant, Subtenant as debtor-in-possession or said trustee shall immediately quit and surrender the Premises as aforesaid.

(e)      Notwithstanding anything contained in this Sublease to the contrary, all amounts payable by Subtenant to or on behalf of Sublandlord under this Sublease, regardless of whether such amounts are expressly denominated as rent, shall constitute rent for the purposes of Section 502(b)(6) of the Bankruptcy Code, and Subtenant's payment obligations with respect thereto shall constitute obligations to be timely performed pursuant to Section 365(d) of the Bankruptcy Code.

21.    **Remedies and Damages**.

(a)      If: (i) an Event of Default occurs and this Sublease and the Term expires and comes to an end as provided in Section 19(b) hereof; or (ii) this Sublease terminates as provided in Section 20(c) hereof, then:

(1)      Subtenant shall immediately quit and peacefully surrender the Premises to Sublandlord, and Sublandlord and its agents may, without prejudice to any other remedy which Sublandlord may have, (A) re-enter the Premises or any part thereof, without notice, either by summary proceedings, or by any other applicable action or proceeding, or by lawful force (without being liable to indictment, prosecution or damages therefor), (B) repossess the Premises and dispossess Subtenant and any other Persons from the Premises, and (C) remove any and all of their property and effects from the Premises; and

(2)      Sublandlord, at Sublandlord's option, may relet the whole or any portion or portions of the Premises from time to time, either in the name of Sublandlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the end of the Term, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Sublandlord, in its sole discretion, may determine.

(b)      Sublandlord shall have no obligation to relet the Premises or any part thereof and shall not be liable for refusal or failure to relet the Premises or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting. Any such refusal or failure on Sublandlord's part shall not relieve Subtenant of any liability under this Sublease or otherwise affect any such liability. Sublandlord, at Sublandlord's option, may

make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Sublandlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Subtenant of any liability under this Sublease or otherwise affecting any such liability.

(c)     In the event of a breach or threatened breach by Subtenant, or any Persons claiming by, through or under Subtenant, of any term, covenant or condition of this Sublease, Sublandlord shall have the right to: (i) enjoin or restrain such breach; (ii) invoke any other remedy allowed by law or in equity as if re-entry, summary proceedings and other special remedies were not provided in this Sublease for such breach; and (iii) seek any declaratory, injunctive or other equitable relief, and specifically enforce this Sublease. The right to invoke the remedies hereinbefore set forth are cumulative and non-exclusive and shall not preclude Sublandlord from invoking any other remedy allowed at law or in equity.

(d)     Subject to the terms and provisions of <u>Section 32</u> of this Sublease, Subtenant, on its own behalf and on behalf of all Persons claiming by, through or under Subtenant, including all creditors, does hereby waive any and all rights which Subtenant and all such Persons might have under any present or future law to redeem the Premises, or to re-enter or repossess the Premises, or to restore the operation of this Sublease, after: (i) Subtenant has been dispossessed by a judgment or by warrant of any court or judge; or (ii) any re-entry by Sublandlord; or (iii) any expiration or termination of this Sublease and the Term, whether such dispossess, re-entry, expiration or termination is by operation of law or pursuant to the provisions of this Sublease. The words "re-enter," "re-entry" and "re-entered" as used in this Sublease shall not be deemed to be restricted to their technical legal meanings.

(e)     If this Sublease terminates by reason of the occurrence of an Event of Default or by reason of the occurrence of an Insolvency Event, then Subtenant shall pay to Sublandlord, on demand, and Sublandlord shall be entitled to recover:

(1)     all rent payable under this Sublease by Subtenant to Sublandlord (i) to the date that this Sublease terminates, or (ii) to the date of re-entry upon the Premises by Sublandlord, as the case may be;

(2)     the excess of (i) the rent for the period which otherwise would have constituted the unexpired portion of the Term, over (ii) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of clause (2) of <u>Section 21(a)</u> hereof for any part of such period (such excess being hereinafter referred as a "**Deficiency**"), as damages (it being understood that (x) such net amount described in clause (2) hereof shall be calculated by deducting from the rents collected under any such reletting all of Sublandlord's expenses in connection with the termination of this Sublease, Sublandlord's re-entry upon the Premises and such reletting, including, but not limited to, all repossession costs, brokerage commissions, legal expenses, attorneys' fees and disbursements, alteration costs, contributions to work and other expenses of preparing the Premises for such reletting, (y) any such Deficiency shall be paid in monthly installments by Subtenant on the days specified in this Sublease for payment of installments of Base Rent, and (z) Sublandlord shall be entitled to recover from Subtenant each monthly Deficiency as it arises, and no suit to collect the amount of the Deficiency for any month

28

shall prejudice Sublandlord's right to collect the Deficiency for any subsequent month by a similar proceeding); and

(3) regardless of whether Sublandlord has collected any monthly Deficiency as aforesaid, and in lieu of any further Deficiency, as and for liquidated and agreed final damages, an amount equal to the excess (if any) of (i) the rent for the period which otherwise would have constituted the unexpired portion of the Term (commencing on the date immediately succeeding the last date with respect to which a Deficiency, if any, was collected), over (ii) the then fair and reasonable net effective rental value of the Premises for the same period (which is calculated by (x) deducting from the fair and reasonable rental value of the Premises the expenses that Sublandlord would reasonably expect to incur in reletting the Premises, including, but not limited to, all repossession costs, brokerage commissions, legal expenses, attorneys' fees and disbursements, alteration costs, contributions to work and other expenses of preparing the Premises for such reletting, and (y) taking into account the time period that Sublandlord would reasonably require to consummate a reletting of the Premises to a new tenant), both discounted to present value at a rate equal to the discount rate published in *The Wall Street Journal*, or similar publisher of business statistical data. If, before presentation of proof of such liquidated damages to any court, commission or tribunal, the Premises, or any part thereof, have been relet by Sublandlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, then the amount of rent reserved upon such reletting shall be deemed, prima facie, to be the fair and reasonable rental value of the Premises (or the applicable part thereof) so relet during the term of the reletting.

(f) Nothing contained in this <u>Section 21</u> shall be deemed to limit or preclude the recovery by Sublandlord from Subtenant of the maximum amount allowed to be obtained as damages by any applicable statute or rule of law, or of any sums or damages to which Sublandlord may be lawfully entitled in addition to the damages set forth in this <u>Section 21</u>.

(g) Forbearance by Sublandlord to enforce one or more of the remedies herein provided upon the occurrence of an Event of Default by Subtenant shall not be deemed or construed to constitute a waiver of such default.

(h) Upon the occurrence of an Event of Default by Subtenant which is continuing and remains uncured, Sublandlord may, but shall not be obligated to, make any such payment or perform or otherwise cure any such obligation, provision, covenant or condition on Subtenant's part to be observed or performed (and Sublandlord may enter the Premises for such purposes, subject to the rights of occupants thereof). Any such actions undertaken by Sublandlord pursuant to the foregoing provisions of this <u>Section (h)</u> shall not be deemed a waiver of Sublandlord's rights and remedies as a result of Subtenant's failure to perform and shall not release Subtenant from any of its obligations under this Sublease. Subtenant shall pay to Sublandlord, as additional rent, sums equal to the actual out-of-pocket reasonable third-party and necessary expenditures made by Sublandlord in connection with Sublandlord's performance or cure of any of Subtenant's obligations pursuant to the provisions of this Section. Subtenant's obligations under this <u>Section 21</u> shall survive the expiration or earlier termination of the Term.

(i)    In the event of a default by Sublandlord in the performance of any obligation, provision, covenant or condition on Sublandlord's part to be observed or performed, Subtenant, may, but shall not be obligated to, make any such payment or perform or otherwise cure any such obligation, provision, covenant or condition and the cost thereof shall be payable by Sublandlord to Subtenant upon demand and Subtenant shall have the right to offset the same against the rents payable hereunder.

(j)    Notwithstanding anything to the contrary set forth in this Sublease, the offset rights set forth in the Membership Interests Option are hereby incorporated herein by reference and the Sublandlord hereby agrees to the same.

22.    **Sublandlord's Expenses and Late Charges**.

(a)    In the event that either party incurs any costs or expenses in connection with the enforcement of the terms of this Sublease or defense of claim by the other, the prevailing party in such contest shall be entitled to recover its costs and expenses from the other, including without limitation court costs and reasonable attorneys' fees.  In the event Subtenant is liable therefore, such sums shall be payable as additional rent.  In the event Sublandlord is liable therefore, such sums shall be payable by Sublandlord upon demand and Subtenant shall be permitted to offset the same against the rents.

(b)    Except as otherwise specifically provided herein, any amounts due from one party to the other pursuant to the terms of this Sublease, including amounts to be reimbursed one to the other, shall, if not paid within five (5) Business Days of the due date, bear interest from the due date or the date the right to reimbursement accrues at the prime rate of interest published in *The Wall Street Journal*, or similar publisher of business statistical data, plus five percent (5%) (hereinafter referred to as the "**Applicable Rate**"); provided, however, that such rate shall not exceed, in any event, the highest rate of interest which may be charged under Applicable Law without the creation of liability for penalties or rights of offset or creation of defenses.  For purposes of interest calculations, the due date of amounts or the date the right to reimbursement accrues shall be deemed the date that it originally was owing but may have been disputed, as distinguished from the date of final settlement or the making of a judicial or arbitration award.

23.    **Access.**    After reasonable written notice to Subtenant, Sublandlord and Sublandlord's agents and representatives shall be entitled to enter upon and show and inspect the Premises for any reason whatsoever at any time during Subtenant's normal business hours, so long as such inspection shall not unreasonably interfere with Subtenant's business and Subtenant shall have the right to have a representative present at such inspection.  During an emergency, Sublandlord's access to the Premises will not be restricted as provided in the immediately preceding sentence.

24.    **Covenant of Quiet Enjoyment.**  Subtenant, so long as this Sublease has not been terminated shall peaceably and quietly hold and enjoy the Premises pursuant to this Sublease for the Term, without any hindrance or ejection by Sublandlord or Sublandlord's successors or assigns, any of Sublandlord's lenders or any other Person claiming by, through or under Sublandlord or such successors or assigns, subject to, and in accordance with, the provisions of this Sublease.

30

25.    **<u>Subordination and Non-Disturbance</u>**.

(a)    On the date hereof, Sublandlord shall deliver to Subtenant an agreement from the holder (hereinafter collectively referred to as the "**Leasehold Mortgagee**") of any mortgage encumbering Sublandlord's interest in the Premises on the date hereof (hereinafter collectively referred to as a "**Leasehold Mortgage**") and from the holder of any mortgage encumbering the fee simple interest in the Premises (collectively with any Leasehold Mortgage, a "**Superior Interest Mortgage**"), substantially in the form of <u>Exhibit F</u> hereto.    Subject to Sublandlord obtaining and delivering to Subtenant an agreement from the holder of any Superior Interest Mortgage entered into after the date hereof, substantially in the form of <u>Exhibit F</u> hereto, Subtenant agrees that this Sublease shall at all times be subject and subordinate to the lien of any Superior Interest Mortgage.

(b)    Except as expressly provided in this Sublease by reason of the occurrence of an Event of Default and termination of this Lease by reason thereof, Subtenant's tenancy and Subtenant's rights under this Sublease shall not be disturbed, terminated or otherwise adversely affected, nor shall this Sublease be affected, by any default under any Superior Interest Mortgage, and in the event of a foreclosure or other enforcement of any Superior Interest Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Subtenant for the Term, the rights of Subtenant under this Sublease shall expressly survive, and this Sublease shall in all respects continue in full force and effect so long as it has not been terminated by reason of Subtenant's Default.    Subtenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law.    Any Superior Interest Mortgage to which this Sublease is now or hereafter subordinate shall provide, in effect, that during the time this Sublease is in force, any insurance proceeds and condemnation awards shall be permitted to be used for restoration in accordance with the provisions of this Sublease.

(c)    At any time prior to the expiration of the Term, Subtenant agrees, at the election and upon demand of any owner of the Premises, or of the holder of a Superior Interest Mortgage who has granted non-disturbance to Subtenant pursuant to <u>Section 25(a)</u> hereof, to attorn, from time to time, to any such owner or mortgagee, upon the terms and conditions of this Sublease, for the remainder of the Term.    The provisions of this <u>Section 25(c)</u> shall inure to the benefit of any such owner or the holder of a Superior Interest Mortgage, shall apply notwithstanding that, as a matter of law, this Sublease may terminate upon the foreclosure of the Superior Interest Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions.

(d)    If Sublandlord shall mortgage the Premises, Subtenant shall give to the holder of a Superior Interest Mortgage, whose address has been given to Subtenant by notice, at the address of the holder of a Superior Interest Mortgage (to the extent same is provided to Subtenant), and otherwise in the manner provided by <u>Section 27</u> hereof, a copy of each notice of default by Sublandlord, at the same time as, and whenever, any such notice of default shall be given by Subtenant to Sublandlord, and no such notice of default by Subtenant shall be deemed to have been duly given to Sublandlord unless and until a copy thereof shall have been so given to the holder of a Superior Interest Mortgage. The holder of a Superior Interest Mortgage: (i) shall thereupon have a period of thirty (30) days in the case of a monetary default and ninety (90) days in the case of any non-monetary default, after such notice is given to the holder of a Superior Interest

Mortgage, to remedy the default, cause the same to be remedied or cause action to remedy a default to be commenced; and (ii) shall, within such period and otherwise as herein provided, have the right to remedy such default, cause the same to be remedied or cause action to remedy a default to be commenced; provided, however, that if any such default shall not be capable of being cured within such ninety (90) day period, Sublandlord shall have such longer period to cure such default as shall be reasonable under the circumstances, provided that Sublandlord shall be exercising reasonable diligence seeking to cure the default. Subtenant shall accept performance by the holder of a Superior Interest Mortgage of any covenant, condition, or agreement on Sublandlord's part to be performed hereunder with the same force and effect as though performed by Sublandlord itself.

