UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                          Chapter 11

Scorpion Fitness, Inc. et al.,                  Case No. 19-11231-MEW

                              Debtors.          Jointly Administered
-----------------------------------------------------------x

## DECLARATION OF JOHN SHAMS IN OPPOSITION TO
## LANDLORD'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

John Shams declares the following under penalties of perjury pursuant to 28 U.S.C. §1746:

1. I am the president and majority equity holder of Scorpion Fitness, Inc. ("Fitness") and Scorpion Club Ventures LLC ("Club Ventures") (collectively the "Debtors"). I respectfully submit this Declaration in opposition of the motion (ECF #21) (the "Motion") filed by 220 Fifth Realty LLC (the "Landlord") as the successor to Dino & Sons Realty Corp. LLC ("Dino") seeking relief from the automatic stay pursuant to 11 U.S.C. §362(d). I have personal knowledge of all of the facts and circumstances set forth below.

2. The Debtors are both tenants under a lease dated December 19, 2014 (the "Lease"), for ground floor, mezzanine, and basement premises at 220 Fifth Avenue, New York, NY (the "Premises"), where the Debtors intend to operate an upscale boutique gym facility.

3. Despite several postponements, the Debtors were prepared to open for business in March of 2019, only to suffer through a new round of delays caused by a frozen pipe burst incident on February 1, 2019 from a floor outside of the subject Premises.

4. The Debtors operate a high-end boutique gym and have invested approximately $1.5 million improving the subject Premises, and over $2.5 million in the design and buildout of its new facility, a 7000 square feet luxury boutique gym on Fifth Avenue in

Flatiron district of New York. The Debtors filed Chapter 11 to protect their most valuable asset, the Lease, which is critical for a successful reorganization. Annexed hereto as Exhibit "A" are recent photos of Debtors' substantial leasehold improvements.

5. The Debtors procured a top tier branding agency, Ready 366, to develop their brand, and have attracted a top-level talent, including the the former chief marketing officer of Equinox and Pepsico as the Debtors' senior marketing advisor, and also a shareholder.

6. The Landlord served Debtors with two notices to cure, alleging non-monetary default allegations, which forced Debtors to seek Yellowstone Injunctions in order to toll the cure period and preserve their valuable leasehold.

7. Since the Lift Stay Motion centers on the prior default notices, it is important to place these notices in their proper context, to assuage the Court that the Debtors have honored their obligations, and that the efforts by the Landlord to sully those efforts should be rejected. The Debtors only sought Yellowstone Injunctions to toll potential cure periods and preserve their valuable leasehold while the Debtors challenge the validity of the underlying allegations.

8. The Debtors have the financial means to open for business and to successfully reorganize. Thus, the Landlord's motion to lift the automatic stay in order to terminate Debtor's lease would sabotage Debtor's ability to reorganize.

**LANDLORD VIOLATIONS UNDER THE LEASE**

9. The Debtors entered into the Lease with the 220 Fifth Realty LLC's, predecessor (insofar as an invalid business entity can be said to have a predecessor ), Dino & Sons Realty Corp., for the operation of a high-end gymnasium at the Premises.

10. The Lease was executed on December 22, 2014 by Dino & Sons Realty Corp and Scorpion Club Ventures LLC and Scorpion Fitness Inc. for a term of 15 years and 7 months for the buildout of an exclusive fitness club.

11. Because the Debtors' Lease was a new commercial tenancy, it required the build-out of the Premises, and the assignment of work was shared by the Landlord ("Landlord Work") and by the Debtors ("Tenant Work"). Because of the glaring deficiencies of the subject Premises at the time, it was agreed that Debtors' obligations to pay base rent were triggered upon substantial performance of Landlord's Work.

12. On September 2016, the Debtors commenced the Tenant's Work, anticipating that Dino would complete Landlord's Work by the time the Tenant's Work was completed.

13. However, Dino never performed most of Landlord's Work, and thus the Debtors' obligations to pay base rent under the Lease have never been triggered.

14. Between November 2015 until March 2017, the Debtors sent Dino numerous formal notices and letters, informing Dino of its failure to perform Landlord's Work and deliver possession of the Premises. However, nearly all of the notices were ignored.

15. Dino also failed to make timely payments from the Work Allowance created to fund the Tenant's Work, causing Debtors to lose their first general contractor, PCCM, who walked off of the job and filed a mechanic's lien for approximately $190,000 at or about February 7, 2016, which Debtors later vacated.

