MORRISON TENENBAUM PLLC
*Counsel to the Debtors*
87 Walker Street, Floor 2
New York, New York 10013
Phone: 212-620-0938
Lawrence F. Morrison, Esq.
Brian J. Hufnagel, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| SCORPION FITNESS, INC., et al., | Case No. 19-11231 (MEW) |
| | 19-11232 (MEW) |
| Debtors. | (Jointly Administered) |

------------------------------------------------------------X

### SUPPLEMENTAL STATEMENT REGARDING POST-PETITION RENT

**TO:** **THE HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Scorpion Fitness, Inc. and Scorpion Club Ventures, LLC, the above-captioned debtors and debtors-in-possession (the "Debtors"), hereby submit this supplemental statement regarding the amount of post-petition rent due from the Debtors to its landlord, 220 Fifth Realty, LLC (the "Landlord"). In the Court's August 12, 2019 Order (Ecf No. 44) the Court asked the parties to brief any disagreements regarding the amount of post-petition rent that is due. The following is the Debtors' position.

**a. No Base Rent is due Because of the Casualty Event and Water Damage to the Premises**

1.     No post-petition rent is due because there was a water casualty event and, under Article 9 of the Lease, rent is abated until the water damage has been repaired.

2. As set forth in the Declaration of John Shams, dated June 7, 2019 in Support of the Debtors' Motion to pay Post-Petition Rent in Escrow (ECF No. 16-1), there was substantial damage to the premises caused by a water incident at the building which occurred on February 1, 2019. As Mr. Shams stated:

> More particularly, on February 1, 2019, a frozen pipe burst on an upper floor of the building, causing massive amounts of water to enter the Premises, saturating the walls, ceilings and floors. Due to the water temperature, some of the water turned to ice around entry ways, the fire alarms devises, glass railing and tiled flooring. By coincidence a mold inspection was being conducted [at] the time, and the inspector observed the water intrusion incident.

*Id.* (the incident was document by photographs taken by the mold inspector which were contained in the mold report).

3. Article 9 of the Lease, provides for a rent abatement in the event such casualty occurs as follows:

> (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter set forth. (b) If the demised premises are partially damaged or rendered partially unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of Owner, and the rent and other items of additional rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the demised premises which is usable. (c) If the demised premises are totally damaged or rendered wholly unusable by fire or other casualty, then the rent and other items of additional rent as hereinafter expressly provided shall be proportionately paid up to the time of the casualty and thenceforth shall cease until the date when the demised premises shall have been repaired and restored by Owner (or sooner reoccupied in part by the Tenant then rent shall be apportioned as provided in subsection (b) above).

(*See* Lease, ECF No. 16-2).

4. Based on the above, the Lease provides that no rent is due until the casualty has been repaired. Thus, the Debtors are entitled to a rent abatement until the Landlord finishes the repair of the casualty event. *See e.g. Hudson Towers Hous. Co., Inc. v. VIP Yacht Cruises, Inc.*, 63 A.D.3d 413, 881 N.Y.S.2d 46 (1st Dept. 2009) (under Article 9 of the lease, tenants liability for rent is abated during the period in which the repairs are being made); *Trinity Ctr., LLC v. Wall St. Correspondents, Inc.*, 4 Misc. 3d 1026(A), 798 N.Y.S.2d 348 (Sup. Ct. NY Cty. 2004) (under express terms of the lease, tenant would receive a rent abatement for the period during which the space was unusable). .

5. The Debtors do not believe that the Court ruled under Article 9 of the Lease. Counsel to the Landlord conceded such on the record of the July 16, 2019 hearing – "if someone, in some future date the tenant is entitled to a rent abatement, that can be credited towards future obligations." (*See* transcript of July 16, 2019 hearing, "July 16 Tr.", at 23:17-19, annexed as Exhibit "1"). On the record, an amount was not specified – only that the Debtors should pay according to the Lease. (July 16 Tr. At 32). According to Article 9 of the Lease, the amount that should be due post-petition is zero.

