**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re:                                                       :
                                                             :    **Chapter 11**
**SCORPION FITNESS INC., ET AL.**                            :
                                                             :    **Case No. 19-11231 (MEW)**
                          Debtors.                           :    **(Jointly Administered)**
                                                             :
------------------------------------------------------------------x

**DECISION DENYING *PRO SE* MOTION BY JOHN SHAMS TO
EXTEND TIME TO APPEAL FROM ORDER APPROVING
THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

Before the Court is the *pro se* motion [ECF No. 172] of John Shams, pursuant to Bankruptcy Rule 8002(d), to extend the deadline by which he was required to file a notice of appeal as to the Court's *Order (1) Approving the Appointment Of Chapter 11 Trustee, (2) Denying Motion To Stay Chapter 11 Trustee Order, and (3) Denying Motion To Vacate Chapter 11 Trustee Order* entered January 30, 2020 (the "Motion to Extend"). [ECF No. 163]. For the reasons set forth below, the Motion to Extend is denied.

**Background**

Scorpion Fitness, Inc. and Scorpion Club Ventures LLC (the "Debtors") have hopes to develop and operate a high-end fitness center (the "Gym") in midtown Manhattan in New York City. The space where the Gym is to be located was obtained pursuant to a lease with 220 Fifth Realty LLC ("220 Fifth"), which is a successor landlord to Dino & Songs Realty Corp. LLC. John Shams is the president and the majority shareholder of the Debtors. [ECF No. 11]. The Debtors have had legal representation since the inception of these cases, but as explained below Mr. Shams did not file a notice of appearance in his personal capacity until January 28, 2020.

Prior to the commencement of these cases the construction of the Gym was beset by burst pipes and corresponding water damage, as well as by various disputes between the Debtors and

220 Fifth over the parties' respective obligations under the relevant lease. The Gym was not opened, and the construction work was not completed, at the time of the bankruptcy filings.

The landlord, 220 Fifth, has filed claim no 7-1 in which it alleges a claim of $1,088,049.48 attributable to rent, additional rent, and amounts necessary to discharge mechanic's liens and to pay building code violations. 220 Fifth also filed a cross motion that requested that the Court either grant relief from the automatic stay or otherwise enter an order directing the Debtors (1) to pay post-petition rent, (2) bond or discharge the mechanic's liens, and (3) to cure violations. [ECF No. 21]. (The cross motion was filed in response to a motion by the Debtors to pay post-petition rent into escrow, which was ultimately denied. [ECF Nos. 16 and 45].) The cross motion was resolved by an order that, *inter alia*, directed the Debtors to pay certain post-petition rents and otherwise denied 220 Fifth's request for stay relief. [ECF No. 44].

The startup costs are being financed, in part, by secured loans from the New York Business Development Corporation and NYBDC Local Development Corporation d/b/a The Excelsior Growth Fund (collectively, "NYBDC") in the original principal amounts of $700,000 and $100,000. NYBDC has filed claim nos. 5-1 and 6-1 in these cases, which together assert NYBDC's secured claims in the aggregate amount of $822,871.04. NYBDC has filed several motions in these cases, including a motion for relief from the automatic stay and separate Bankruptcy Rule 2004 motions for examinations of the Debtors and for examinations of certain non-debtor parties, including Mr. Shams.

The Debtors have also entered into three commercial equipment leases with De Lage Landen Financial Services, Inc. ("De Lage Landen"), through which the Debtors obtained leasehold rights over certain fitness equipment over a 60 month term. De Lage Landen has filed claim no. 8-1 in these cases, which asserts a secured claim under its leases in the amount of

2

$225,859.96. It has also filed a motion for relief from the automatic stay. The stay relief motions filed by NYBDC and De Lage Landen have been deferred from time to time and currently are being held in abeyance while a Chapter 11 Trustee attempts to determine if the Gym can be put into operation and whether the creditors' recoveries can thereby be enhanced.