(e)    No default or Event of Default by Sublandlord shall be deemed to exist as long as the holder of a Superior Interest Mortgage, in good faith: (i) shall have commenced or caused to be commenced promptly to cure the default and prosecutes or causes to be prosecuted the same to completion with reasonable diligence and continuity, subject to Unavoidable Delays; or (ii) if possession of the entire Premises or any part thereof is required in order to cure the default, shall have notified Subtenant of its intention to institute foreclosure proceedings to obtain possession directly or through a receiver, and thereafter, within forty-five (45) days of the giving of such notice, commences such foreclosure proceedings, prosecutes such proceedings with reasonable diligence and continuity (subject to Unavoidable Delays) and, upon obtaining such possession, commences promptly to cure the default or event of default and prosecutes the same to completion with reasonable diligence and continuity (subject to Unavoidable Delays); provided, however, that the holder of a Superior Interest Mortgage shall have delivered to Subtenant, in writing, its agreement to take the action described in clause (i) or (ii) hereof, and shall have assumed the obligation to attempt to cure the default, and that during the period in which such action is being taken (and any foreclosure proceedings are pending), all of the other obligations of Sublandlord under this Sublease are being duly performed within any applicable grace periods. Notwithstanding the foregoing, at any time after the delivery of the aforementioned agreement, the holder of a Superior Interest Mortgage may notify Subtenant, in writing, that it has relinquished possession of the Premises or that it will not institute foreclosure proceedings, or, if such proceedings have been commenced, that it has discontinued them (without intention to recommence same) or the holder of a Superior Interest Mortgage has elected not to continue to attempt to cure the default, and in such event, the holder of a Superior Interest Mortgage shall have no further liability under such agreement from and after the date it delivers such notice to Subtenant (except for any obligations assumed by the Leasehold Mortgagee and accruing prior to the date it delivers such notice).

(f)    No holder of a Superior Interest Mortgage shall become liable under the provisions of this Sublease unless and until such time as it becomes, and then only for as long as it remains, the owner of the Premises.

26.    **Holding Over by Subtenant.**  In the event Subtenant remains in possession of the Premises after the expiration of the Term, without the execution of a new lease, Subtenant, at the option of Sublandlord, shall be deemed to be occupying the Premises as a tenant from month-to-month and such tenancy shall not be deemed to extend or renew the Term, and Subtenant shall pay Sublandlord for use and occupancy of the Premises, an amount equal to one and a half (1.5) times the Base Rent in the last year of the term for each month or any part thereof (prorated accordingly), subject to all of the other terms, covenants, conditions, provisions and agreements of

32

this Sublease insofar as the same are applicable to a month-to-month tenancy. Further, in the event Subtenant holds over and remains in possession of the Premises or any part thereof for more than thirty (30) days after the expiration of the Term, then: (i) Subtenant shall indemnify, defend and hold harmless Sublandlord from all costs, losses, expenses, or liabilities incurred as a result of or related to such failure, including, without limitation, claims made by any succeeding or prospective tenant and real estate brokers' claims and reasonable attorneys' fees; and (ii) Sublandlord may, at its option, commence a summary holdover proceeding against Subtenant seeking possession of the Premises.

27.  **Notices and Payments.**  Any notice, document or payment required or permitted to be delivered or remitted hereunder or by law shall be deemed to be delivered or remitted, whether actually received or not, on the earlier to occur of: (i) when personally delivered to the respective party, or (ii) one (1) day after delivery to a nationally recognized overnight courier service addressed in accordance herewith; or (iii) within three (3) Business Days after being deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, addressed to the parties hereto at the respective addresses set forth below, or at such other address as they shall have theretofore specified by not less than twenty (20) days prior written notice delivered in accordance herewith:

| | |
|---|---|
| Sublandlord: | Subtenant: |
| Notices:<br>Dino & Sons Realty Corp.,<br>1590 Troy Avenue,<br>Brooklyn, NY 11234<br>Attn: c/o Dino Tomassetti, Jr., | 220 5th Realty LLC<br>c/o Stellar Management<br>156 William Street<br>10th Floor<br>New York, New York 10038<br>Attn: _____, |
| With a copy to: | With a copy to: |
| Cole Schotz, P.C.<br>1325 Avenue of the Americas<br>19th Floor<br>New York, NY 10019-6079<br>Attn: Leo Leyva, Esq. | Nesenoff & Miltenberg, LLP<br>363 Seventh Avenue<br>Fifth Floor<br>New York, New York 10001<br>Attn: Ira S. Nesenoff, Esq. |

28.  **Force Majeure.**  The time for performance by Sublandlord or Subtenant of any term, provision or covenant of this Sublease (other than any term, provision or covenant, respecting the payment of money) shall be deemed extended by any time lost due to delays resulting from acts of God, strikes, unavailability of building materials, civil riots, floods, material or labor restrictions by governmental authority and any other uncontemplated cause not within the reasonable control of Sublandlord or Subtenant, respectively, as the case may be.

29.  **Waiver of Subrogation.**  Subtenant waives any and every claim which arises or may arise in its favor and against during the Term for any and all loss or damage to any of its property located within or upon, or constituting a part of, the Premises, which loss or damage is covered by the insurance policies required to be carried by Subtenant under this Sublease. Inasmuch as the above waiver will preclude the assignment of any aforesaid claim by way of

33

subrogation (or otherwise) to an insurance company (or any other Person), Subtenant agrees to give to each insurance company which has issued to it policies of insurance, written notice of the terms of said waiver and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverages by reason of said waivers.

30. **Recording.** Concurrently with the execution of this Sublease, Sublandlord and Subtenant shall execute, acknowledge and deliver a Memorandum of this Sublease (hereinafter referred to as the "**Memorandum of Lease**"), in the form attached hereto as Exhibit C and made a part hereof for all purposes, which Memorandum of Lease may be recorded by Subtenant in the New York City Register's Office. The recording costs relating to the Memorandum of Lease shall be paid by Subtenant and any fees or other charges associated with the recording of the Memorandum of Lease or payable in connection with the execution of the Memorandum of Lease shall be the sole responsibility of Subtenant.

31. **Waiver of Sublandlord's Lien.** Sublandlord hereby waives all of Sublandlord's rights to any contractual, statutory, constitutional or other lien or security interest on any of Subtenant's Business Property that may now or at any time hereafter be situated on the Premises. If requested by a lender holding or obtaining a security interest in Subtenant's Business Property, Sublandlord shall enter into such reasonable and customary documentation as the lender shall reasonably request and that is reasonably acceptable to Sublandlord, including a waiver of any statutory lien that Sublandlord may have in such personal property and permitting such lender reasonable access to the Premises (before and for a reasonable period of time after termination of this Sublease) for the purpose of enforcing such lender's lien with respect to such personal property.

32. **Mortgage by Subtenant.** Subtenant is hereby given the right by Sublandlord to create, without Sublandlord's prior consent, one or more security interests or mortgages covering the Sublease Estate and any subleases under one or more leasehold mortgages or the direct or indirect beneficial interests in Subtenant (herein referred to as a "**Subleasehold Mortgage**" and the holder thereof herein called a "**Subleasehold Mortgagee**"), and to collaterally assign this Sublease and any subleases (and the rents and profits under any subleases) as collateral security for any Subleasehold Mortgage. Sublandlord's right, title and interest in this Sublease and in the Premises shall not be subordinate or subject to the lien, priority or security of any encumbrance of this Sublease created by Subtenant or to any Subleasehold Mortgage, regardless of when created. In the event of a foreclosure of any Subleasehold Mortgage by Subleasehold Mortgagee, such foreclosure will affect only the leasehold estate created by this Sublease. The foreclosure will extinguish Subtenant's ownership of Subtenant's interest in this Sublease, subject to such Subleasehold Mortgagee's rights under this Section 32, and a purchaser of Subtenant's leasehold interest in this Sublease at such foreclosure shall acquire Subtenant's interest in this Sublease, but the foreclosure will not affect: (i) Sublandlord's rights in or ownership of the fee interest in the Premises; or (ii) the interest of the holder of any Subleasehold Mortgage. If Subtenant shall create any Subleasehold Mortgage(s), and if the Subleasehold Mortgagee(s) shall send to Sublandlord a true copy thereof, together with written notice specifying the name(s) and address(es) of the Subleasehold Mortgagee(s) and the pertinent recording data with respect to the Subleasehold Mortgage(s) Sublandlord agrees that so long as the Subleasehold Mortgage(s) shall remain unsatisfied of record or until written notice of satisfaction is given by the Subleasehold Mortgagee(s) to Sublandlord, the following provisions shall apply:

(a)      Except as is expressly permitted by this Sublease, there shall be no cancellation, surrender or modification of this Sublease by joint action of Sublandlord and Subtenant without the prior consent in writing of the Subleasehold Mortgagee(s).

(b)      Sublandlord, on serving Subtenant with any notice or legal process in respect of any Event of Default under this Sublease, or of any matter on which an Event of Default may be predicated or claimed or any other notice whatsoever, shall simultaneously serve a copy of such notice or legal process upon the Subleasehold Mortgagee(s).  In addition, if Subtenant is in default under this Sublease and any cure period applicable to such default expires without cure of such default, then Sublandlord shall promptly give notice of such fact to any Leasehold Mortgagee, which notice shall describe in reasonable detail Subtenant's default (a "**Subtenant's Cure Period Expiration Notice**").The Subleasehold Mortgagee(s) shall thereupon have a reasonable period of time but in no event less than the same period of time that Subtenant has under this Sublease, after service of such notice or legal process, plus the periods of time set forth below (in addition to any grace periods provided to Subtenant under this Sublease), to remedy or cause to be remedied the defaults complained of ("Mortgagee's Cure Rights" and such actions, "Mortgagee's Cure"), and Sublandlord shall accept such performance by or at the instigation of such Subleasehold Mortgagee(s) as if the same had been done by Subtenant:

(1)      In the case of a monetary default, any Subleasehold Mortgagee shall be entitled (but not required) to cure such default within a cure period consisting of Subtenant's cure period under this Lease extended through the date 20 days after such Subleasehold Mortgagee shall have received Subtenant's Cure Period Expiration Notice as to such monetary default.

(2)      In the case of any nonmonetary default that any Subleasehold Mortgagee is reasonably capable of curing without obtaining possession of the Premises (excluding in any event a Personal Default), such Leasehold Mortgagee, shall have the right (but not the obligation) to cure such nonmonetary default within a period consisting of Subtenant's cure period for the default, extended through the date thirty (30) days after receipt of Subtenant's Cure Period Expiration Notice as to such default, the right to do all the following:

(i)      advise Sublandlord of its intention to take all reasonable steps necessary to remedy such nonmonetary default; (it being understood that such notice is a statement of intention and not an obligation):

(ii)      duly commence the cure of such nonmonetary default within such extended period, and thereafter (during and after such extended period) diligently prosecute to completion the remedy of such nonmonetary default subject to Unavoidable Delays; and

(iii)      complete such remedy within a reasonable time under the circumstances, subject to Unavoidable Delays.

(3)      In the case of (1) a nonmonetary default that is not reasonably susceptible of being cured by such Subleasehold Mortgagee without obtaining possession of the

35

Premise or (2) a Personal Default by Subtenant, such Leasehold Mortgagee shall be entitled (but not required) to do the following:

(i)     At any time during the cure period (if any) that applies to Subtenant, extended through the date that is ninety (90) days after such Subleasehold Mortgagee's receipt or Subtenant's Cure Period Expiration Notice as to such default, Subleasehold Mortgagee shall be entitled to institute proceedings, and (subject to any stay in any Bankruptcy Proceedings affecting Tenant, or any injunction, unless such stay or injunction is lifted), diligently prosecute the same to completion, to obtain possession of the Premises as mortgagee (including possession by a receiver), or (cause a successor subtenant to) acquire the Subleasehold Estate through a Foreclosure Event, or foreclose on its pledged collateral, as applicable (the obtaining of such possession or the completion of such acquisition, "**Control of the Premises**").

(ii)    Upon obtaining Control of the Premises (whether before or after expiration of any otherwise applicable cure period), Subleasehold Mortgagee or a successor subtenant shall then be entitled (but not required) to proceed with reasonable diligence and reasonable continuity to cure such nonmonetary defaults as are then reasonably susceptible of being cured by such Leasehold Mortgagee or successor subtenant (excluding Subtenant's Personal Defaults, which Leasehold Mortgagee need not cure), subject to Unavoidable Delay.  A Leasehold Mortgagee or successor subtenant having Control of the Premises shall not be bound by any deadline for completion of any construction or alterations, or other performance, required of Subtenant under this Sublease, provided that such Leasehold Mortgagee or successor subtenant shall with reasonable diligence and reasonable continuity prosecute completion of same.

(iii)   Upon the cure of a default by such Subleasehold Mortgagee in accordance with this Sublease, this Sublease shall continue in full force and effect as if no default(s) had occurred. Subleasehold Mortgagee's exercise of Mortgagee's Cure Rights shall not be deemed an assumption of this Sublease in whole or in part.

(c)     Forbearance by Landlord.

(1)     So long as a Subleasehold Mortgagee shall be diligently exercising its Mortgagee's Cure Rights within the applicable cure periods set forth above, Sublandlord shall not (1) re-enter the Premises, (2) serve a termination notice, or (3) bring a proceeding on account of such default to (A) dispossess Subtenant and/or other occupants of the Premises, (B) re-enter the Premises, or (C) terminate this Sublease or the Subleasehold Estate (such rights described in clauses (1), (2) and (3) being herein "**Sublandlord's Termination Rights**").  Upon any cessation of a Subleasehold Mortgagee exercising such

prosecute to completion, all steps necessary to remedy such nonmonetary default (subject to Unavoidable Delays), and (3) complete such remedy within a reasonable time after such commencement, subject to Unavoidable Delays). In no event, however, shall such Leasehold Mortgagee be required to cure a Personal Default of Tenant as a condition to obtaining or retaining a New Lease or otherwise..

(2)     The following additional provisions shall apply to any New Sublease:

(i)     Form and Priority. Any New Sublease (or, at Sublandlord's or Subleasehold Mortgagee's option, a memorandum thereof) shall be in recordable form and at the request of either such party shall be recorded. Such New Sublease shall not be subject to any rights, liens, or interests other than Permitted Exceptions. Although, it is the intention of the parties that any New Sublease shall be owned and held solely by New Subtenant free and clear of any claims of (1) Subtenant prior to the termination of this Sublease, (2) if the New Sublease was requested by a Subleasehold Mortgagee, any holder of any lien that encumbered the Subleasehold Estate before this Sublease was terminated, but whose lien was junior and subordinate to the Subleasehold Mortgage whose Subleasehold Mortgagee requested the New Sublease, the New Sublease shall be expressly made subject to any rights of Subtenant prior to the termination of this Lease.