16. At or about March 15, 2017, 220 Fifth Realty LLC became the successor Landlord to Debtors ("Landlord").

17. The Debtors sent numerous notices to the Landlord about Landlord's defaults demanding that Landlord's Work be completed and that delivery of possession of the premise be done. Up until that time, the Debtors had never received a default notice by Dino or the Landlord.

18. The parties entered into a Modification at or about June 30th, 2017 pursuant to which the Landlord promised to complete the remainder of Landlord Work, so as allow Debtors to open by the end of that year.

19. The Debtors hoped the underlying issues involving Dino's failures in performing Landlord's Work would be solved through the Modification. However, the Modification was illusionary, since most of the remaining Landlord Work was never done by the new Landlord.

20. To make matters worse, on July 20th, 2017, shortly after Debtors and Landlord entered executed the Modification agreement, Debtor's second contractor, Ancor, walked off of the job after discovering that the ACP-5 that Dino had provided misrepresented the level of asbestos at the Premises, thus adding more delays to the project.

## FIRST YELLOWSTONE INJUCTION

21. On May 29, 2018, the Landlord issued a certain "Notice of Default", purporting to complain that Debtors were obliged to recharge the security deposit that the Landlord had raided by reason of Debtors' alleged failure to pay base rent, in spite of the fact that Landlord had not done its work to make the Premises usable, and never triggered the Debtors' obligation to pay base rent. Since the Debtor was not obliged to pay base rent until the Premises was delivered in the condition as required in the lease, the Landlord improperly absconded with the Debtors' security deposit, and the Debtors were under no obligation to recharge it. Rather, it was the Landlord's obligation to restore the funds it defalcated.

22. To protect themselves and the Lease, on or about June 18, 2018, the Debtors commenced an action in the Supreme Court of the State New York, New York County (the "State Court"), entitled: Scorpion Fitness, Inc. and Scorpion Club Ventures, LLC v. 220 Fifth Realty LLC, Index No. 653035/2018, seeking a so-called "Yellowstone Injunction" barring the Landlord from pursuing the alleged defaults while the parties litigated their disputes.

23. On August 15, 2018 Hon. Justice Ramos granted a Yellowstone TRO, however, the counsel representing Debtors in that case abruptly filed an Order to Show Cause on August 17th, 2019 to be relieved as counsel alleging Debtors had not paid their bill in the amount of $3,314.26 despite that Debtors had paid its counsel over $65,000.00 up until that point to deal with Landlord's December 20, 2017 "Notice of Intent."

24. Although the hearing on August 20th, 2018 was related to counsel's motion to be relieved, the focus of discussion was on instead on the Landlord's Work. At the hearing, the Debtors' CEO, Mr. John Shams, presented material information that its counsel never had an opportunity to present before, which showed the Landlord was still performing ongoing sidewalk work in connection the leaks entering the vault region of the Premises.

25. Regardless, the Debtors were prepared to comply with the Yellowstone order requiring them to deposit $123,907.83 into escrow by the end of that day and had, in fact, emailed Landlord's counsel the previous day to obtain their bank wire transfer information in order to wire them the funds. After further analysis, Justice Ramos issued a stay of proceedings on his Yellowstone TRO order prior to the Debtors' deadline to deposit funds into escrow in light of the additional information about Landlord's failures and Debtor's counsel motion to withdraw.

26. On September 12, 2018, at the second hearing pursuant to counsel's OTSC, Justice Ramos conditioned the lifting of the stay on the first Yellowstone TRO on Debtor's counsel's delivery of Debtors file to a representative of the Debtors.

Court: The motion to withdraw as counsel is granted, only on the condition that the entire file be turned over to a representative of Scorpion Fitness otherwise you're still in the case…

Court: The stay continue until this is resolved. The stay continues.

27. To date, Debtors have not received the file from their former counsel nor has the Landlord filed any motions to lift the stay on the first Yellowstone TRO order. A copy of the September 12th, 2018 order, notice of court's entry on September 12th order, and the Court's transcript on September 12th, 2018 are collectively annexed hereto as Exhibit "B".

## SECOND YELLOWSTONE INJUNCTION

28. On November 1, 2018, the Landlord served the Debtors with a "Supplemental Notice of Default" alleging a series of invalid and frivolous non-monetary default allegations, most of which are related to the adjacent tenant's fire exit which is illegally located inside Debtor's exclusive space.