**b. The Deferred Rent is a Pre-Petition Obligation Under the Lease Amendment**

6. The June 30, 2017 lease amendment (the "Lease Amendment") (ECF No. 16-4) provided that the Debtors would make payments in the sum of $105,299.66 in installments of $3,509.99 payable monthly from October 1, 2017 through March 1, 2020. The question now posed by the Court is whether these amounts constitute amounts that are post-petition obligations under the Lease or whether the amounts represent amounts due for pre-petition periods.

7. As a concession for compelling the Landlord to perform Landlord's Work and to make payments from the Work Allowance which the Landlord was in default of at the time

(Debtors had sent about one dozen notices and complaints), the Debtors agreed to a payment schedule pursuant to Exhibit B, wherein they agreed to make extra monthly payments in the amount of $3509 commencing on October 1, 2017 through March 1, 2020. The amount was equal to the aggregate sum of the $17,706 for the period of March 1, 2017 until September 30th, 2017 which was the total amount that would have been owed if the base rent had been triggered by that time and the Debtors would have been making rent payments.

8. Up until then, the Debtors had never received a notice to cure or a notice of default. The Debtors had sent the predecessor Landlord, Dino, and also the successor Landlord over one dozen notices, demands, and complaints for failing to perform Landlord's Work and for failing to make payments from the Work Allowance. When 220 5th Realty LLC (Stellar Management) became the new Landlord on March 22, 2017 the parties entered into negotiations for the Modification. Up until then, the events that triggered tenant's obligations to pay base rent had not occurred because the Landlord had failed to complete most of Landlord's Work and had failed to deliver exclusive possession of the premise in the conditions required in the lease. The Debtors waited nearly two years for Dino to complete Landlord's Work (which he had agreed to do with commercial reasonable diligence pursuant to article 23). The heart of the original deal was that Landlord's Work would precede Tenant's Work and that the first 210 days of Tenant's Work would be abated in order for Debtors to complete Tenant's Work. Because 2 years had elapsed the Debtors decided to commence both Debtors and Landlord's work after Dino finally removed an LPC violation at or about October 2016 allowing them to pull DOB permits. However the general contractor that was hired to perform this work walked off of the job shortly after, on Dec 13, 2016 and then filed a mechanic's lien because the predecessor landlord failed to make payments from

the Work Allowance. The Debtors had paid $317,000 upon the execution of the Lease on Dec 22, 2014.

9. In the Modification, the parties agreed to certain concessions. The Debtors agreed to the "Deferred Rent Payment Schedule" and to remove the mechanic's lien with 120 days. In exchange, the Landlord agreed to perform the remaining Landlord's Work which represented the most significant and costly items. Also upon execution of the Modification, the Landlord was required to immediately pay the Debtors $129,125.00 from the Work Allowance so that Debtors could pay ten (10) vendor invoices, mostly for soft costs, which had been past due for nearly 6 (six) months. These past due vendor invoices are listed in the "Work Allowance Payment Requisition" which is annexed to the Modification. The invoices needed to be paid in order to prevent the filing of additional mechanics liens. The Debtors diligently performed on all of their obligations by discharging the first GC's mechanics liens within 3 weeks and making payments from the deferred rent schedule between October 2018 up until February 2018. The Debtors withheld payment when the Debtors learned the Landlord was colluding with IDDC, and after receiving a notice of intent alleging that the Debtors had failed to replenish their security deposit which the landlord later conceded contained material errors. More importantly, the Landlord failed to perform any of the items on Landlord's Work. The Debtors demanded 8 months of rent back and to complete Landlord's Work. The parties reengaged in "Settlement Negotiations" for the next 5 months.

10. It became apparent by then that these acts indicated that the Landlord never had any intention to perform Landlord's Work and was engaged in a scheme to "squeeze the Debtors out" and recapture the space as Justice Ramos concluded. This seemed plausible since the value of the space and the leasehold had skyrocketed since the execution date of the lease.