On December 16, 2019, the Office of the United States Trustee (the "UST") filed a motion to convert the Debtors' cases to chapter 7 of the Bankruptcy Code (the "Motion to Convert"). Notice of the motion was served upon the Debtors and their counsel, as evidenced by an affidavit of service. [ECF Nos. 98, 99 and 100]. The Court held an evidentiary hearing on two consecutive days starting on January 21, 2020 as to the Motion to Convert at which Mr. Shams appeared in his capacity as a representative of, and witness for, the Debtors. During the course of the hearing, the Court noted that pursuant to section 1112(b)(1) of the Bankruptcy Code it had the power to appoint a chapter 11 trustee in lieu of dismissing the cases or converting them to chapter 7, so long as the appointment of a chapter 11 trustee under section 1104(a) of the Bankruptcy Code was in the best interests of creditors and the Debtors' estates. The attorneys for 220 Fifth subsequently made an oral motion, in open court and in Mr. Shams's presence, for the appointment of a chapter 11 trustee. They renewed that motion, again in open court (and again in Mr. Shams's presence) at the close of the record (the "Oral Motion").

At the conclusion of the evidentiary hearing on January 22, 2020 the Court asked parties to state their positions as to whether a Chapter 11 Trustee should be appointed. Counsel to NYBDC joined in the Oral Motion, and counsel to De Lage Landen and the UST stated that they did not oppose it. Only the Debtors opposed the requested relief. The Debtors' opposition was predicated on a desire to call additional witnesses to testify about certain personal expenses of Mr. Shams that had been paid from the Debtors' accounts, and on the Debtors' general desire to

3

"remain in Chapter 11 without a trustee being appointed." Hr'g Tr. 186:24 – 187:1, 189:17-19, Jan. 22, 2020 [ECF No. 165].

The Oral Motion was granted for the reasons stated on the record at the conclusion of the evidentiary hearing on January 22, 2020. On January 24, 2020, the Court entered an order pursuant to 11 U.S.C. § 1104(a)(2) directing the UST to appoint a chapter 11 trustee (the "Chapter 11 Trustee Order"). [ECF No. 156].

On January 28, 2020, the UST filed a notice of the appointment of Salvatore LaMonica as the chapter 11 trustee and an application for the approval of Mr. LaMonica's appointment. [ECF Nos. 158 and 159]. On that same day, attorney Tanner Bryce Jones filed a notice of appearance on behalf of Mr. Shams in his personal capacity. This was the first entry of an appearance by Mr. Shams personally or by counsel on his behalf. Mr. Jones also filed a letter request seeking a conference to discuss the entry of the Chapter 11 Trustee Order and the events that had occurred at the prior hearing. [ECF Nos. 160 and 161]. On January 29, 2020, Neal Magnus, a minority shareholder of the Debtors, also filed a *pro se* motion by order to show cause to stay Mr. LaMonica's appointment pending an appeal of the Chapter 11 Trustee Order. [ECF No. 162].

The Court held a telephonic hearing on January 29, 2020 in response to Mr. Jones's request and to hear arguments on Mr. Magnus's motion. Mr. Shams participated in that hearing and spoke on the record. During that hearing, Mr. Jones made an oral motion to vacate the Chapter 11 Trustee Order (the "Motion to Vacate") and asked the Court to consider the retention of a chief financial officer or a chief restructuring officer in lieu of appointing a Chapter 11 Trustee. After considering the parties' arguments, I made a ruling from the bench indicating that I would enter an order that would approve Mr. LaMonica's appointment as chapter 11 trustee and that I would deny Mr.

4

Magnus's Motion and the Motion to Vacate. On January 30, 2020, I entered an order to those same effects (the "January 30 Order"). [ECF No. 163].