(ii)     Adjustment for Net Income. On the New Sublease Delivery Date, Sublandlord shall pay New Subtenant an amount equal to any net income derived from the Premises and actually received by Sublandlord (excluding from income the amount of Rent payable hereunder) during the period from the termination of this Sublease to the New Sublease Delivery Date, provided that New Subtenant concurrently pays Sublandlord all sums required to be paid Sublandlord pursuant to this Sublease upon execution of such New Sublease.

(iii)     Assignment of Certain Items. On the New Sublease Delivery Date, Sublandlord shall assign to New Subtenant all of Sublandlord's right, title and interest in and to all moneys (including insurance proceeds and condemnation awards), if any, then held by, or payable to, Sublandlord that Subtenant (or Subleasehold Mortgagee) would have been entitled to receive but for termination of this Sublease, and all subleases.

(iv)     Preservation of Subleases. Between the date of the termination of this Sublease and the New Sublease Delivery Date, Landlord shall not take any affirmative action to cancel any sublease or accept any cancellation, termination, or surrender of a sublease (it being understood that Landlord shall not be obligated to take any action to keep any Subleases in effect), except, that Sublandlord shall duly perform the obligations of Subtenant under the subleases). Any sublease which was terminated upon the termination of this Sublease as a matter of law, shall, at New Subtenant's option, be reinstated upon execution of the New Sublease.

(v)     Separate Instrument. Sublandlord hereby agrees, at the request of any Leasehold Mortgagee, to enter into a separate instrument (and memorandum

38

thereof in recordable form) memorializing such Subleasehold Mortgagee's rights under this Section 32(f).

(g)    Nothing herein contained shall require any Subleasehold Mortgagee to cure any default of Subtenant.

(h)    Subtenant's making of a Subleasehold Mortgage shall not be deemed to constitute an assignment or transfer of the Subleasehold Estate, nor shall any Subleasehold Mortgagee, as such, or in the exercise of its rights under this Sublease, be deemed to be an assignee or transferee or mortgagee in possession of the Subleasehold Estate so as to require such Leasehold Mortgagee, as such, to assume or otherwise be obligated to perform any of Subtenant's obligations under this Sublease except when, and then only for so long as, such Subleasehold Mortgagee has acquired ownership and possession of the Subleasehold Estate pursuant to a Foreclosure Event under its Subleasehold Mortgage (as distinct from its rights under this Lease to cure defaults). No Subleasehold Mortgagee (or person acquiring the Subleasehold Estate pursuant to a Foreclosure Event under a Subleasehold Mortgage) shall be liable under this Sublease unless and until such time as it becomes, and then only for so long as it remains, the owner of the Subleasehold Estate. Landlord recognizes that a Subleasehold Mortgagee may cause an affiliate, nominee or designee thereof to acquire the Subleasehold Estate on a Foreclosure Event

(i)    Sublandlord shall, on request, execute, acknowledge and deliver to each Subleasehold Mortgagee (subject to execution, acknowledgment and delivery by the Subleasehold Mortgagee) an agreement prepared at the sole cost and expense of Subtenant, in form and substance reasonably satisfactory to Sublandlord, between Sublandlord and the Subleasehold Mortgagee, agreeing to the provisions of this Section 32.

(j)    All Subleasehold Mortgagees shall be given notice of any arbitration or judicial proceedings by the party instituting such arbitration or judicial proceeding, and shall have the right to intervene therein and be made a party to such proceedings. If any Subleasehold Mortgagee shall elect not to intervene or become a party to any such proceedings, such Subleasehold Mortgagee shall receive notice and a copy of any award or decision made in such proceedings from the party instituting such arbitration or judicial proceedings.

(k)    Notwithstanding the provisions hereof, if any Subleasehold Mortgagee shall acquire title to Subtenant's interest under this Sublease by foreclosure, assignment in lieu of foreclosure or otherwise, or under a new lease pursuant to this subparagraph (e) hereof such Subleasehold Mortgagee may assign such interest under this Sublease or in such new lease and shall thereupon be released from all liability for the performance or observance of the covenants and conditions in this Sublease or in such new lease contained on Subtenant's part to be performed and observed; provided, however, that the assignee of such Subleasehold Mortgagee shall have expressly assumed this Sublease or such new lease and written evidence thereof shall have been submitted to Sublandlord.

(l)    Within twenty (20) days after request by Subleasehold Mortgagee, Sublandlord shall execute and deliver to the requesting party, a written certificate as to the status of this Sublease, any existing defaults, the status of the payments and performance of the parties

required hereunder, and such other information as may be reasonably requested in connection with this Sublease.

(m)     Any Subleasehold Mortgagee may exercise all rights of Subtenant during such time as the Subleasehold Mortgage shall remain outstanding and unsatisfied.

(n)     Notwithstanding anything to the contrary in this Sublease, any Foreclosure Event, or any exercise of rights or remedies under any Subleasehold Mortgage, shall not be deemed to violate this Sublease or require the consent of Sublandlord.

(o)     Sublandlord and Subtenant authorize each Subleasehold Mortgagee to enter the Premises as necessary to affect Mortgagee's Cure and take any action(s) reasonably necessary to effect Mortgagee's Cure.

33.   **Sublandlord's Liability Limited to Sublandlord's Interest.**   If Subtenant is awarded a money judgment against Sublandlord, then recourse for satisfaction of such judgment shall be limited to execution against Sublandlord's estate and interest in the Premises and the insurance proceeds, sales proceeds and condemnation awards related thereto.  No other asset of Sublandlord, any partner, director, member, manager, officer or trustee of Sublandlord shall be available to satisfy or be subject to such judgment, nor shall any such Person or entity be held to have personal liability for satisfaction of any claim or judgment against Sublandlord or any such individual.

34.   **Excavations and Shoring.**

(a)     If any excavation or other building operation shall be about to be made or shall be made on any adjoining premises or streets, Subtenant shall permit the owner or lessee of such adjoining premises and their respective representatives, to enter the Premises and to shore the foundations and walls thereof, and to do any other act or thing necessary for the safety or preservation of the Premises. Sublandlord shall not be liable for any inconvenience, annoyance, disturbance, loss of business or other damage arising therefrom and Subtenant's obligations hereunder shall not thereby be affected.  Subtenant shall have the sole authority and right to negotiate the terms and conditions of any such access and to enter into any agreements in connection therewith and shall be solely entitled to any compensation therefore.

(b)     If any adjoining building or structure encroaches or shall at any time encroach upon the Premises, no claim or demand or objection of any kind shall be made by Subtenant against Sublandlord by reason of any such encroachment, and no claim for abatement of rent and of other charges which may become due under this Sublease shall be made by reason of any such encroachment or acts of or in connection with the removal thereof, and the rights, liabilities and obligations of the parties hereto shall be the same as if there were no such encroachment and in any legal proceedings relating thereto the Premises may properly and without prejudice be described according to the description hereinbefore contained without reference to any such encroachments. Sublandlord shall reasonably cooperate with Subtenant in any proceedings brought by Subtenant to remove any such encroachments, provided that the same shall be without cost, liability or expense to Sublandlord.

35.   **Miscellaneous.**

40

(a)    The captions used in this Sublease are for convenience only and shall not be deemed to amplify, modify or limit the provisions hereof.

(b)    Words of any gender used in this Sublease shall be construed to include any other gender, and words in the singular shall include the plural and vice versa, unless the context otherwise requires.

(c)    This Sublease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. Notwithstanding anything to the contrary in this Sublease, Sublandlord shall not be permitted to assign or transfer, whether directly or indirectly, its interest in the Sublease and/or the Lease, except in conjunction with a Superior Interest Mortgage to which the provisions of Section 25 hereof shall apply.

(d)    This Sublease contains the entire agreement of the parties hereto with respect to the subject matter hereof and can be altered, amended or modified only by a written instrument executed by all such parties.

(e)    If any term or provision of this Sublease or the application thereof to any Person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Sublease or the application of such term or provision to persons or circumstances (other than those as to which it is held invalid or unenforceable) shall not be affected thereby, and each term and provision of this Sublease shall be valid and enforceable to the fullest extent permitted by law.

(f)    Nothing herein contained, either in the method of computing rent or otherwise, shall create between the parties hereto, or be relied upon by others as creating, any partnership, association, joint venture or otherwise.  The sole relationship of the parties hereto shall be that of landlord and tenant.

(g)    This Sublease shall be governed by, and construed in accordance with the laws of the State of New York without regard to conflicts of law principles.

(h)    This Sublease shall not be construed either for or against Sublandlord or Subtenant, but this Sublease shall be interpreted in accordance with the general tenor of the language in an effort to reach a fair and equitable result.

(i)    It is understood that there are no oral agreements or representations between the parties hereto affecting this Sublease, and this Sublease supersedes and cancels any and all previous negotiations, arrangements, agreements or representations and understandings, if any, between the parties hereto with respect to the subject matter hereof.  There are no other representations or warranties between the parties hereto and all reliance with respect to representations is solely upon the representations and agreements contained herein.

(j)    From time to time during the Term, within ten (10) Business Days after the written request of the other party, each party hereto shall execute and deliver to the other an estoppel certificate in the form attached hereto as Exhibit D.  It is intended that any such statement delivered pursuant to this subsection (j) may be relied upon by any prospective purchaser, lender, subtenant, assignee or any entity which is a party to a potential merger, consolidation with, or

41

acquisition of all or substantially all of the assets or interest of, Sublandlord or Subtenant. Sublandlord shall also deliver such other information in such certificate as the Subtenant and/or any prospective purchaser, lender, subtenant, assignee or any entity which is a party to a potential merger, consolidation with, or acquisition of all or substantially all of the assets or interest of Subtenant shall reasonably request.

(k)    **SUBTENANT AND SUBLANDLORD WAIVE ANY OBJECTION TO THE VENUE OF ANY ACTION FILED IN ANY COURT SITUATED IN THE STATE OF NEW YORK OR, WITH RESPECT TO ANY FORCIBLE ENTRY AND DETAINER ACTION OR SIMILAR PROCEEDING GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, IN THE JURISDICTION IN WHICH THE PREMISES IS LOCATED, AND WAIVES ANY RIGHT, CLAIM OR POWER, UNDER THE DOCTRINE OF FORUM *NON CONVENIENS* OR OTHERWISE, TO TRANSFER ANY SUCH ACTION TO ANY OTHER COURT.**

(l)    Subtenant shall not claim any money damages by way of set-off, counterclaim, or defense, based on any claim that Sublandlord unreasonably withheld its consent or approval under this Sublease, in which case Subtenant's sole and exclusive remedy shall be an action for specific performance, injunction, or declaratory judgment.

(m)    Unless Subtenant's financials are publicly available online at no cost to Sublandlord, within ten (10) days after written request by Sublandlord (but not more than once during any twelve (12)-month period unless a default has occurred under this Sublease, or in the event of a sale, financing, or refinancing by Sublandlord of all or any portion of the Premises), Subtenant shall furnish to Sublandlord, Sublandlord's lender, prospective lender or purchaser, reasonably requested financial information. In connection therewith and upon Subtenant's request, Sublandlord and Subtenant shall execute a mutually acceptable confidentiality agreement on Sublandlord's form therefor.

(n)    Each party hereto represents and warrants to the other that such party is not a party with whom the other is prohibited from doing business pursuant to the regulations of the Office of Foreign Assets Control ("**OFAC**") of the U.S. Department of the Treasury, including those parties named on OFAC's Specially Designated Nationals and Blocked Persons List. Each party hereto is currently in compliance with, and shall at all times during the Term remain in compliance with, the regulations of OFAC and any other governmental requirement relating thereto. Each party hereto shall defend, indemnify, and hold harmless the other from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs) incurred by the other to the extent arising from or related to any breach of the foregoing certifications. The foregoing indemnity obligations shall survive the expiration or earlier termination of this Sublease.

(o)    There shall be no merger of this Sublease nor of the leasehold estate created by this Sublease with the fee estate in or ownership of any of the Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly: (i) this Sublease or the leasehold estate created by this Sublease or any interest in this Sublease or in such leasehold estate; and (ii) the fee estate or ownership of any of the Premises or any interest in such fee estate or ownership.  No such merger shall occur unless and until all

persons, corporations, firms and other entities having any interest in: (A) this Sublease or the leasehold estate created by this Sublease; and (B) the fee estate in or ownership of the Premises or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duty record the same.

(p)    If Subtenant or (with Subtenant's authorization) any subtenant requests Sublandlord's consent or approval to alterations, subletting or assignment, or any other matter or thing requiring Sublandlord's consent or approval under this lease, and if in connection with such request Sublandlord seeks the advice of its attorneys, architects, engineers and/or other professionals or consultants, then Sublandlord, as a condition precedent to granting its consent or approval, may require (in addition to any other requirements of Sublandlord in connection with such request) that Subtenant pay the fee(s) of Sublandlord's attorneys, architects, engineers and/or other professionals or consultants in connection with the consideration of such request and/or the preparation of any documents pertaining thereto.

36.    **Definitions.**    The terms defined in this Section 36 shall, for all purposes of this Sublease, have the following meanings:

(a)    "**Applicable Laws**" mean all statutes, ordinances, regulations, codes, by-laws and requirements of any Governmental Authority (as hereinafter defined) having jurisdiction, including, without limitation, Environmental Laws and zoning, health, fire, safety and building codes, applicable to Subtenant or the Premises.

(b)    "**Appraised Value of the Leasehold Estate**" means the value of the Subtenant's interest in this Sublease, including the unamortized value of Subtenant's capital improvements in the Premises, as determined by a Qualified Appraiser, calculated without regard to any early termination or expiration thereof and upon the assumption that every extension of the term of the Lease had been exercised.

(c)    "**Bankruptcy Proceeding**" means any bankruptcy, insolvency, reorganization, composition, or similar proceeding under the United States Bankruptcy Code (the "Bankruptcy Code") or any similar state or federal statute for the relief of debtors.