29. In the notice, the Landlord alleges that the Debtors took down a two-hour fire wall in spite of the fact that the wall did not exist in Debtors' space when Debtors signed the Lease, as confirmed in a photograph of the space in early 2016. The photograph clearly shows Debtors received an open layout with no separating fire walls in the cellar. As a result, the Debtors' entire ground floor entry and portion of the cellar was never demised and was retained by the Landlord as a building common area.

30. To make matters worse, the Landlord alleges that the Debtors barricaded a fire exit door that is not even depicted in Debtors' Lease, and whose continued presence is a violation of Debtors' right to quiet enjoyment and exclusive use of the Premises. The Landlord was responsible for removing the door after the Debtors signed the lease. However, the Landlord is trying to wash its hands clean and relieve itself of its obligations to cure its own defaults by alleging that the Debtors are in default for barricading the door, removing a non-existent fire wall, and causing related violations.

31. Furthermore, in compliance with their obligations to perform Tenant's Work, the Debtors have invested over $500,000 renovating the ground floor and portion of the lower level for its exclusive use, however the region continues to remain as building common area despite that the Debtors designed and installed new glass railings, hand rails and new stair treads and risers, high end stone flooring, and custom lighting fixtures. Most of the Debtors' new HVAC equipment is also located in this region, however because of delays, the Debtors have not been able to start the system yet.

32. Both the Lease and the Modification require that Landlord must deliver an "exclusive" and "private "elevator. However, the elevator is non-exclusive because it is located inside of the illegal fire exit/building common area. As a result, the Debtors' elevator can be accessed by anyone by way of the illegal Fire Exit Door which illegally swings into the Debtors' Premises so that outsiders can enter from the rest of the building. Therefore ,allegations that the Debtors blocked this exit door and failed to comply with the second Yellowstone order are incorrect, although the entire situation can easily be remedied by the Landlord.

33. To date, the improper access to the Premises through the fire door remains unresolved, and the elevator has no electricity, no interior panels, is not ADA compliant, nor in any condition to pass an elevator inspection until the Landlord or somebody performs this work. In fact, an elevator report obtained by the Debtors, recommends that the seventeen-year old elevator should be replaced given how poorly it has been maintained. A copy of the report is annexed hereto as Exhibit "C". According to the Lease, the base rent continues to abate until Landlord has performed this work.

34. Both Yellowstone cases were initially heard by Hon. Justice Ramos who retired on January 1, 2018. A review of the Court's transcript on November 27th, 2018 shows that Debtors had won the Court's favor in both Yellowstone cases prior to Justice Ramos's retirement. However, the Debtors' situation changed substantially on February 4, 2019 after Debtors' second counsel failed to apprise the new judge, Hon Andrew Borrok, prior to entering his decision, that the trigger of base rent was conditioned on Landlord's performance of Landlord's Work; that there were, in fact, no known mechanic's liens at the time, which the Debtors were ordered to vacate; and that the purported Fire Exit Door which Debtors were allegedly barricading and ordered to clear, was illegal and should not even exist

35. While the purpose of the Yellowstone Injunction is to preserve the tenant's valuable leasehold and the status quo, obligating the Debtors to litigate a series of contrived, nonmonetary default allegations after posting an extraordinary financial undertaking proportional to the alleged rental arrears would have severely prejudiced Debtors' since their obligations to pay base rent has yet to be triggered. In agreement with Justice Ramos, the Debtors contend that the Landlord's egregious conduct is a tactic to "squeeze" the Debtors in an effort to recapture their valuable under-market leasehold after the Debtors enormous investment

to improving the premises and just prior to opening for business. In fact, the Debtors learned that in mid 2018, the Landlord was actively marketing the Debtors' space with the adjacent tenant, Beerco. which filed for Chapter 11 earlier that year. A copy of the listing is attached hereto as Exhibit "D".

**WHY LANDLORD IS NOT ENTITLED TO BASE RENT**

36. Under the Lease and the Modification, it was agreed that the Debtors' rent obligations would not commence until the Landlord performed its work. However, the issues surrounding the landlord's failure to provide a space "sufficiently completed" and "ready for occupancy," means that the base rent continues to abate up and until the Landlord properly completes its construction in accordance with the explicit provisions of the Lease. Thus, the base rent has, and continues to abate until the space is constructed and delivered to the Debtors per the Lease, *i.e.*, without the presence of any water leaks, an operable code, compliant private elevator, fire stopping, and all asbestos abated.