11. For the reasons set forth below, the Debtors submit that the monthly payments of $3,509.99 do not apply to post-petition rent but are deferred payments due pursuant to the Lease Amendment for pre-petition arrears. Although billed during the post-petition period, they are charges assessed for pre-petition periods. Thus, the Debtor does not have to pay the deferred monthly amounts post-petition on a monthly basis.

12. Section 5 of the Lease Amendment provides that the entire amount becomes due in the event there is a default as follows:

> In the event of the default of Tenant under the Lease beyond the expiration of applicable notice and cure periods, if any, expressly reserved in the Lease, then in such event, the aforesaid sum of $105,299.66, less any sums theretofore actually paid on account thereof by Tenant shall be immediately due and payable as additional rent, without notice or demand.

(Lease Amendment § 5).

13. This provision demonstrates that the deferred payment amounts represent arrears for a prior period and not an agreed upon increase in future rent. Further, the Lease Amendment states that the monthly payments are in lieu of amounts that were due for the period from March, 2017 through September, 2017.

14. The Lease Amendment categorizes the charges as the "Deferred Base Rent Amount to be Paid" (hereinafter, the "Deferred Rent"). In its brief, the Landlord seeks to label these charges as the "Re-allocated Payments." But the term "re-allocated" appears nowhere in the Lease Amendment. Instead, the parties categorized these as "deferred" payments – meaning payments that were based on what the rent would have been for a prior period, but the time to make those payments has been moved into the future. The settlement could have been, but was not, an increase in the future monthly base rent payments

15. The Debtors' position is that the Deferred Rent (the additional payments) was incurred for pre-petition time period. Turning to the caselaw, this Court must evaluate whether to adopt a "pro-rata" approach or the "billing date" approach argued by the Landlord.

16. Caselaw concerning amounts incurred pre-petition, but billed to a tenant post-petition, is mostly in the property tax context. In *Child World v. Campbell/Massachusetts Trust (In re Child World)*, 161 B.R. 571, 576 (S.D.N.Y. 1993) the District Court stated "[t]hose few courts which have interpreted § 365(d)(3) as providing that the billing date determines when lease obligations arise have produce results which, given the legislative history, we cannot believe were intended by Congress." Further that "Congress did not intend for courts applying § 365(d)(3) to rely mechanically on the billing date in determining which postpetition, prerejection obligations under nonresidential leases must be timely paid." *Id*. at 577.

17. Courts in this District have interpreted *Child World* as following "the long-standing, pre-1984 practice of prorating payment of a debtor's obligations under a lease, regardless of the billing date." *Newman v. McCrory Corp. (In re McCrory Corp.),* 210 B.R. 934 (S.D.N.Y. 1997) (noting that pro-rata approach is the majority view in the Second Circuit). Thus the only amounts that are due post-petition are for rent, taxes, and other charges incurred after the petition date.

18. Accordingly, because the unpaid Deferred Rent are amounts assessed pre-petition, but payment for those amounts was deferred, it is not a post-petition obligation of the Debtors. The Debtors should not be required to pay the monthly $3,509.99 charge in order to stay current with their post-petition obligations to the Landlord.

**Reservation of Rights**

19. The foregoing position regarding post-petition rent is made without prejudice to the Debtors' objections to the proof of claim filed by the Landlord. The Debtors intend to object to the Landlord's claim in its entirety based upon the reasons set forth above, along with other arguments.

**WHEREFORE**, the Debtors respectfully request that an Order be entered denying the Landlord's request for payment of the Deferred Rent, finding that zero post-petition base rent payments need to me made, and granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      September 17, 2019                    Respectfully Submitted,

                                          MORRISON TENENBAUM PLLC

                                          */s/ Brian J. Hufnagel*
                                          By:   Brian J. Hufnagel
                                          Lawrence F. Morrison
                                          *Counsel for the Debtors*
                                          87 Walker Street, Floor 2
                                          New York, New York 10013
                                          (212) 620-0938
                                          lmorrison@m-t-law.com
                                          bjhufnagel@m-t-law.com