Rule 8002(a)(1) of the Federal Rules of Bankruptcy Procedure provides that with certain exceptions (which are discussed below) an appeal from an order must be filed within fourteen days. I will treat the letter request by Mr. Shams's counsel, and his oral Motion to Vacate, as motions that extended the appeal period pursuant to Fed. R. Bankr. P. 8002(b), so that the time to appeal from my January 24, 2020 Order began to run from the January 30, 2020 entry of my Order denying these motions. The fourteen day period after the entry of the January 30, 2020 Order expired without the filing of any notice of appeal.

On March 5, 2020, Mr. Jones filed a motion to withdraw as attorney for Mr. Shams. [ECF No. 171]. On that same day, he also used his ECF account to docket the pending Motion to Extend, along with a *pro se* notice of appeal (the "Notice of Appeal") of the January 30 Order on behalf of Mr. Shams. [ECF Nos. 172 and 173]. Mr. LaMonica and the UST have filed separate objections to the Motion to Extend. [ECF Nos. 177 and 180]. NYBDC has joined in the objections, and 220 Fifth has joined in both the UST's objection and NYBDC's joinder. [ECF Nos. 182 and 185].

After reviewing the Debtors' books and records, Mr. LaMonica filed a letter requesting a status conference, which the Court held on March 11. [ECF No. 175]. Mr. Jones appeared on that conference, again in representation of Mr. Shams in his personal capacity. Mr. Shams spoke as well, although his participation was delayed by approximately thirty minutes as a result of his delays in remitting a credit card payment to the company providing telephonic hearing services. I granted Mr. Jones's request to withdraw from the case on March 11, 2020, and I entered an order to that effect on March 18, 2020. [ECF No. 184].

5

**Legal Standard Governing the Motion to Extend**

Rule 8002(a)(1) of the Federal Rules of Bankruptcy Procedure generally fixes a fourteen day period after the entry of a judgment, order, or decree by which a notice of appeal must be filed. Fed. R. Bankr. P. 8002(a)(1). Rule 8002(d)(1)(A) permits the time to be extended if a motion for an extension is filed before the 14-day period expires, but that did not happen in this case. Rule 8002(d)(1)(B) permits the 14-day period to be extended by an additional 21 days even if a request is filed after the 14-day period has expired, but only if the party seeking the extension can demonstrate "excusable neglect" for its failure to make a timely filing. If Mr. Shams were able to make such a showing, and if the appeal period were to be extended by an additional 21 days, then March 5, 2020 would be the deadline for the filing of a notice of appeal, and that is the date on which Mr. Shams actually filed his *pro se* notice of appeal.

The issue, then, is whether Mr. Shams has demonstrated "excusable neglect" for his failure to file a timely notice within the original 14-day appeal period. Several other federal procedural rules also employ the "excusable neglect" standard. *See, e.g.*, Fed. R. Civ. P. 6(b)(1)(B) and 60(b)(1); Fed. R. App. P. 4(a)(5)(A); Fed. R. Bankr. P. 9006(b)(1). Courts generally have held that the standard is to be applied in the same manner whenever it appears in the federal rules. *See Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 391-93, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (2003) (noting that both Bankruptcy Rule 9006(b)(1) and Civil Procedure Rule 6(b)(1) utilized a "commonly accepted meaning" of the phrase, and interpreting Civil Procedure Rule 60(b)(1) to synthesize that meaning); *see also In re Enron Corp.*, 364 B.R. 482, 486 (S.D.N.Y. 2007) (concluding that the *Pioneer* standard applies with equal force to the determination of whether a party's failure to timely file an appeal was justified by excusable neglect.)

The leading decision on the application of the "excusable neglect" standard is the Supreme Court's decision in *Pioneer*. In that case, an attorney filed a claim 20 days after the bar date. The attorney claimed that he had been experiencing "a major and significant disruption" in his life due to his withdrawal from his former law firm and that he was unaware of the bar date until after the date had passed. He therefore sought relief based on "excusable neglect."