(d)    "**Business Day**" shall mean any day that is not a Saturday, a Sunday, a national or New York State holiday. In the event that date for action or performance hereunder falls on a day which is not a Business Day, then the date of such action or performance shall be moved to the next succeeding Business Day.

(e)    "**Existing Leases**" means all leases, licenses, or concessionaire or other occupancy agreements (if any) granted by or on behalf of Sublandlord or its predecessors as previous owner of the Premises on or before the Effective Date which entitle any third party to possess or occupy any space within the Premises.

(f)    "**Foreclosure Event**" means a foreclosure, trustee's sale, deed, transfer, assignment or other conveyance in lieu of foreclosure, or other similar exercise of rights or remedies under any Subleasehold Mortgage, including the occurrence of any transfer of title to the mortgaged estate by operation of or pursuant to any bankruptcy proceeding, in each case whether

the transferee is a Subleasehold Mortgagee, a party claiming through a Subleasehold Mortgagee, or a third party.

(g)    "**Governmental Authority (Authorities)**" shall mean the United States of America, the State of New York, the City of New York, and any agency, department, commission, board, body, bureau, official, instrumentality or political subdivision of any of the foregoing, now existing or hereafter created, having jurisdiction over the Premises or any portion thereof (including any quasi-Governmental Authority).

(h)    "**Membership Interest Option Period**" shall mean the Option Period as such term is defined in Membership Interests Option.

(i)    "**Qualified Appraiser**" means an individual satisfying the following criteria:

(i)    such individual is a New York licensed appraiser who is in good standing in the State of New York and who bears MAI credentials from the Appraisal Institute;

(ii)    such individual has 10 years current and active experience in appraising commercial real estate similar to the Real Property within the City, County and State of New York; and

(iii)    such individual is independent, impartial and has never been a direct or indirect employee, affiliate, or agent of either Landlord, Sublandlord or Subtenant (or any of their Affiliates); provided, however, that this clause (iii) shall not be constructed to bar an individual solely because such individual (or the company for which the individual works) has previously provided, or was engaged to provide, services to any such party.

A qualified Appraiser shall be designated by mutual agreement of Sublandlord and Subtenant, provided, if the parties are unable to agree within fifteen (15) days, either of the parties may make application to the American Arbitration Association in New York to appoint such appraiser and such appointment shall be binding upon the parties.

(j)    "**Personal Default**" means any nonmonetary default under this Lease that is not susceptible of cure by a Subleasehold Mortgagee.

(k)    "**Subleasehold Estate**" means Subtenant's leasehold estate arising under this Sublease.

(l)    "**Subtenant Indemnitees**" means Subtenant, its partners, officers, directors, members, managers, trustees, employees, agents and lenders and their respective heirs, successors and assigns.

(m)    "**Person**" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

[Remainder of Page Left Intentionally Blank]

**IN WITNESS WHEREOF**, this Sublease has been duly executed by the parties hereto as of the day and year first above written.

SUBLANDLORD:

**CROISIC BUILDING, LLC**, a Delaware
limited liability company

By:_____

Name: *Dino Tomassetti*

Title: *Manager*

SUBTENANT:

**220 5TH REALTY LLC**
a Delaware limited liability company

By:_____

Name:

Title:

**IN WITNESS WHEREOF**, this Sublease has been duly executed by the parties hereto as of the day and year first above written.

SUBLANDLORD:

**CROISIC BUILDING, LLC**, a Delaware limited liability company


By:_____
Name:
Title:


SUBTENANT:

**220 5TH REALTY LLC**
a Delaware limited liability company


By:_____
Name:
Title:    Matthew Lembo
          Authorized Signatory

## EXHIBIT A

## DESCRIPTION OF THE PREMISES

Premises: 218-220 Fifth Avenue
New York, NY 10001
Block: 828 Lot: 35

The land referred to in this Certificate of Title is described as follows:
ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:
BEGINNING at the corner formed by the intersection of the northerly side of 26th Street with the westerly side of Fifth Avenue;
RUNNING THENCE westerly, along said northerly side of 26th Street, 127 feet 6 inches;
THENCE northerly parallel with said Fifth Avenue, 58 feet;
THENCE easterly parallel with the said northerly side of 26th Street, 27 feet 6 inches;
THENCE southerly parallel with said Fifth Avenue, 1 foot 8 inches;
THENCE easterly, again parallel with said northerly side of 26th Street, 100 feet to the westerly side of Fifth Avenue; and
THENCE southerly, along the westerly side of Fifth Avenue, 56 feet 4 inches to the corner aforesaid, the point or place of BEGINNING

## **EXHIBIT B**

## **BASE RENT SCHEDULE**

# 220 5th Avenue, New York, NY
Payment Schedule

| Exhibit B to Sublease -- Base Rent Schedule | |
|---|---|
| **Short Term Lease Payments** | **Total Rent** |
| Year 1 | $4,050,000.00 |
| Year 2 | 4,095,000.00 |
| Year 3 | 4,140,900.00 |
| Year 4 | 4,187,718.00 |
| Year 5 | 4,235,472.36 |
| Year 6 | 4,284,181.81 |
| Year 7 | 4,333,865.44 |
| Year 8 | 4,384,542.75 |
| Year 9 | 4,436,233.61 |

Note: The initial Sublease term is for nine years and may be extended for consecutive one year terms pursuant to the terms of the Sublease. If the Sublease is so extended, rent for each year of the extended Sublease term is as follows:

| | |
|---|---|
| Year 10 | 4,488,958.28 |
| Year 11 | 4,556,182.24 |
| Year 12 | 4,625,086.79 |
| Year 13 | 4,695,713.96 |
| Year 14 | 4,768,106.81 |
| Year 15 | 4,842,309.48 |
| Year 16 | 4,918,367.22 |
| Year 17 | 4,996,326.40 |
| Year 18 | 5,076,234.56 |
| Year 19 | 5,158,140.42 |
| Year 20 | 5,242,093.93 |

## EXHIBIT C

**RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:**

_____
_____
_____
_____

_____

## MEMORANDUM OF LEASE

Between

_____

a _____ limited liability company

**"Sublandlord"**

and

_____

a _____ limited liability company

**"Subtenant"**

| | |
|---|---|
| Block: | 828 |
| Lot: | 35 |
| Address: | 218-220 Fifth Avenue, New York, New York 10001 |
| County: | New York |
| State: | New York |

## MEMORANDUM OF SUBLEASE

This Memorandum of Sublease is made this _____ day of _____, 2016, between _____, a _____ limited liability company ("**Sublandlord**"), and _____, a _____ limited liability company ("**Subtenant**").

## W I T N E S S E T H:

Sublandlord and Subtenant have entered into a Sublease Agreement (the "**Sublease**") dated as of _____, 2016, whereby Sublandlord has subleased to Subtenant the real property located in the City of New York, County of New York, State of New York (the "**Premises**"), the legal description of which Premises is set forth on <u>Exhibit A</u> attached hereto. This Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

1.  **Term**. The term of the Sublease is for a period of nine (9) years, commencing on the Effective Date (as such term is defined in the Lease), subject to extension as provided for therein.

2.  **Successors**. The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

3.  **Incorporation of Sublease**. All terms and conditions of the Sublease are hereby incorporated herein by reference as if fully set forth herein.

4.  **Conflicts with Sublease**. This Memorandum of Sublease is solely for notice and recording purposes and shall not be construed to alter, modify, expand, diminish or supplement the provisions of the Sublease. In the event of any inconsistency between the provisions of this Memorandum of Sublease and the provisions of the Sublease, the provisions of the Sublease shall govern.

**IN WITNESS WHEREOF**, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

**SUBLANDLORD**:

_____
a _____ limited liability company


By:_____
Name:
Title:

## **ACKNOWLEDGMENT**

STATE OF NEW YORK        )
                                        ) SS.:

COUNTY OF NEW YORK     )

       On the _____ day of _____ in the year 201_ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary:_____
Print Name:
NOTARY PUBLIC,
State of New York
**LANDLORD:**


_____
a _____ limited liability company


By:_____
Name:
Title:

**SUBTENANT**:

_____

a _____ limited liability company

By:_____

Name:

Title:

### **ACKNOWLEDGMENT**

STATE OF NEW YORK                    )
                                    ) SS.:
COUNTY OF NEW YORK                   )

      On the _____ day of _____ in the year 201_ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

**Notary:_____**

**Print Name:**

**NOTARY PUBLIC,**

**State of New York**

## EXHIBIT D

## FORM OF ESTOPPEL CERTIFICATE

The undersigned, as the [landlord][tenant] ("**[Sublandlord][Subtenant]**") under the lease attached hereto as <u>Exhibit A</u> covering the space described in <u>Exhibit A</u> (the "**Premises**"), hereby certifies to [_____] ("**[Subtenant][Sublandlord]**") as follows:

1.  [Sublandlord][Subtenant] is the [landlord][tenant] under the sublease attached hereto as <u>Exhibit A</u> covering the Premises, which sublease has not been modified, assigned, pledged or amended (orally or in writing) except as set forth in <u>Exhibit A</u> (as so modified, the "**Lease**"). The Sublease contains all of the understandings and agreements between Sublandlord and Subtenant with respect to the Premises, except pursuant to [INSERT MEMBERSHIP INTERESTS OPTION AND PURCHASE AGREEMENT].

2.  The Sublease is in full force and effect. As of the date hereof [Subtenant][Sublandlord] has not given any notice of default to [Sublandlord][Subtenant] under the Sublease and, to the undersigned's best knowledge, there are no existing defaults under the Sublease by Sublandlord or Subtenant.

3.  Rent (including fixed rent and additional rent) and other charges due under the Sublease have been paid through _____ ___, _____.

4.  The Sublease commencement date was _____ and the term of the Sublease expires on _____. Subtenant has _____ remaining options to renew.

5.  To Subtenant's knowledge, Subtenant is not entitled to any offsets, abatements, deductions or otherwise against the rent payable under the Sublease as of the date hereof, except as follows: _____.

IN WITNESS WHEREOF, [Subtenant][Sublandlord] has executed this certificate this ___ day of _____, 20___.

By: _____
     Name:
     Title:

<u>Exhibit A</u>

<u>The Sublease</u>

## EXHIBIT E

## FEE OWNER RECOGNITION AGREEMENT

**(ABOVE SPACE FOR RECORDER'S USE ONLY)**

UPON RECORDING,
RETURN TO:

_____
_____
_____
_____

**FEE OWNER AND SUBLANDLORD RECOGNITION AND NON-DISTURBANCE
AGREEMENT**

THIS FEE OWNER AND SUBLANDLORD RECOGNITION AND NON-DISTURBANCE AGREEMENT (this *"Agreement"*) is made as of this ____ day of _____, 20__, by and between DINO & SONS REALTY CORP., a New York Corporation, having an address at 1590 Troy Avenue, Brooklyn, NY 11234 (*"Fee Owner"*), CROISIC BUILDING, LLC, a Delaware limited liability Company having an address at 1590 Troy Avenue, Brooklyn, NY 11234 (*"Sublandlord"*) and [SPACE TENANT], a _____, having an address at _____ (*"Space Tenant"*).

R E C I T A L S

A.     Fee Owner is the landlord under that certain Lease dated _____, (the *"Prime Lease"*), with Sublandlord, as tenant, which Prime Lease demises all present and future leases, rights, buildings and the improvements, on certain real property located in City of New York, County of New York, State of New York, as more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof (the *"Property"*).

B.     Sublandlord is the sublandlord under that certain Sublease dated _____, (the *"Sublease"*), with _____, as subtenant (the *"Subtenant"*), which Sublease demises the entire Property.

C.     Pursuant to that certain [INSERT LEASE TITLE] dated as of _____, 20__, (the *"Space Lease"*), Subtenant leased to Space Tenant a portion of the Property (said portion, the *"Demised Premises"*).

1

NOW, THEREFORE, it is agreed as follows:

1.    Fee Owner covenants, warrants and represents as follows:

(a)    it is the sole fee owner of the Property and holds the interest of Landlord under the Prime Lease;

(b)    the Prime Lease is unmodified and is in full force and effect; and

(c)    Sublandlord is not in default under the Prime Lease nor has any event occurred which, after notice to Sublandlord and the passage of time, would become a default by Sublandlord under the Prime Lease.

2.    Sublandlord covenants, warrants and represents as follows:

(a)    it is the net lessee of the Property and holds the interest of sublandlord under the Sublease;

(b)    the Sublease is unmodified and in full force and effect; and

(c)    Subtenant is not in default under the Prime Lease nor has any event occurred which, after notice to Subtenant and the passage of time would become a default by Sublandlord under the Sublease.

3.    Fee Owner hereby acknowledges receipt of a copy of, and consents to and approves, the Space Lease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Space Tenant of any of the rights, remedies and options contained therein shall not constitute a default under the Prime Lease.

4.    Sublandlord hereby acknowledges receipt of a copy of, and consents to and approves, the Space Lease and all of the terms, covenants and provisions thereof, and agrees that exercise by Space Tenant of any rights, remedies and options contained therein shall not constitute a default under the Sublease.

5.    Fee Owner hereby agrees that if the Prime Lease and Sublease are terminated by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or if the Prime Lease and Sublease shall terminate or expire for any reason (other than casualty or condemnation) prior to any of the dates provided in the Space Lease for the termination of the initial or renewal terms of the Space Lease, and as a result thereof the Fee Owner acquires, by operation of law or otherwise, the Subtenant's interest in the Space Lease, then, provided that at that time, Space Tenant is not in default of the Space Lease beyond any applicable notice and cure periods and provided that Space Lease  has not been terminated, Space Tenant shall not be made a party in any removal or eviction action or proceeding nor shall Space Tenant be evicted or removed of its possession or its right of possession be disturbed or in any way interfered with, and the Space Lease shall continue in full force and effect as a direct lease between Fee Owner and Space Tenant upon the terms and conditions of the Space Lease, provided, however, that in no event shall Fee Owner: (A) be liable for any security deposit of Space Tenant, unless such security deposit has actually been transferred to Fee Owner; (B) be liable in damages for, or be obligated to provide an indemnity against, Subtenant's (x) failure to perform any obligation as sub-sublandlord under the Space Lease, or (y) other act or omission of

2

Subtenant (except Fee Owner shall comply with any ongoing, non-monetary obligations imposed upon the sub-sublandlord under the Space Lease except for any obligations not performed or satisfied by Subtenant that are not reasonably susceptible to cure and except for any obligations that were personal to Subtenant; (C) bound by any fixed or addition rent paid more than one-month in advance of its due date (with all fixed rent payable under the Space Lease being payable monthly in advance in equal monthly installments); (D) be obligated to complete any construction work required to be done by Subtenant pursuant to the provisions of the Space Lease for Space Tenant's initial occupancy or to reimburse Space Tenant for any tenant allowance or for the cost of any construction work done by Space Tenant; (E) be subject to any offsets, defenses, abatements, counterclaims, rent free periods or rent concessions which shall have accrued to Space Tenant against Subtenant prior to the date upon which the Fee Owner shall become the landlord under the Space Lease; or (F) be bound by any representations or warranties made to Space Tenant under the Space Lease; and in such event Space Tenant shall attorn to and recognize Fee Owner as its landlord under the terms of the Space Lease, and shall perform all of Space Tenant's obligations thereunder for the benefit of Fee Owner, upon all of the terms, covenants and conditions of the Space Lease (including, without limitation, the payment of rent and all other charges due under the Space Lease by Space Tenant directly to Fee Owner), and Fee Owner shall have all of the rights that Subtenant has as landlord under the Space Lease.