37. In light of these issues, the Debtors have modified their architectural plans in order to deal with the issue, and up until just a few months ago, the Landlord was emailing the Debtors asking to grant them access in order to contain the water leaks entering the sprinkler room inside Debtor's space. Debtors took a video of water infiltration June 13, 2019.

38. Furthermore, the effects of the water leaks and the delay in starting the HVAC system has led to a mold problem in certain regions of the premise and have caused damage to the Debtor's leasehold improvements, which added more delays in Debtors opening. This has also contributed to delays which Debtors are in the process of remediating.

39. The Landlord contends the Debtors agreed to a "Commencement Date" in the Modification, but a closer examination of the Lease shows that the Commencement Date is

defines as the commencement of the "Term" of the Lease and should not be confused with a rent commencement date. Justice Ramos himself stated that a " rent commencement date is yet to be found." Paragraph 41B states in relative part "all of Tenant's monetary obligations (including but limited to Tenant's obligations to pay for electricity) *other than* the obligation to pay rent shall start as of the Commencement Date." (Emphasis supplied).

        40.    Furthermore, Paragraph 23 of the Lease states in relevant part:

> if the owner is unable to give possession of the demised premises on the *date of the commencement of the term* hereof because such building has not been *sufficiently completed* to make demised premises *ready for occupancy*.....or for any other reason....but the *rent payable hereunder shall be abated* (provided Tenant is not responsible for the inability to obtain possession or complete construction) until after Owner shall have given Tenant written notice that the Owner is able to deliver possession of the demised premises in the *condition required by this lease.* If permission is given to Tenant to enter into possession of the demised premises....Tenant covenants and agrees that such possession and/or occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this lease, *except the obligation to pay the fixed annual rent set forth in page one of this lease.* (Emphasis supplied).

There is no question Landlord has failed to deliver the Premises in the "conditions required in this lease."

        41.    Furthermore, the Landlord's failure to deliver the Premises in a usable and conforming condition serves as grounds for a partial or actual constructive eviction, further relieving the Debtors of any obligations to base pay rent until the Landlord corrects the egress conflicts and performs its work. Additionally, the Debtors contend the Modification is also a nullity in light of the Landlord's utter bad faith, maleficence, and material breaches of the modification.

## MECHANIC'S LIENS

42. The Landlord has also mischaracterized the status and disposition of the mechanic's liens, which have been properly addressed by the Debtors pre-petition. Each time a lien was filed, the Debtors responded appropriately to promptly address the matter, beginning with PMMC Management Corp., which filed a lien on February 10, 2017 in the amount of $190,768.87. The Debtors filed an Order to Show Cause on May 9, 2017, to remove this lien on multiple grounds. Following several hearings, a Decision and Order was issued on July 14, 2017 by the Hon. Sherry Klein Heitler, directing PCCM to comply with the Lien Law to correct discrepancies in its lien by July 28, 2017 or have its lien cancelled. Thereafter, a satisfaction of the lien was obtained from PCCM on August 4, 2017.

43. A second lien was filed by Rand Engineering & Architecture, D.P.C. in the amount of $29,012.00 on October 23, 2018. A satisfaction of that lien was likewise obtained by the Debtors on December 12, 2018.

44. A third lien in the amount of $375,205.55 was filed by IDDC on July 31, 2018, and thereafter formally cancelled and discharged by Order of Judge James dated September 11, 2018 without leave for refiling. Thus, these three liens were resolved prior to the February 4, 2019 Order.

45. IDDC improperly re-filed its mechanic's lien again on March 18, 2019 in violation of the September 11, 2018 order discharging the original lien. In fact, IDDC slowed down its construction work shortly after it was paid $301,000 by the Debtor, and instead began working on other areas of the building for the Landlord. Thereafter, IDDC allowed its building permits to expire on May 24, 2018, triggering an automatic stop work order and causing building violations. The Debtors believe these actions were taken at the direction of the Landlord.

46. Curiously, on March 19, 2-19, the very next day after IDDC re-filed its own lien, IDDC's subcontractors similarly filed duplicative and overlapping liens even though the subcontractors had previously issued lien waivers to the Debtors. In light of the relationship between IDDC, the subcontractors and the Landlord, the Debtors believe that the refiling of the mechanic's liens were a thinly-veiled litigation ploy done at the behest of the Landlord.

47. Indeed, only a few days later, on March 22, 2019, the Landlord moved to terminate the TRO based on the refiled liens before the Debtors even had a chance to address them on their own.

Dated: New York, NY
July 12, 2019

John Shams