In its decision in *Pioneer*, the Supreme Court held that the wording of the rule shows that relief may be available even if a deadline is missed due to neglect, and that the term "neglect" encompasses "both simple, faultless omissions to act and, more commonly, omissions caused by carelessness." *Id*. at 388. The Supreme Court also held that the determination of whether neglect is excusable is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id*. at 395. The relevant factors include: (1) the danger of prejudice; (2) the length of the delay and its potential impact on proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the movant; and (4) whether the movant acted in good faith. *Id.* However, the Supreme Court rejected the argument that a party should not be held responsible for the neglect of its counsel, and instead held that a party could be so excused only if counsel's own neglect was excusable. *Id.* at 396-99.

Applying these principles, the Supreme Court held in *Pioneer* that excusable neglect had been demonstrated. *Id*. at 397-99. The Supreme Court gave "little weight" to the fact that counsel was allegedly experiencing upheaval in his law practice. *Id*. at 398. However, since the bar date notice had been set forth in a notice of a creditor meeting, without any indication in the title of the notice that a bar date had been set, the Supreme Court held that counsel's admitted lack of actual knowledge of the bar date, coupled with a lack of prejudice and a demonstration of good faith, constituted excusable neglect. *Id*. at 398-99.

The Second Circuit has taken "a hard line" in applying the *Pioneer* factors. *See Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003). In *Silivanch*, the Second Circuit applied the *Pioneer* factors in determining whether an untimely filing of an appeal was due to excusable neglect. The Court held that the third of the *Pioneer* factors (the reason for a delay and whether it was in the reasonable control of the movant) is to be given the most weight in determining whether excusable neglect has been shown. *Id.* at 366. It further instructed that if a deadline is clear and understood, but is missed anyway, "we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test." *Id*. at 366-67; *see also Canfield v. Van Atta Buick/GMC Truck, Inc.*, 127 F.3d 248, 251 (2d Cir. 1997).

The *Silivanch* decision was reaffirmed in *Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 122-24 (2d Cir. 2005), where the court rejected a request for relief from a bar date based on allegations of "excusable neglect." In an intervening decision, the Second Circuit emphasized that when a court evaluates an "excusable neglect" contention "it is the third factor – the reason for delay – that predominates, and the other three are significant only in close cases." *Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 415-16 (2d Cir. 2004).

**Analysis**

I will review each of the *Pioneer* factors in order, though I will give greater weight to the third *Pioneer* factor pursuant to the Second Circuit authorities cited above. As the movant, Mr. Shams has the burden of proving his entitlement to relief based on the *Pioneer* factors. *See Enron, supra*, 364 B.R. at 486 ("[t]he party seeking the extension of time in which to file a notice of appeal has the burden of establishing 'excusable neglect.'")

8

**Factors 1 (Danger of Prejudice to Others) and 2 Potential Impact on Proceedings)**

Since the question before the Court is whether Mr. Shams's delay should be excused, the "prejudice" and "impact on proceedings" that should be considered are those that are attributable to the delay in filing a notice of appeal, rather than (for example) the effect on parties and proceedings that an appeal itself might have.

By its nature Rule 8002(d) does not permit much delay, as a motion to extend the time to appeal based on "excusable neglect" must itself be filed no later than twenty-one days after the expiration of the 14-day appeal period. Fed. R. Bankr. P. 8002(d). In this case – as will be true in most cases that raise issues under Rule 8002(d) – there appears to be little or no danger of prejudice to the other parties, or any material impact on proceedings, that result from the delay in filing a notice of appeal. The only case activity that has occurred prior to the Motion to Extend has been the retention of Mr. LaMonica's firm, his review of the Debtors' books and records, and the March 11 status conference. Those are events that would have happened even if a timely notice of appeal had been filed.