6.      Sublandlord hereby agrees that if the Sublease is terminated by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or if the Sublease shall terminate or expire for any reason (other than casualty or condemnation) prior to any of the dates provided in the Space Lease for the termination of the initial or renewal terms of the Space Lease, and as a result thereof the Sublandlord acquires, by operation of law or otherwise, the Subtenant's interest in the Space Lease, then, provided that at that time, Space Tenant is not in default of the Space Lease beyond any applicable notice and cure periods and provided that Space Lease is then in full force and effect, then Space Tenant shall not be made a party in any removal or eviction action or proceeding nor shall Space Tenant be evicted or removed of its possession or its right of possession be disturbed or in any way interfered with, and the Space Lease shall continue in full force and effect as a direct lease between Sublandlord and Space Tenant, upon the terms and conditions of the Space Lease provided, however, that in no event shall Sublandlord: (A) be liable for any security deposit of Space Tenant, unless such security deposit has actually been transferred to Sublandlord; (B) be liable in damages for, or be obligated to provide an indemnity against, Subtenant's (x) failure to perform any obligation as sub-sublandord under the Space Lease, or (y) other act or omission of Subtenant (except Sublandlord shall comply with any ongoing, non-monetary obligations imposed upon the sub-sublandlord under the Space Lease except for any obligations not performed or satisfied by Subtenant that are not reasonably susceptible to cure and except for any obligations that were personal to Subtenant; (C) bound by any fixed or addition rent paid more than one-month in advance of its due date (with all rent payable under the Space Lease being payable monthly in advance in equal monthly installments); (D) be obligated to complete any construction work required to be done by Subtenant pursuant to the provisions of the Space Lease for Space Tenant's initial occupancy or to reimburse Space Tenant for any tenant allowance or for the cost of any construction work done by Space Tenant; (E) be subject to any offsets, defenses, abatements, counterclaims, rent free periods or rent concessions which shall have accrued to Space Tenant against Subtenant prior to the date upon which the Sublandlord shall

3

become the landlord under the Space Lease; or (G) be bound by any representations or warranties made to Space Tenant under the Space Lease; and in such event Space Tenant shall attorn to and recognize Sublandlord as its landlord under the terms of the Space Lease, and shall perform all of Space Tenant's obligations thereunder for the benefit of Sublandlord, upon all of the terms, covenants and conditions of the Space Lease (including, without limitation, the payment of rent and all other charges due under the Space Lease by Space Tenant directly to Sublandlord), and Sublandlord shall have all of the rights that Subtenant has as landlord under the Space Lease.

7.    (a)    Any notices, demands, reports or communications required, desired or permitted to be given under this Agreement (each, a *"Notice"*) shall be in writing and, notwithstanding any law or statute to the contrary, shall not be effective for any purpose unless any such Notice is given by registered or certified mail, return receipt requested, postage prepaid, or by any recognized overnight mail carrier, with proof of delivery slip, (public or private), and addressed as follows:

> If to Fee Owner, at the address of Fee Owner as hereinabove set forth or at such other address as Fee Owner may designate by Notice.

> If to Sublandlord, at the address of Sublandlord as hereinabove set forth or at such other address as Sublandlord may designate by Notice.

> If to Space Tenant, at the address of Space Tenant as hereinabove set forth or at such other address as Space Tenant may designate by Notice.

(b)    Any Notice hereunder shall be deemed to have been given or served for all purposes on the date of delivery or refusal thereof.

8.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

9.    This Agreement shall be governed by the internal laws of the State of New York, without regard to the conflict of law principles thereof.  The parties hereby agree and consent to the sole and exclusive jurisdiction of the courts of the State of New York in and for New York County in connection with any matter arising out and/or related to this Agreement.

10.    The parties hereby waive their right to trial by jury in any action arising out of and/or related to this Agreement.

11.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns, as may be limited by the Prime Lease, Sublease and/or Space Lease, as applicable.

12.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]

4

IN WITNESS WHEREOF, the parties have caused this Fee Owner and Sublandlord Recognition and Non-Disturbance Agreement to be executed, to be effective as of the date first above written.

**FEE OWNER:**

DINO & SONS REALTY CORP.,
a New York Corporation

BY:_____
      Name:
      Title:

**SUBLANDLORD:**

ROISIC BUILDING, LLC,
a Delaware limited liability company

BY:_____
      Name:
      Title:

**SPACE TENANT:**

_____
a _____

BY:_____
      Name:
Title:

SIGNATURE PAGE TO FEE OWNER AND SUBLANDLORD RECOGNITION AND
NON-DISTURBANCE AGREEMENT

STATE OF _____            )
                               ) ss.:
COUNTY OF _____)


On the ___ day of _____, in the year 20___, before me the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.


_____
Notary Public

STATE OF _____            )
                               ) ss.:
COUNTY OF _____)


On the ___ day of _____, in the year 20___, before me the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.


                                        _____
                                        Notary Public

STATE OF _____        )
                                                                ) ss.:
COUNTY OF _____)


On the ____ day of _____, in the year 20___, before me the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.


_____
Notary Public

## EXHIBIT A

### LEGAL DESCRIPTION OF THE PROPERTY

Premises: 218-220 Fifth Avenue
New York, NY 10001
Block: 828 Lot: 35

The land referred to in this Certificate of Title is described as follows:
ALL that certain plot, piece or parcel of land with the buildings and improvements thereon
erected, situate, lying and being in the Borough of Manhattan, City, County and State of
New York, bounded and described as follows:
BEGINNING at the corner formed by the intersection of the northerly side of 26th Street
with the westerly side of Fifth Avenue;
RUNNING THENCE westerly, along said northerly side of 26th Street, 127 feet 6 inches;
THENCE northerly parallel with said Fifth Avenue, 58 feet;
THENCE easterly parallel with the said northerly side of 26th Street, 27 feet 6 inches;
THENCE southerly parallel with said Fifth Avenue, 1 foot 8 inches;
THENCE easterly, again parallel with said northerly side of 26th Street, 100 feet to the
westerly side of Fifth Avenue; and
THENCE southerly, along the westerly side of Fifth Avenue, 56 feet 4 inches to the corner
aforesaid, the point or place of BEGINNING

EXHIBIT F
RIGHTS, RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**(ABOVE SPACE FOR RECORDER'S USE ONLY)**

UPON RECORDING,
RETURN TO:
Nesenoff & Miltenberg, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Attention: Ira S. Nesenoff, Esq.

**RIGHTS, RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS RIGHTS, RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this *"Agreement"*) is made as of this _____ day of February, 2017, by and between DINO & SONS REALTY CORP., a New York Corporation, having an address at 1590 Troy Avenue, Brooklyn, NY 11234 (*"Fee Owner"*), CROISIC BUILDING, LLC, a Delaware limited liability Company having an address at 1590 Troy Avenue, Brooklyn, NY 11234 (*"Sublandlord"*), Dino Tomassetti, Jr., a natural person, having an address at 1590 Troy Avenue, Brooklyn, NY 11234 (*"Dino Jr."*), 220 5TH REALTY LLC, a Delaware limited liability company, having an address at c/o Stellar Management, 156 William Street, 10th Floor, New York, NY 10038 (*"Subtenant"*), 220 FIFTH AVENUE MEMBER LLC, a Delaware limited liability company, having an address at c/o Stellar Management, 156 William Street, 10th Floor, New York, NY 10038 (*"Optionee"*) and INVESTORS BANK, a New Jersey State-chartered savings bank, having an address at 101 JFK Parkway, Short Hills, New Jersey 07078 (*"Investors"*).

R E C I T A L S

A.      WHEREAS, Fee Owner is the landlord under that certain Lease of even date herewith, (the *"Prime Lease"*), with Sublandlord, as tenant, which Prime Lease demises all present and future buildings and the improvements on certain real property located in City of New York, County of New York, State of New York, as more particularly described on Exhibit A attached hereto and made a part hereof (the *"Property"*);

B.      WHEREAS, Sublandlord is the sublandlord under that certain Sublease of even date herewith, (the *"Sublease"*), with Subtenant, as subtenant, which Sublease demises the entire Property;

1

C.    WHEREAS, Fee Owner and Dino Jr. are the sole members of Sublandlord (collectively, the "**Sole Members**"), owning one hundred (100%) percent of the limited liability company interests in Sublandlord;

D.    WHEREAS, Fee Owner has entered into a Lease Option Agreement (the "***Lease Option Agreement***") of even date herewith with 220 FIFTH AVENUE HOLDER LLC, a Delaware limited liability company ("***Lease Option Holder***"), whereby it has agreed to grant Lease Option Holder the option for a new lease for the Property, for a term of forty-nine (49) years, to commence upon the expiration of the Prime Lease, subject to and in accordance with the terms and provisions of the Lease Option Agreement;

E.    WHEREAS, Sole Members have entered into a certain option agreement of even date herewith (the "***Option Agreement***"), whereby they have, inter alia, granted Optionee, the option to purchase one hundred (100%) percent of the limited liability company interests in Sublandlord, subject to and in accordance with the terms of the Option Agreement and have agreed to observe certain covenants during the pendency of the Option Agreement;

F.    WHEREAS, upon Optionee's exercise of its option pursuant to the Option Agreement, the Option Agreement provides that Sole Members and Optionee shall enter into a membership interest purchase agreement (the "***MIPA***") with respect to the purchase of the limited liability company interests in Sublandlord, the form of which is annexed to the Option Agreement;

G.    WHEREAS, pursuant to the terms of the Option Agreement, as security for the performance of Sole Members' obligations under the Option Agreement and the MIPA and the better protecting of Optionee's rights thereunder, Sole Members have delivered a Pledge and Security Agreement of even date herewith (the "***Pledge***") to Optionee with respect to the limited liability company interests in Sublandlord;

H.    WHEREAS, Investors, is the mortgagee under that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 31, 2014, (the "***Original Mortgage***") granted by Fee Owner to Investors encumbering the entire Property (as defined in the Original Mortgage). The Original Mortgage has been amended pursuant to a certain Amendment to Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of the date hereof (the "***Amendment***", the Original Mortgage as amended by the Amendment, is hereafter referred to as "***Fee Mortgage***") and continues to encumber the Fee Owner's fee interest in the Property. On the date hereof, Sublandlord has entered into a Collateral Leasehold Mortgage, Assignment of Leases and Rents and Security Agreement in favor of Investors which encumbers Sublandlord's leasehold interest in the Property pursuant to the Prime Lease (the "***Leasehold Mortgage***" and together with the Fee Mortgage, collectively the "***Mortgage***"). Investors is executing and delivering this Agreement to acknowledge its agreement to the terms hereof and agreeing to be bound by the terms hereof; and

I.    WHEREAS, pursuant to the terms of the Option Agreement, as further security for the performance of Sole Members' obligations under the Option Agreement and MIPA, the better protecting of Optionee's rights thereunder and Subtenants rights under the Sublease and the

2

clarification and conformation of the rights of the various parties with respect to the various agreements, the parties have agreed to deliver this Agreement.

NOW, THEREFORE, for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      The above recitals are hereby incorporated herein and form an integral part of this Agreement.

2.      For so long as the Sublease has not been terminated by reason of the Subtenant's default beyond the expiration of all applicable notice, grace and cure periods and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, the Prime Lease shall not be assigned, amended, extended, modified, terminated or otherwise altered in any manner, without the express prior written consent of both Optionee and Investors, to be granted or withheld in Optionee's sole and absolute discretion and Investor's sole but reasonable discretion.  The Sublease shall not be assigned, amended, extended, modified or otherwise altered in any manner without the prior written consent of Investors, to be granted or withheld in Investor's sole but reasonable discretion.

3.      Subtenant's performance of all of its obligations under the Sublease shall constitute full performance on the part of Sublandlord of the equivalent obligations under the Prime Lease.

4.      Subtenant shall have the right, but not the obligation, to perform and cure on Sublandlord's behalf, any obligations of Sublandlord under the Prime Lease and Fee Owner shall accept such performance and cure.

5.      Copies of any notices given or received under the Prime Lease shall simultaneously be provided to Subtenant in like manner.  Sublandlord and Fee Owner agree to provide copies of any notices and/or other written communications given or received under the Mortgage (or "Note" or "Loan Documents" (as such terms are defined in the Mortgage)) to Optionee and Subtenant simultaneously with the giving and/or receipt thereof and in like manner, including without limitation, all monthly statements.  Except as may be expressly provided in this Agreement, including, without limitation, Paragraph 9 below, nothing in this Paragraph 5 shall impose upon Investors an obligation to provide Optionee or Subtenant with copies of any notices or written communications given or received by Investors under the Note, Mortgage or Loan Documents. Fee Owner and Sublandlord hereby consent to and agree to Subtenant and/or Optionee communicating directly with Investors and hereby irrevocably and unconditionally waive any right, recourse, claim or remedy they may have by reason thereof, whether now or hereafter accruing.