**Factor 3 (Reason for Delay, If Within the Reasonable Control of the Movant)**

Mr. Shams's explanations for his delay in filing the Notice of Appeal can be found in two of the Motion to Extend's eighteen numbered paragraphs. The first of these is paragraph 6, which reads:

> Pursuant to Fed. R. Bankr. P. 80023(d)(1) [sic], I was unable to file this motion before the initial filing deadline of February 13, 2020 because I did not have the financial capability to pay counsel the retainer deposit that was being requested to represent me for an appeal as a direct result of these proceedings in such a short time frame.

Although paragraph 6 states that Mr. Shams was unable to "file this motion" by February 13, the more reasonable interpretation of this paragraph is that it sets forth reasons explaining why Mr. Shams was unable to file the Notice of Appeal on a timely basis. No motion to extend would have

9

been required if the notice of appeal had been filed before February 13. In any case the remainder of paragraph 6 makes clear that Mr. Shams intended to argue that his financial issues were an obstacle to obtaining legal representation in an appeal, not to the filing of the Motion to Extend.

In paragraph 15, Mr. Shams again argues that the Notice of Appeal was delayed due to his lack of legal representation:

> I was unable to retain counsel to file a notice of appeal within the 14-day statutory timeframe as a result of the untimely outcome of these proceedings in which I had no reasonable control to be involved in. I anticipate to locate counsel within the allotted time of this appeal however may pursue this action pro se given the cost of attorneys and financial harm these proceedings have caused me.

There are a number of problems with the excuse that Mr. Shams has offered, however.

<u>First</u>, Mr. Shams did have counsel of record throughout the relevant appeal period. His personal attorney entered an appearance after I directed that a trustee be appointed, and he appeared on behalf of Mr. Shams during the telephonic hearing that led to the entry of the January 30, 2020 Order. Mr. Shams's counsel did not file a motion to withdraw until the same date on which the Motion to Extend was filed (March 5, 2020), and even on that date counsel filed Mr. Shams's *pro se* notice of appeal on behalf of Mr. Shams. Under our Local Rules, an attorney who enters an appearance is not relieved of his obligations as counsel unless and until the Court issues an order that permits the attorney to terminate his representation. *See* Local Bankruptcy Rule 2090-1(e). Mr. Shams therefore had counsel who was obligated to act on his behalf at all times between the entry of the January 30, 2020 Order and the expiration of the normal 14-day appeal period.

<u>Second</u>, courts have consistently held that financial impediments to the retention of counsel do not constitute excusable neglect for a missed deadline. *See Lopez v. First Horizon Home Loan Corp.*, 600 F. App'x 642, 643-45 (11th Cir. 2015) (affirming district court's denial of a motion to reconsider that asserted excusable neglect on the basis of the movants' *pro se* status, ignorance of

10

the law, and inability to afford an attorney); *Dolphin Plumbing Co. of Fla., Inc. v. Fin. Corp. of N. Am.*, 508 F.2d 1326, 1327–28 (5th Cir. 1975) (affirming district court's denial of a motion to reconsider that asserted excusable neglect on the basis of the movants' "general financial difficulties in paying its retained counsel"); *McDermott v. Mayes (In re Mayes)*, No. 18-04401, 2019 WL 1087888, at *1 (Bankr. E.D. Mich. Mar. 6, 2019) (holding that a debtor's inability to afford an attorney does not constitute excusable neglect); *Middle Mkt. Fin. Corp. v. D'Orazio*, No. 96 CIV. 8138 (SWK), 2000 WL 783068, at *2–3 (S.D.N.Y. Jun. 8, 2000) (holding, in an advisory opinion, that plaintiff's inability to afford counsel after withdrawal of prior counsel did not constitute excusable neglect); *Cincinnati Specialty Underwriters Ins. Co. v. Albuquerque Navajo Lodge 863 I.B.P.O.E. of W.*, No. 15-572 KG/WPL, 2016 WL 9444447, at *2 (D.N.M. June 17, 2016), *aff'd* 687 F. App'x 778 (10th Cir. 2017) ("[m]oreover, the mere fact that [defendant] could not afford an attorney to defend against this lawsuit does not constitute excusable neglect"); *but see Lowery v. Hoffman*, 188 F.R.D. 651, 655 (M.D. Ala. 1999) (excusable neglect found where *pro se* defendant defaulted on tort and breach of contract claims after co-defendant assured defendant that he was not a party to the litigation.)  Mr. Shams has not alleged that he was unaware of the appeal deadline.  He has cited to alleged financial obstacles that might have affected his ability to pay counsel to make an energetic pursuit of an appeal, but those are not excuses for his failure to file the notice of appeal itself on a timely basis.