6.      In the event of the termination of the Prime Lease for any reason whatsoever, unless, (i) the termination is solely by reason of a default by Optionee in the payment of any sums due under the promissory note entered into pursuant to the MIPA (the "***MIPA Note***") beyond the expiration of all applicable notice, grace and cure periods, if any, and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, or (ii) the Option and/or the Sublease have expired or have been terminated solely by reason of a default by Optionee or Subtenant thereunder beyond the expiration of all applicable notice, grace and cure

3

periods and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, or (iii) a new lease identical in form and substance to the Prime Lease, has already been entered into by Fee Owner and Sublandlord (being subject to the Sublease, the Pledge, the Option and the Lease Option Agreement (collectively, the "**_Transactional Documents_**"), upon Optionee's request, Fee Owner shall deliver Optionee a new lease identical in form and substance to the Prime Lease, except that (i) the commencement date of such new lease shall be the date that the Prime Lease would have been terminated, (ii) it shall expressly provide that Optionee shall not be liable for any pre-existing default arising prior to the commencement date of the new lease (unless such default results from an equivalent obligation under the Sublease), and (iii) the Fixed Rent payable thereunder shall be the amount of the installment payments that would have been payable pursuant to the MIPA Note, subject to the right of Optionee to set-off from the Initial Installment Payment (as such term is defined in the Note) and other such installment payments all unsatisfied monetary obligations preventing Optionee from obtaining clear title to such leasehold interest and all costs and expenses incurred by Optionee to obtain such leasehold including, but not limited to, reasonable attorney's fees. The failure of Fee Owner to deliver a new lease pursuant to the terms of this Paragraph, shall not affect the validity of the terms of this Paragraph and the same shall be self-executing. In the event of an exercise of the rights of the Optionee under this Paragraph 6, neither Subtenant nor Optionee shall be required to exercise its rights and/or perform under the Option Agreement and/or the MIPA and they shall be released from all liability thereunder.

7.    Except if the Option and/or the Sublease (i) have terminated solely by reason of the termination of the Prime Lease due to a default by Optionee in the payment of any sums due under the under the MIPA Note beyond the expiration of all applicable notice, grace and cure periods, if any, and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, or (ii) have expired or have been terminated solely by reason of a default by Optionee or Subtenant thereunder beyond the expiration of all applicable notice, grace and cure periods and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, in the event of a material default on the part of Sole Members under the Option Agreement and/or MIPA which default continues uncured for a period of thirty (30) days (however with respect to a default in Closing under the MIPA by Sole Members such period shall be twenty (20) days) after written notice specifying such default is delivered to Sole Members, Subtenant and Optionee shall not be required to, but nonetheless may, exercise their rights under the Pledge, but rather at Subtenant and Optionee's option, shall be permitted, upon a second written notice to the parties to succeed to the rights of Sublandlord under the Prime Lease in the place and stead of Sublandlord, provided, that Subtenant and Optionee shall not be liable for any pre-existing default by Sublandlord under the Prime Lease (unless such default results from an equivalent obligation under the Sublease). In conformation of the foregoing, upon Subtenant and Optionee's request, Fee Owner shall deliver Subtenant and Optionee a new lease identical in form and substance to the Prime Lease, except that (i) the commencement date of such new lease shall be the date that Subtenant and Optionee provided notice pursuant to this Paragraph 7, (ii) it shall expressly provide that Subtenant and Optionee shall not be liable for any pre-existing default arising prior to the commencement date of the new lease (unless such default results from an equivalent obligation under the Sublease), and (iii) the Fixed Rent payable thereunder shall be the amount of the installment payments that would have been payable pursuant to the MIPA Note, subject the right of Optionee to set-off from the Initial Installment Payment (as such term is defined in the MIPA Note) and other such installment payments all unsatisfied monetary

4

obligations preventing Optionee from obtaining clear title to such leasehold interest and all costs and expenses incurred by Optionee to obtain such leasehold including, but not limited to, reasonable attorney's fees. The failure of Fee Owner to deliver a new lease pursuant to the terms of this Paragraph, shall not affect the validity of the terms of this Paragraph and the same shall be self-executing. In the event of an exercise of the rights of the Optionee under this Paragraph 7, neither Subtenant nor Optionee shall be required to exercise its rights and/or perform under the Option Agreement and/or the MIPA and they shall be released from all liability thereunder.

8.     (a)     Unless the Option and/or the Sublease (i) have terminated solely by reason of the termination of the Prime Lease due to a default by Optionee in the payment of any sums due under the MIPA Note beyond the expiration of all applicable notice, grace and cure periods, if any, and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, or (ii) have been terminated solely by reason of a default by Optionee or Subtenant thereunder beyond the expiration of all applicable notice, grace and cure periods and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, provided the Subtenant is not in default of its monetary obligations under the Sublease beyond applicable grace and cure periods, Subtenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage, unless Investors is required by law to do so, in which event such naming of Subtenant shall be only to satisfy such law, order, regulation, rule or judicial decision and not to deprive Subtenant of any of its rights under the Sublease, nor shall the rights of Subtenant under the Sublease be affected by any foreclosure of the Mortgage and it shall be binding upon any party succeeding to ownership of the Property upon a foreclosure of the Mortgage or any Future Mortgage it being understood that any such party shall recognize the rights of Subtenant under the Sublease. Subtenant hereby agrees to attorn under the terms of the Sublease to any party succeeding to ownership of the Property upon a foreclosure of the Mortgage.

(b) Unless the Option and/or the Sublease (i) have terminated solely by reason of the termination of the Prime Lease due to a default by Optionee in the payment of any sums due under the MIPA Note beyond the expiration of all applicable notice, grace and cure periods, if any, and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, or (ii) have been terminated solely by reason of a default by Optionee or Subtenant thereunder beyond the expiration of all applicable notice, grace and cure periods and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, Subtenant and Optionee shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of any future (entered into after the date hereof) mortgage encumbering the Fee Owner's fee simple interest in the Property (or any portion thereof), or encumbering the Sublandlord's leasehold interest in the Property, or by any renewals, extensions, supplements, amendments, modifications, consolidations, and replacements thereof or thereto, substitutions for such fee or leasehold mortgage and advances made thereunder (a "***Future Mortgage***"), unless the holder of such Future Mortgage (a "***Future Mortgagee***") is required by law to do so, in which event such naming of Subtenant and/or Optionee shall be only to satisfy such law, order, regulation, rule or judicial decision and not to deprive Subtenant and/or Optionee of any of their respective rights under the Transactional Documents, nor shall the rights of Subtenant and Optionee under the Transactional Documents be affected by any foreclosure of the Future Mortgage and they shall be binding upon any party succeeding to ownership of the Property upon a foreclosure of any Future Mortgage; it being understood that all such rights and the terms,

conditions and provisions of the Transactional Documents are superior in nature to any such Future Mortgage. Subtenant and Optionee hereby agree to attorn under the terms of the Lease and Sublease to any party succeeding to ownership of the Property upon a foreclosure of any Future Mortgage under the terms of the Transactional Documents. In furtherance of the foregoing, if any Future Mortgagee as a result of the foreclose of a Future Mortgage, or the exercise of any other lender remedy, acquires the interests of Fee Owner and/or Sublandlord in the Property then such Future Mortgage hereby agrees to deliver Optionee a new lease identical in form and substance to the Prime Lease, except that (i) the commencement date of such new lease shall be the date that Future Mortgagee acquires the interest of Fee Owner and/or Sublandlord in the Property, (ii) it shall expressly provide that Optionee shall not be liable for any pre-existing default arising prior to the commencement date of the new lease (unless such default results from an equivalent obligation under the Sublease), and (iii) the Fixed Rent payable thereunder shall be the amount of the installment payments that would have been payable pursuant to the installment note contemplated to be entered into pursuant to the MIPA, subject the right of Optionee to set-off from the Initial Installment Payment (as such term is defined in the MIPA Note) and other such installment payments all unsatisfied monetary obligations preventing Optionee from obtaining clear title to such leasehold interest and all costs and expenses incurred by Optionee to obtain such leasehold including, but not limited to, reasonable attorney's fees.

       9.     Notwithstanding anything to the contrary set forth in the Mortgage, if there is any default by Fee Owner or Sublandlord and as a result thereof Investors intends to exercise any of its remedies pursuant to the Mortgage, Note or any other Loan Document (other than simply charging late fees or default interest), then Investors shall provide Subtenant and Optionee prompt written notice of such default by Fee Owner and/or Sublandlord under the Mortgage or any other Loan Document or the Note, whether or not Fee Owner or Sublandlord is entitled to notice of such default and of Investors' intent to exercise Investors' remedies. Upon receipt of such notice, the Fee Owner and Sublandlord agree that the Optionee shall have the right (but not the obligation) (irrespective of whether Fee Owner and Sublandlord have such a right) at any time after the receipt of such notice from Investors until ninety (90) days after Optionee having received actual notice thereof, to cure any default and/or payoff and satisfy in full all obligations of the Owner and Sublandlord to Investors in connection with the Note and the Loan Documents. Investors hereby agrees (i) to accept any such cure offered by Optionee, and (ii) that Optionee's right of cure is an ongoing right with respect to each default described in this Paragraph 9. Fee Owner and Sublandlord hereby irrevocably and unconditionally waive any right, recourse, claim or remedy they may have by reason of the exercise, or failure to exercise, in whole or in part, of Optionee's rights pursuant to this Section 9. In the event of any such cure or payment by Optionee, (A) the amount thereof and all costs and expenses incurred in connection therewith (including without limitation, reasonable attorney's fees), shall be offset against, as applicable, the Initial Installment Payment (as such term is defined in the MIPA Note) and other installment payments under the MIPA Note and if the Mortgage has been paid off, all rents payable under the Sublease, and (B) the synthetic interest component of the rent payable under the Sublease (One Million Eight Hundred Thousand Dollars of the annual Base Rent, calculated as interest at the rate of three (3%) percent on a principal balance of Sixty Million ($60,000,000.00) Dollars (the amount of the First Installment Payment under the MIPA Note)) shall be adjusted so that it is thereafter calculated on the Initial Installment Payment reduced by the total amount paid by Optionee to satisfy in full all obligations of Fee Owner and Sublandlord to Investors in connection with the "Note" and the "Loan Documents", as provided above or to otherwise cure a default thereunder. If Optionee has

received a copy of a notice of default from Investors pursuant to the terms of this Agreement, Optionee shall have the right to request directly from Investors written confirmation of the amount required to effectuate the cure of such default or, as applicable, to discharge the Mortgage and Investors hereby agrees to respond to such request with fifteen (15) days of Investors' receipt thereof.

10.    The parties hereby acknowledges receipt of a copy of, and consent to and approve, the Prime Lease, Sublease, MIPA, Option Agreement, Lease Option Agreement and Pledge, and all of the terms, covenants and provisions thereof.

11.    In the event there is any matter which requires Sublandlord's consent pursuant to the terms of the Sublease and which also requires Fee Owner's consent pursuant to the terms of the Prime Lease, then for so long as Fee Owner constitutes one of the Sole Members, the consent by Sublandlord with respect to such matter shall be deemed to be consented by the Fee Owner thereto.

12.    Subtenant is deemed to be and shall be a third-party beneficiary of the following provisions of the Prime Lease: (i) 18(b) and (ii) 19(c), and Subtenant shall have the right, in its own name, to exercise all rights and remedies of Sublandlord under such provisions and to enforce all obligations of the Fee Owner with respect to such provisions and in this regard Fee Owner will accept such cure by Subtenant.

13.    Investors and Fee Owner hereby acknowledge that, under the Sublease, Subtenant has the right to consent to the appointment of an insurance trustee for the holding and application of insurance proceeds in the event of a casualty affecting the Property. Subtenant, Sublandlord and Fee Owner hereby agree to the appointment of Investors as the insurance trustee and, subject to the provisions set forth in Paragraph 6 of the Fee Mortgage, that the insurance proceeds shall be used for restoration of the Property in accordance with the terms of the Lease and Sublease. If Investors receives any insurance proceeds as insurance trustee but elects not to release such proceeds to Subtenant due to the fact that an Event of Default of the type described in Paragraph 6 of the Mortgage continues uncured, then Investors shall give Optionee and Subtenant notice of such Event of Default and upon receipt of such notice, Subtenant shall have the right, but not the obligation, to cure such Event of Default within sixty (60) days of Optionee and Subtenant's receipt of such notice.    In the event that following a casualty affecting the Property, the as-completed, appraised value of the Property would result in the loan-to-value ratio of the Loan exceeding 50% and as a result thereof Investors elects pursuant to the Mortgage to apply insurance proceeds to repayment of the debt (or any other sums due thereunder) due under the Mortgage, the "Note" or any other "Loan Documents" (as such terms are defined in the Mortgage), in lieu of making them available for restoration, then in such event, Optionee shall have the right (but not the obligation) to payoff and satisfy in full all obligations of Fee Owner and Sublandlord to Investors in connection with the Note and the Loan Documents. If Subtenant cures an Event of Default within sixty (60) days of Optionee and Subtenant's receipt of such notice, as provided above or Optionee satisfies in full all obligations of Fee Owner and Sublandlord to Investors in connection with the Note and the Loan Documents, Investors shall make the casualty proceeds available for restoration in accordance with the Mortgage.    In the event of any such payment by Optionee pursuant to this paragraph 13, (A) the amount thereof (together with all costs and expenses incurred in connection therewith, including reasonable attorneys' fees), shall be offset against, the Initial Installment Payment (as such term is defined in the MIPA Note) and other installment

7

payments under the MIPA Note and if the Mortgage has been paid off, offset against all rents payable under the Sublease; and (B) the synthetic interest component of the rent payable under the Sublease (One Million Eight Hundred Thousand Dollars of the annual Base Rent, calculated as interest at the rate of three (3%) percent on a principal balance of Sixty Million ($60,000,000.00) Dollars (the amount of the First Installment Payment under the MIPA Note)) shall be adjusted so that it is thereafter calculated on the Initial Installment Payment reduced by the total amount paid by Optionee to satisfy in full all obligations of Fee Owner and Sublandlord to Investors in connection with the "Note" and the "Loan Documents", as provided above.  If the insurance proceeds are held and disbursed by Investors as an insurance trustee, as provided in the Mortgage, Investors hereby acknowledges that Subtenant shall have the right to apply to Investors for the release of, and Investors hereby agrees to release to Subtenant, the insurance proceeds, in accordance with, and subject to the satisfaction of the requirements set forth in, the Mortgage and Fee Owner and Sublandlord hereby agree to use commercially reasonable efforts to cooperate with Subtenant with respect thereto.  At Subtenant and Optionee's option, without obligation to do so, in lieu of satisfying in full all obligations of Fee Owner and Sublandlord to Investors in connection with the Note and the Loan Documents, Subtenant and/or Optionee shall have the right, to restore such casualty and (A) the amount thereof (together with all costs and expenses incurred in connection therewith, including reasonable attorneys' fees), shall be offset against, the Initial Installment Payment (as such term is defined in the MIPA Note) and other installment payments under the MIPA Note and if the Mortgage has been paid off, offset against all rents payable under the Sublease; and (B) the synthetic interest component of the rent payable under the Sublease (One Million Eight Hundred Thousand Dollars of the annual Base Rent, calculated as interest at the rate of three (3%) percent on a principal balance of Sixty Million ($60,000,000.00) Dollars (the amount of the First Installment Payment under the MIPA Note)) shall be adjusted so that it is thereafter calculated on the Initial Installment Payment reduced by the total amount paid by Optionee to restore the casualty.