Third, Mr. Shams actually did not need counsel in order to file his notice of appeal.  The notice of appeal that he did file on March 5 was filed *pro se*.  There is no discussion in the papers as to why such a *pro se* notice could not have been filed earlier.  The alleged obstacles to the filing (a lack of financial resources and a lack of counsel) had not changed by March 5, and they did not prevent Mr. Shams from filing a notice of appeal on March 5.  If they did not prevent a filing on

11

March 5, there is no good reason why they should have prevented a timely filing during the ordinary 14-day appeal period.

This case is unlike *Lowery, supra*, 188 F.R.D. 651, in which excusable neglect was found after a movant was affirmatively misled by someone else as to what the law required. There is no contention that Mr. Shams was unaware of the 14-day appeal deadline, and nothing in the record suggests that anyone misled Mr. Shams about the manner in which a notice of appeal could be filed. It is possible that, as an individual and a non-attorney, Mr. Shams was confused as to how he should proceed. But even if he was confused, letting the 14-day deadline expire was hardly the right way to proceed. Mr. Shams had counsel of record who was obliged to act on his behalf and to answer his questions about an appeal and how to initiate one, and the record shows clearly that in fact counsel was willing to file the notice of appeal that Mr. Shams ultimately decided to file. Ignorance of the law is not generally an excuse for a missed deadline for the filing of a notice of appeal, *see Merriweather v. Wilkinson*, 83 F. App'x 62, 64 (6th Cir. 2003), and it falls particularly short of "excusable neglect" where (as here) the party actually was represented by counsel at the relevant time.

**Factor 4  (Whether the Movant Acted in Good Faith)**

There is one glaring contradiction in Mr. Shams's argument. Despite alleging that his lack of funding and lack of counsel somehow prevented him from filing a timely notice of appeal, he ultimately did file a notice of appeal without any resolution of those alleged obstacles. While that might constitute grounds for further inquiry as to Mr. Shams's good faith, it is not necessary to pursue such an inquiry at this time. It appears clear to me, based on the foregoing discussion, that Mr. Shams's delay would not be attributable to "excusable neglect" even if I were to assume that he acted in good faith.

I have discretion to balance the *Pioneer* factors, so long as I give primary weight to the third factor in accordance with the Second Circuit authorities. In my judgment the lack of a good reason for delay, and the fact that what happened was entirely under the control of Mr. Shams, show that Mr. Shams's failure to file a timely notice of appeal was not due to "excusable neglect." I note that under the applicable case law Mr. Shams's failure to identify a good and sufficient excuse for the missed deadline is sufficient grounds for the denial of relief, even if all of the other factors weigh in his favor. *See Williams*, 391 F.3d at 417 (holding that even if the other factors favored relief, a failure to satisfy the third *Pioneer* factor justified the denial of a motion for relief from the consequences of a missed deadline based on alleged "excusable neglect").

I find that Mr. Shams has not satisfied his burden of establishing that his failure to file either a timely notice of appeal or a timely request for an extension of the appeal period was the result of excusable neglect. I will therefore enter an order denying the Motion to Extend.

Dated: New York, New York
April 3, 2020

<u>s/Michael E. Wiles</u>
Honorable Michael E. Wiles
United States Bankruptcy Judge

13