14.    Except if the Option and/or the Sublease (i) have terminated by reason of the termination of the Prime Lease due to a default by Optionee in the payment of any sums due under the MIPA Note beyond the expiration of all applicable notice, grace and cure periods, if any, and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, or (ii) have expired or have been terminated solely by reason of a default by Optionee or Subtenant thereunder beyond the expiration of all applicable notice, grace and cure periods and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, except as otherwise permitted under this Agreement, neither the Mortgage nor the "Note" or "Loan Documents", as such terms are defined in the Mortgage shall be modified to extend the maturity date or otherwise in a manner that materially adversely affects the rights of Optionee or Subtenant hereunder without the prior written consent of Subtenant and Optionee, in their sole and absolute discretion.

15.    (a)    For so long as the Sublease has not been terminated by reason of the Subtenant's default beyond the expiration of all applicable notice, grace and cure periods and further subject to any cure and/or redemption rights that may be set forth therein or pursuant to law or equity, (i) the Fee Owner and/or Sublandlord's interest in the Property shall not be subject to mortgage indebtedness exceeding the total principal amount of Forty-Two Million Five Hundred Thousand ($42,500,000.00) Dollars in the aggregate without the Subtenant's prior written consent, in its sole and absolute discretion; and (ii) if the total indebtedness due Investors under the Note or

8

the Loan Documents at any time exceeds Fifty Million ($50,000,000.00) Dollars, Investors shall give Subtenant and Option notice of that fact.

(b)    Without limitation to the foregoing, to the extent that Subtenant and/or Optionee have exercised any rights under this Agreement to cure any default of Fee Owner and/or Sublandlord under the Mortgage, "Note" or "Loan Documents" or otherwise paid any amounts to satisfy the obligations of Fee Owner and/or Landlord under the same, then Fee Owner and Landlord agree that no further or other financing or incurrence of any debt of any kind shall be permitted to be taken or received, until the Closing under the MIPA has occurred.  The foregoing restriction on financing shall include all direct or indirect financing, including without limitation, any Future Mortgage, equity financing, mezzanine financing secured by the beneficial ownership interests in Fee Owner and/or Sublandlord, any pledge, hypothecation or assignment of all or any interest in the Prime Lease and/or Sublease or otherwise.

(c)    For so long as all or any portion of the Mortgage is outstanding, Sublandlord shall maintain a deposit account at Investors in connection therewith, into which all rents payable to Sublandlord under the Sublease shall be paid.  The Loan Documents provide that upon an Event of Default, Investors has the right to prohibit distributions from such account except for amounts payable under the Loan Documents.

16.    (a)    Any notices, demands, reports or communications required, desired or permitted to be given under this Agreement (each, a *"Notice"*) shall be in writing and, notwithstanding any law or statute to the contrary, shall not be effective for any purpose unless any such Notice is given by registered or certified mail, return receipt requested, postage prepaid, or by any recognized overnight mail carrier, with proof of delivery slip, (public or private), and addressed to the parties as follows:

If to Fee Owner, at the address of Fee Owner as hereinabove set forth with a copy in like manner to Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019, Attention: Leo Leyva.

If to Sublandlord, at the address of Sublandlord as hereinabove set forth with a copy in like manner to Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019, Attention: Leo Leyva.

If to Dino Jr., at the address of Dino Jr. as hereinabove set forth with a copy in like manner to Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019, Attention: Leo Leyva.

If to Subtenant., at the address of Subtenant as hereinabove set forth with a copy in like manner to Nesenoff & Miltenberg, LLP, 363 Seventh Avenue, Fifth Floor, New York, New York 10001, Attention: Ira S. Nesenoff, Esq..

If to Optionee, at the address of Optionee as hereinabove set forth with a copy in like manner to Nesenoff & Miltenberg, LLP, 363 Seventh Avenue, Fifth Floor, New York, New York 10001, Attention: Ira S. Nesenoff, Esq.

<u>If to Investors</u>, at the address of Investors as hereinabove set forth with a copy
in like manner to Brach Eichler L.L.C., 101 Eisenhower Parkway, Roseland,
New Jersey 07068, Attention: Brian Richard Lenker.

(b)    Any Notice hereunder shall be deemed to have been given or served for all
purposes on the date of delivery or refusal thereof.

(c)    Any party may change their address for Notices by giving of Notice in the
manner provided for herein.

17.    The parties each represent and warrant that they have been represented by
independent counsel of their choosing in connection with the negotiation of and entry into this
Agreement.

18.    No modification, amendment, waiver or release of any provision of this Agreement
or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for
any purpose whatsoever unless in writing and duly executed by the party against whom the same is
sought to be asserted.  The exercise of any right or remedy by Optionee, Lease Option Holder or
Subtenant under this Agreement or any other Transactional Document or any other agreement or at
law or equity, shall be without limitation to any other right or remedy that the Optionee, Lease
Option Holder and/or Subtenant may have, all such rights and remedies being cumulative in nature
and not to the exclusion of any other.

19.    This Agreement shall be governed by the internal laws of the State of New York,
without regard to the conflict of law principles thereof.  The parties hereby agree and consent to the
sole and exclusive jurisdiction of the courts of the State of New York in and for New York County
in connection with any matter arising out and/or related to this Agreement.

20.    The parties hereby waive their right to trial by jury in any action arising out of
and/or related to this Agreement.

21.    This Agreement shall be binding on and shall inure to the benefit of the parties
hereto and their respective heirs, legal representatives, successors and assigns.

22.    In the event that either party incurs any costs or expenses in connection with the
enforcement of the terms of this Agreement or defense of claim by the other, the prevailing party in
such contest shall be entitled to recover its costs and expenses from the other, including without
limitation court costs and reasonable attorneys' fees.

23.    Investors represents and warrants to Optionee and Subtenant as of the date hereof,
that it has sent no notice of default under the Mortgage, "Note" or "Loan Documents" (as such
terms are defined in the Mortgage) that is outstanding as of the date hereof and it knows of no
circumstance or condition that with notice and/or the passage of time or both, could constitute a
default under the Mortgage, "Note" or "Loan Documents" (as such terms are defined in the
Mortgage).

24.    This Agreement shall constitute a covenant running with the land.

25.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

26.     In the event that Fee Owner is the subject of a bankruptcy case (a "Bankruptcy Case") under Title 11 of the United States Code (the "Bankruptcy Code"), Sublandlord shall not consent to (and shall object to) any proposed disposition of the Property free and clear of the Prime Lease.  In the event that the Prime Lease is rejected in a Bankruptcy Case, Sublandlord shall elect to retain its rights under the Prime Lease pursuant to section 365(h)(1)(A)(ii) and shall not treat the Prime Lease as terminated.  In the event Sublandlord does not promptly make the objections and/or election set forth in this paragraph, Subtenant may make such objections and/or election on Sublandlord's behalf.

27.     In the event of any conflict between the terms of this Agreement and the terms of the Transactional Documents, the Mortgage and/or the "Loan Documents" or "Note", as such terms are defined in the Mortgage, the terms of this Agreement shall govern and control.

[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]

IN WITNESS WHEREOF, the parties have caused this Rights, Recognition Non-Disturbance and Attornment Agreement to be executed, to be effective as of the date first above written.

**FEE OWNER:**
DINO & SONS REALTY CORP.,
a New York Corporation

BY:_____

Name:
Title:

STATE OF NEW YORK            )

                             ) ss.:

COUNTY OF NEW YORK           )

On the _____ day of January, 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                              _____
                              Notary Public

SIGNATURE PAGE TO RIGHTS, RECOGNITION, NON-DISTURBANCE AND
ATTORNMENT AGREEMENT

**<u>SUBLANDLORD:</u>**
CROISIC BUILDING, LLC,
a Delaware limited liability company


BY:_____
        Name:
        Title:

STATE OF NEW YORK            )

                            ) ss.:

COUNTY OF NEW YORK          )

On the \_\_\_\_ day of January, 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


**SIGNATURE PAGE TO RIGHTS, RECOGNITION, NON-DISTURBANCE AND
ATTORNMENT AGREEMENT**

**SUBTENANT:**

**220 5TH REALTY LLC**, a Delaware limited
liability company

BY:_____

     Name:

Title:

STATE OF NEW YORK       )

                           ) ss.:

COUNTY OF NEW YORK     )

On the ____ day of January, 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

**SIGNATURE PAGE TO RIGHTS, RECOGNITION, NON-DISTURBANCE AND
ATTORNMENT AGREEMENT**

**OPTIONEE:**
**220 FIFTH AVENUE MEMBER LLC**, a
Delaware limited liability company


BY:_____
     Name:
Title:


STATE OF NEW YORK      )

                       ) ss.:

COUNTY OF NEW YORK     )


On the _____ day of January, 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


**SIGNATURE PAGE TO RIGHTS, RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

**INVESTORS BANK**

BY:_____

       Name:

       Title:

STATE OF _____       )

                  ) ss.:

COUNTY OF _____)

     On the ___ day of _____, in the year 20___, before me the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

_____

       Notary Public

**SIGNATURE PAGE TO RIGHTS, RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

EXHIBIT A

**LEGAL DESCRIPTION OF THE PROPERTY**

Premises: 218-220 Fifth Avenue

New York, NY 10001

Block: 828 Lot: 35

The land referred to in this Certificate of Title is described as follows:

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of 26th Street with the westerly side of Fifth Avenue;

RUNNING THENCE westerly, along said northerly side of 26th Street, 127 feet 6 inches;

THENCE northerly parallel with said Fifth Avenue, 58 feet;

THENCE easterly parallel with the said northerly side of 26th Street, 27 feet 6 inches;

THENCE southerly parallel with said Fifth Avenue, 1 foot 8 inches;

THENCE easterly, again parallel with said northerly side of 26th Street, 100 feet to the westerly side of Fifth Avenue; and

THENCE southerly, along the westerly side of Fifth Avenue, 56 feet 4 inches to the corner aforesaid, the point or place of BEGINNING

<u>EXHIBIT G</u>

<u>SCOPE OF WORK</u>

# Proposed "Scope Of Work" Exhibit G

## 220 FIFTH AVENUE, NEW YORK NY                    CAPITAL WORK SCOPE EXHIBIT

1)  ELEVATOR:

Elevators will be upgraded and maintained as required under the Lease.

2)  LOBBY RENOVATION:

Design and renovation to building lobby and reception desk as permitted by landmarks and as further determined by Subtenant's scope may include but is not limited to the following:

- Design/Drawings/Filings
- Demolition
- Drywall/Carpentry
- Glass
- Doors/Hardware
- Tile
- Millwork
- HVAC
- Electrical
- Lighting package
- Paint/Wall covering & signage
- Signoff

3)  LOCAL LAW 11/98:

Perform necessary work to satisfy 2016 cycle filing (e.g.):
- Engineering
- Rigging
- Maintenance Pointing
- Brickstitching
- Lintels
- Fire escape
- Sills
- Cornice/bands
- Coping covers
- Parapets
- Stone repairs
- Bulkheads
- Roofing
- Clear existing violations

4)  ROOF:

- General repairs and maintenance as required under the Lease.

5)  WINDOW REPLACEMENT:

Building window replacement program
- Remove windows as needed
- Installation of new windows

# Proposed "Scope Of Work" Exhibit G

## 220 FIFTH AVENUE, NEW YORK NY                    CAPITAL WORK SCOPE EXHIBIT

6) ELECTRICAL:

   Repair and upgrade existing electrical service as required.

7) PLUMBING:

   Replacement of damaged/deteriorated water/waste lines as needed.

7A) SPRINKLER:

   - Inspection/test and repair sprinkler standpipe risers as needed
   - Replacement of sprinkler shutoff valves as needed
   - Inspection and repair to tanks and related equipment as needed
   - Installation of sprinkler branches on all floors to as needed

8) FIRE SAFETY:

   - Upgrade fire safety system as required
   - Installation of stairwell lighting as needed
   - Repairs to stairwell as needed
   - Renovation/replacement of all existing fire doors as needed

9) CONDITION OF DELIVERY  (Preparation of space for "white box" delivery to tenant, as market conditions require)

   Condition of delivery per floor as leases roll (as market conditions require) may include, without limitation:

   - Skim/Repair to perimeter walls and ceilings
   - Floor Repair and sanding/finishing
   - Package air cooled cooling A/C unit
   - Sprinkler repairs
   - Tenant bathrooms

10) REMOVAL OF VIOLATIONS (except as otherwise provided in the Sublease):

   - Fines
   - Professional fees related to removal of existing violations

11) HAZARDOUS MATERIALS:

   - Encapsulation/removal of hazardous materials as needed

<u>Schedule 2</u>

<u>Rent Roll</u>

Rent Roll

Dino & Sons Realty Corp

220 Fifth Avenue, New York, NY 10001

As of: February 23, 2017 (Revised)

| Premises/ Address | Tenant | Lease Term | SQ. Ft. | Monthly Rent | Annual Rent | Current Lease Term | Option to Extend Lease Term |
|---|---|---|---|---|---|---|---|
| "A portion of 20th Floor" (Penthouse West) 220 Fifth Ave., NY, NY 10001 | Vanguard Management Group, LLC | 11/1/2013 – 10/31/2023 | | $6,866.67 | $82,400.00 | 11/1/2016 – 10/31/2017 | Currently in 4th year of 10 year extension provided by Second Amendment to the Lease. |
| 220 Fifth Ave., 19th Floor NY, NY 10001 | Bridgeton Holdings | 9/1/2015 – 12/31/2025 | | $23,280.75 | $279,368.96 | 9/2016 – 8/2017 | Option to renew for an additional 5 years. |
| 220 Fifth Ave., 19th Floor NY, NY 10001 | Signature Partners, LLC | 2/2013 – 5/31/2018 | | $8,632.54 | $103,590.52 | 2/2017 – 1/2018 | Option to extend and renew for an additional 5 years from Expiration Date |
| 220 Fifth Ave., 17th and 18th Fl NY, NY 10001 | Racher Press, Inc. | 9/1/2008 - 8/31/2018 | | $42,042.52 | $504,510.20 | 9/1/2016 - 8/31/2017 | No Option |
| 220 Fifth Ave., 17th Floor NY, NY 10001 | 1-800-Flowers | 2/1/2013 - 6/30/2018 | 3,700 | $11,799.08 | 141,589.01 | 2/2017 – 1/2018 | Currently in 4th year of a 5 year extension, with an additional "New Option" to extend for |

1

Rent Roll

Dino & Sons Realty Corp

220 Fifth Avenue, New York, NY 10001

As of: February 23, 2017 (Revised)

| Premises/ Address | Tenant | Lease Term | SQ. Ft. | Monthly Rent | Annual Rent | Current Lease Term | Option to Extend Lease Term |
|---|---|---|---|---|---|---|---|
| | | Date" is "the last day of the month in which the 10th anniversary of the 6th Floor Rent Commencement Date Occurs. | | | | | |
| 220 Fifth Ave. 4th Fl. NY, NY 10001 | The Marymont Group [4th Fl. Before March 1st, 2016, also included "Original Premises" of 20th Floor] | 2/1/16 – 12/31/2025 | | $24,932.18 | $299,186.16 | 1/1/2017 – 12/31/2017 | No Option |
| 220 Fifth Ave. 4th Fl. NY, NY 10001 | AH + Associates, Inc. | 7/11/2013 – 8/11/2018 | | $4,188.79* | $50,265.48 | 7/11/2016 – 7/11/2017 | Option to renew for an additional five (5) years |
| 220 Fifth Ave. 3rd Fl. NY, NY 10001 | Ram Development, Inc. | 1/1/2012 – 12/31/2021 | | $6,762.43 | $81,149.19 | 1/1/2017 – 12/31/2017 | No Option |
| Portions of the ground floor, mezzanine floor, Lower Level of the Building. | BEERCO | 3/1/2013 – 1/31/2029 | | $79,166.67 | $950,000.00 | 3/1/2016 – 2/28/2017 | No Option |

**Rent Roll**

**Dino & Sons Realty Corp**

**220 Fifth Avenue, New York, NY 10001**

**As of: February 23, 2017 (Revised)**

| Premises/ Address | Tenant | Lease Term | SQ. Ft. | Monthly Rent | Annual Rent | Current Lease Term | Option to Extend Lease Term |
|---|---|---|---|---|---|---|---|
| Ground floor, Mezzanine and lower level | Scorpion Fitness, Inc. and Scorpion Club Ventures, LLC | 03/1/2016 - 10/01/2031 | | $17,706.44 | $212,477.30 | 03/01/2016 – 2/28/2017 | No Option |

5

Schedule 3(b)

Agreements

1.    Installation Contract dated 1/13/2015 between Nation Mechanical Services Inc. and he Laquila Group, Inc.

2.    Modernization Proposal #14-33654 dated 12/11/2014 between TEI Group Inc., and Dino Tomassetti, Jr.

3.    Modernization Proposal #14-33657 dated 12/12/2014 between TEI Group Inc., and Dino Tomassetti, Jr.

4.    Office Building Contract dated 6/14/2006 between Croker Fire Drill Company and Dino & Sons Co.

3.

Schedule 3(c)

Employees

| 220 Fifth Avenue | Employee | Position |
|---|---|---|
| 1. | Nestor Moreno* | Super |
| 2. | Milagros Aponte | Cleaning Lady |
| 3. | Almicar Marte | Night Guard |
| 4. | Xiomara De La Cruz | Cleaning Lady |
| 5. | Sarria Enoc | Night Guard |
| 6. | Jose A. Obando | Handyman |
| 7. | Sandy Ortega | Front Desk. Security Guard |
| 8. | Raquel Garcia | Cleaning Lady |
| 9. | Carmelo Tejada | Handyman |

*NOTE: Fee owner will discharge all employees other than the superintendent, Nestor Moreno, as of the date of the sublease. Nestor Moreno is paid $27/ hour and is an employee at will.

Schedule 10(a)

Permitted Exceptions

## SCHEDULE 10(A)

SCHEDULE OF PERMITTED TITLE EXCEPTIONS

1.    All outstanding taxes and assessments for the year 2015 and thereafter, and any
      additional taxes which result from a reassessment of the property.

2.    Right of tenants or persons in possession, pursuant to the Rent Roll.

3.    Any state of facts which an accurate survey might show.

4.    Premises are located in an area designated as a landmark historic district by a notice
      recorded 11/30/2010 in the New York County Register's Office as CRFN
      2010000400864 and are therefore subject to the restrictions as to use provided for in the
      Administrative Code of the City of New York, Title 25, Chapter 3.

5.    Intentionally Omitted.

6.    The following Financing Statement (UCC-1):

      Debtor: Dino & Sons Realty Corp.
      Secured Party: Investors Bank
      Filed: 8/11/2014
      CRFN: 2014000266234

7.    Collateral Assignment of Leases by and between Dino & Sons Realty Corp. to
      Manufacturers Hanover Trust Company, dated 6/12/1991 and recorded 7/18/1991 in Reel
      1798, Page 550, subject to Rights, Recognition Non-Disturbance and Attornment
      Agreement.

8.    Collateral Assignment of Leases and Rents by and between Dino & Sons Realty Corp. to
      The Chase Manhattan Bank, dated 12/5/1996 and recorded 12/24/1996 in Reel 2405,
      Page 1549, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

9.    Assignment of Leases and Rents by and between Dino & Sons Realty Corp. to Investors
      Bank, dated as of 7/31/2014 and recorded 8/11/2014 as CRFN 2014000266233, subject
      to Rights, Recognition Non-Disturbance and Attornment Agreement.

10.   Intentionally Omitted.

11.   Notice of Sidewalk Violation filed 9/14/1993 Index No. 62014.

12.   Variations between tax map and record description.

13.   1. Mortgage made by 218 Fifth Avenue, Inc. to Metropolitan Life Insurance Company, in
      the amount of $800,000.00, dated 4/9/1945 and recorded 4/10/1945 in the Register's
      Office of New York County, State of New York, in Liber 4737, Page 265. Mortgage Tax

Paid $16,600.86 , subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

1a. Said mortgage was assigned by Assignment of Mortgage made by Metropolitan Life Insurance Company, assignor, to East River Savings Bank, assignee, dated 6/15/1962 and recorded 6/29/1962 in the Register's Office of New York County, State of New York, in Liber 6063, Page 405, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

NOTE: Assigns Mortgage 1.

2. Building Loan Mortgage made by 218 Fifth Avenue, Inc. to East River Savings Bank, in the amount of $254,961.29, dated 6/21/1962 and recorded 6/29/1962 in the Register's Office of New York County, State of New York, in Liber 6063, Page 407. Mortgage Tax Paid $1,275.00 , subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

2a. Said mortgage was consolidated by Consolidation, Extension and Modification Agreement made by and between East River Savings Bank and 218 Fifth Avenue, Inc., dated 6/21/1962 and recorded 6/29/1962 in the Register's Office of New York County, State of New York, in Liber 6063, Page 413, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

NOTE: Consolidates Mortgages 1 and 2 to form a single lien in the amount of $825,000.00 , subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

2b. Said mortgage was extended by Extension Agreement made by and between East River Savings Bank and 218 Fifth Avenue, Inc., dated 9/29/1964 and recorded 10/7/1964 in the Register's Office of New York County, State of New York, in Liber 6322, Page 240, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

NOTE: Extends Mortgages 1 and 2, as Consolidated, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

2c. Said mortgage was assigned by Assignment of Mortgage made by East River Savings Bank, assignor, to Dry Dock Savings Bank, assignee, dated 6/16/1972 and recorded 6/22/1972 in the Register's Office of New York County, State of New York, in Liber 244, Page 844 , subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

NOTE: Assigns Mortgages 1 and 2, as Consolidated, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

3. Mortgage with Consolidation Clause made by SAG. S.H. Corp. to Dry Dock Savings Bank, in the amount of $868,558.87, dated 6/20/1972 and recorded 6/22/1972 in the Register's Office of New York County, State of New York, in Reel 244, Page 846. Mortgage Tax Paid $10,857.50 , subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

2

NOTE: By its terms, said Mortgage is consolidated with Mortgages 1 and 2 to form a single lien in the amount of $1,500,000.00 , subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

3a. Said mortgage was assigned by Assignment of Mortgage made by Dollar Dry Dock Bank f/k/a Dry Dock Savings Bank, assignor, to Manufacturers Hanover Trust Company, assignee, dated 6/11/1991 and recorded 6/28/1991 in the Register's Office of New York County, State of New York, in Liber 1793, Page 1346, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

NOTE: Assigns Mortgages 1, 2 and 3, as Consolidated, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

4. Mortgage and Modification, Consolidation and Extension Agreement made by Dino & Sons Realty Corp. to Manufacturers Hanover Trust Company, in the amount of $11,659,077.38, dated 6/12/1991 and recorded 6/28/1991 in the Register's Office of New York County, State of New York, in Reel 1793, Page 1351. Mortgage Tax Paid $320,625.25, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

NOTE: By its terms, said Mortgage is consolidated with Mortgages 1, 2 and 3 to form a single lien in the amount of $12,500,000.00, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

4a. Said Agreement of Extension and Modification of Mortgage made by and between Dino & Sons Realty Corp. and The Chase Manhattan Bank, dated 12/5/1996 and recorded 12/24/1996 in the Register's Office of New York County, State of New York, in Reel 2405, Page 1516, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

NOTE: Modifies Mortgages 1, 2, 3 and 4, as Consolidated, subject to Rights, Recognition Non-Disturbance and Attornment Agreement..

4b. Said mortgage was modified by Modification Agreement with Consent made by and between Dino & Sons Realty Corp. and JPMorgan Chase Bank (formerly known as The Chase Manhattan Bank), dated as of 4/11/2003 and recorded 5/14/2003 in the Register's Office of New York County, State of New York, as CRFN 2003000128195, subject to Rights, Recognition Non-Disturbance and Attornment Agreement..

NOTE: Modifies Mortgages 1, 2, 3 and 4, as Consolidated, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

5. Gap Mortgage and Security Agreement made by Dino & Sons Realty Corp. to JPMorgan Chase Bank, in the amount of $3,237,500.00, dated as of 7/26/2004 and recorded 11/17/2004 in the Register's Office of New York County, State of New York, as CRFN 2004000714202. Mortgage Tax Paid $89,031.26, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

3

5a. Said mortgage was amended by Amended, Restated and Consolidated Mortgage and
Security Agreement made by and between Dino & Sons Realty Corp. and JPMorgan
Chase Bank, dated 7/26/2004 and recorded 11/17/2004 in the Register's Office of New
York County, State of New York, as CRFN 2004000714203, subject to Rights,
Recognition Non-Disturbance and Attornment Agreement.

NOTE: Amends, Restates and Consolidates Mortgages 1, 2, 3, 4 and 5 to form a single
lien in the amount of $10,000,000.00, subject to Rights, Recognition Non-Disturbance
and Attornment Agreement.

5b. Said mortgage was assigned by Assignment of Mortgage made by JPMorgan Chase
Bank, assignor, to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of
JPMorgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-
Through Certificates, Series 2004-LN2, assignee, dated as of 8/20/2004 and recorded
4/19/2005 in the Register's Office of New York County, State of New York, as CRFN
2005000224057, subject to Rights, Recognition Non-Disturbance and Attornment
Agreement.

NOTE: Assigns Mortgages 1, 2, 3, 4 and 5, as Consolidated, subject to Rights,
Recognition Non-Disturbance and Attornment Agreement..

5c. Said mortgage was assigned by Assignment of Mortgage made by Wells Fargo Bank,
N.A., as Trustee for the Registered Holders of JPMorgan Chase Commercial Mortgage
Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2004-LN2,
assignor, to Investors Bank, assignee, dated as of 7/31/2014 and recorded 8/11/2014 in
the Register's Office of New York County, State of New York, as CRFN
2014000266230, subject to Rights, Recognition Non-Disturbance and Attornment
Agreement.

NOTE: Assigns Mortgages 1, 2, 3, 4 and 5, as Consolidated, subject to Rights,
Recognition Non-Disturbance and Attornment Agreement.

6. Gap Mortgage and Security Agreement made by Dino & Sons Realty Corp. to
Investors Bank, in the amount of $28,568,513.96, dated as of 7/31/2014 and recorded
8/11/2014 in the Register's Office of New York County, State of New York, as CRFN
2014000266231. Mortgage Tax Paid $799,918.01, subject to Rights, Recognition Non-
Disturbance and Attornment Agreement.

6a. Said mortgage was Amended, Restated and Consolidated Mortgage, Assignment of
Leases and Rents, Security Agreement and Fixture Filing made by and between Dino &
Sons Realty Corp. and Investors Bank, dated 7/31/2014 and recorded 8/11/2014 in the
Register's Office of New York County, State of New York, as CRFN 2014000266232,
subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

NOTE: Consolidates Mortgages 1, 2, 3, 4, 5 and 6 to form a single lien in the amount of
$35,000,000.00, subject to Rights, Recognition Non-Disturbance and Attornment
Agreement.

4

NOTE: Schedule I of the prior mortgages erroneously shows Mortgage 6 in the amount of $2 whereas it should be $28,568,513.96, subject to Rights, Recognition Non-Disturbance and Attornment Agreement.

5